# EXHIBIT C
# Founders Complaint

UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK

FOUNDERS EQUITY SBIC I, L.P and : 
FEF MANAGEMENT SERVICES, LLC :

                  Plaintiffs, : Civ. A. N **06 CV 13216**

      v. : **ECF CASE**

                        : COMPLAINT

UNITED RESOURCE RECOVERY :
CORPORATION and CARLOS :
GUTIERREZ, :

                 Defendants. :

RECEIVED
NOV 14 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs, Founders Equity SBIC I, L.P. and FEF Management Services, LLC, by way of complaint against defendants United Resources Recovery Corporation and Carlos Gutierrez state as follows:

### THE PARTIES

1.    Plaintiff Founders Equity SBIC I, LP ("Founders") is a private equity investment fund (the "Fund") that operates as a Small Business Investment Company ("SBIC"). Founders is a Delaware Limited Partnership with its principal place of business located at 711 Fifth Avenue, Fifth Floor, New York, New York.

2.    Plaintiff FEF Management Services, LLC ("FEF") is the management company for the Fund. FEF is a Delaware Limited Liability Company with its principal place of business located at 711 Fifth Avenue, Fifth Floor, New York, New York. FEF is an affiliate of Founders and, pursuant to the letter of intent at issue in this action, was to receive Three Hundred Seventy-Five Thousand Dollars ($375,000) for work it performed with regard to the Transaction (as defined below).

3.     Defendant United Resources Recovery Corporation ("URRC") is a South Carolina corporation with its principal place of business located at 5396 N. Blackstock Road, Spartanburg, South Carolina.  URRC is a process technology company engaged in two lines of businesses:  (1) the reclamation of polyethylene terepthalate ("PET"), the substance in most soft drink bottles, from used beverage bottles; and (2) the reclamation of PET and silver from used film (primarily medical x-rays).

4.     Defendant Carlos Gutierrez is an individual who resides at 170 Knighton Road, Spartanburg, South Carolina.

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between New York corporations and a citizen and corporation of a foreign State, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     This Court has personal jurisdiction over URRC because URRC has had systematic and ongoing contacts with the State of New York, which include, but are not limited to, transacting business in the State of New York; soliciting substantial business from New York customers such as Pepsi Co. and Coca-Cola; retaining a financial advisor, John Kohut, located in the State of New York; and soliciting financing from New York residents.  This Court also can exercise specific personal jurisdiction over URRC because URRC's officers and directors traveled to New York on various occasions to negotiate the letter of intent and various agreements contemplated thereby that are at issue in this litigation.

7.     This Court has personal jurisdiction over Carlos Gutierrez because, among other things, Mr. Gutierrez traveled to New York on numerous occasions to (a) negotiate the letter of intent and various agreements contemplated thereby that are at issue in this matter, and

-2-

(b) meet with potential co-investors in URRC. Mr. Guiterrez also committed tortious acts in the State of New York, and without the state, that resulted in an injury that was suffered in New York.

## VENUE

8.      Venue in this Court is proper under 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York and/or the defendants are subject to personal jurisdiction in the Southern District of New York.

## FACTS

9.      In 2002, defendant URRC and Founders (collectively the "Parties") engaged in exploratory discussions about Founders making a capital investment in URRC that would fund URRC's UnPet Recycling expansion program (the "Transaction").

10.      Between November 2004 and June 2005, the Parties' discussions grew more serious and on or about July 15, 2005, the Parties decided to enter into a formal letter of intent ("LOI") relating to the Transaction. Attached as Exhibit A is a true and accurate copy of the Parties' LOI.

11.      The original LOI memorialized the Parties' understanding of the agreed-upon material terms of the investment Founders would make in URRC.

12.      Under the terms of the original LOI, Founders and its affiliates proposed to invest $15 million in capital to fund an expanded UnPet Recycling program for URRC.

13.      Upon completion of the Transaction, the Parties agreed that Founders would own a 62.5 % fully diluted equity interest in URRC (i.e., 1,500,000 newly issued common shares) and URRC's existing shareholders would retain a 37.5% equity interest in URRC (i.e., 900,000 common shares).

-3-

14.     Under the LOI, the Parties agreed that following the closing of the Transaction, URRC would incorporate a subsidiary for the purpose of pursuing international licensing opportunities. URRC's existing shareholders would own 20% of this international subsidiary and URRC would own the remaining 80% of the subsidiary.

15.     Under the licensing agreement with URRC, the subsidiary would have the exclusive right to use URRC's intellectual property, including know how, for its patented UnPET and Hybrid UnPET technology solely for purposes of pursuing international licensing opportunities.

16.     Under the LOI, the Parties agreed upon a Board of Directors structure for URRC.  Under this structure, seven (7) directors would comprise URRC's Board, with Founders having the right to appoint four (4) directors and URRC having the right to appoint the remaining three (3) directors.

17.     Under the LOI, FEF was to receive a $375,000 management fee for leading the investment, performing due diligence and securing other institutional investors to participate in the Transaction.

18.     Although the material terms of the Transaction were already agreed upon, the Transaction was subject to certain conditions that had to be satisfied before a closing could occur.

19.     In order to satisfy the conditions under the LOI, the Parties also agreed to an exclusivity period provision in which the Parties had ninety (90) days to "complete due diligence, to negotiate and execute definitive documentation and to close the transaction."

20.     Under this exclusivity period provision, the Parties further agreed that neither URRC, its affiliates nor its advisors "would initiate discussions or engage in due

diligence correspondence with respect to an equity investment in [URRC] with any party other than Founders."

21.     In a "Note" provision, the LOI made clear that the expense, confidentiality and exclusivity provisions were fully binding and the other provisions of the LOI would be negotiated and incorporated in definitive agreements that contained "the usual representation, warranties, conditions and covenants for this type of transaction."

22.     Following execution of the LOI, Founders engaged in substantial business, legal, financial and technical due diligence and the Parties instructed their respective legal counsel to draft various definitive agreements contemplated by the LOI.

23.     In the early part of due diligence, Founders' counsel advised URRC's counsel that the receipt by the existing shareholders of 20% of the international subsidiary would likely create a taxable event for URRC's existing shareholders.  URRC recognized this taxable event and indicated a desire to work with Founders and its counsel to identify a solution or alternatives to minimize or eliminate the tax consequences to the shareholders.

24.     Ultimately, the Parties were unable to finish due diligence and URRC was not able to satisfy all the conditions outlined in the LOI in order to close the Transaction within the original exclusivity period.

25.     On November 1, 2005, the Parties extended the LOI and specifically the exclusivity period until the close of business on December 31, 2005.  Attached as <u>Exhibit B</u> is a true and accurate copy of the Parties' November 1, 2005 letter agreement.

26.     The November 1, 2005 letter agreement extending the LOI stated, in relevant part, that "the [LOI] remains in full force and effect."

-5-

27.     In reliance on the LOI and based on the due diligence that was performed, on or about November 5, 2005, Founders circulated a confidential detailed investment committee memorandum to potential co-investors in the Transaction.

28.     The investment committee memorandum outlined the material terms set forth in the LOI and reaffirmed by the Parties' November 5, 2004 letter agreement.

29.     At or about the same time that the investment committee memorandum was being prepared, the Parties learned that the Transaction closing would need to be delayed due to delays in URRC obtaining an environmental air permit from the South Carolina Department of Health and Control (the "DHEC") for the construction of a plant to expand its UnPet recycling operations.

30.     Upon information and belief, URRC used the LOI as leverage to obtain the DHEC permit on an expedited basis.  It also used the LOI to show Coca-Cola (its largest customer) it had funding to begin construction on a plant to expand its UnPet recycling program.

31.     URRC and Founders agreed to work through the permitting issue and other issues related to due diligence.  At the time, URRC indicated that approval for the DHEC permit would be received no later than February 2006.  Due to a number of delays, however, actual approval did not occur until August 2006.

32.     While waiting for the permit and the completion of due diligence, the Parties agreed to further extend the LOI and the exclusivity provision.

33.     By letter agreement dated December 31, 2005, the Parties agreed to a further extension of the exclusivity period from December 31, 2005 until the close of business on February 17, 2006.  See Exhibit C.  The letter agreement extending the LOI again stated, in relevant part, that "the [LOI] remains in full force and effect."

-6-

34.    On February 17, 2006, the Parties agreed to an additional extension of the exclusivity period until the close of business on March 31, 2006. See Exhibit D. The letter agreement extending the LOI again stated, in relevant part, that "the [LOI] remains in full force and effect."

35.    After March 31, 2006, the Parties continued to engage in due diligence and Carlos Gutierrez gave Founder's managing member J.D. White oral assurances that the LOI and exclusivity provisions were in full force and effect and that URRC would proceed to closing.

36.    Founders attempted to memorialize Mr. Gutierrez's oral assurances in writing. Finally, by letter agreement dated May 23, 2006, the Parties reinstated the exclusivity period and extended this period until June 2, 2006. See Exhibit E.

37.    Unlike the prior amendments, the May 23rd amendment to the LOI permitted URRC to speak with Coca-Cola about the "status of the Company's obligations of exclusivity to Founders and the plan of action of the Company and Founders to address material outstanding issues during such period." It did not permit URRC to negotiate with Coca-Cola over alternate or competing sources of financing.

38.    Through the May 23rd amendment, Founders and URRC agreed that the LOI continued to represent the terms of the proposed transaction between Founders and URRC.

39.    During the period of time that the LOI and exclusivity provision were being extended, Founders incurred great expense to (a) undertake business, technical, financial and legal due diligence, (b) visit and inspect URRC's UnPet plant in Mexico, and (c) secure investment partners through FEF to insure the $15 million equity investment was in place to complete the Transaction. During this same period, Founders was unable to pursue other business opportunities.

-7-

40.     While the Parties were working on due diligence and waiting for issuance of the DHEC permit, URRC was breaching the exclusivity provision in the LOI by, among other things, engaging in discussions and negotiations with Coca-Cola, Southeastern Container, and NTR plc over potential equity investments in URRC operations.

41.     Carlos Gutierrez represented to Founders representative Roger Vincent that the discussions with Coca-Cola were solely to explain the planned UnPet recycling program expansion and retain Coca-Cola as a URRC customer following the Transaction.

42.     During the summer of 2006, while URRC was negotiating with Coca-Cola, Southeastern Container, and NTR plc about equity investments, it was still acknowledging to Founders its exclusivity obligation and its commitment to close the Transaction in accordance with the terms in the LOI.

43.     On June 9, 2006, Founders sent URRC a Signing/Closing/Funding Proposal memorandum that evidenced the Parties would close the transaction in accordance with the material terms outlined in the LOI. Attached hereto as <u>Exhibit F</u> is a true and accurate copy of Founders' Signing/Closing/Funding Proposal memorandum.

44.     The June 9, 2006, Signing/Closing/Funding Proposal memorandum recognized three timing scenarios, all of which revolved around the issuance of the DHEC permit, on when the Transaction would close: (1) within 30 days, (2) between 30 and 90 days, (3) between 90 and 180 days.

45.     Among other things, the Founders' Signing/Closing/Funding Proposal memorandum states that the Parties would "negotiate in good faith to resolve any outstanding business issues" and "work in good faith towards [s]igning [a Definitive Stock Purchase

PR: #545487 v1 (BR.7R01!.DOC)

Agreement] at the earliest practicable, mutually agreed upon date, currently estimated to be between June 30th and July 15th.

46.    The June 9, 2006 Signing/Closing/Funding Proposal memorandum also stated that if the terms and closing scenarios were acceptable, URRC shall indicate acceptance of those terms by executing an exclusivity period extension.

47.    Upon URRC's execution of the extension, the June 9, 2006 Signing/Closing/Funding Proposal memorandum recognized that the Parties would provide the business terms in the LOI and memorandum to their respective counsel who would "draft definitive documents and to negotiate amongst themselves in good faith to document, as required, the intent of the business terms."

48.    URRC agreed to the terms of the June 9, 2006 Signing/Closing/Funding Proposal memorandum by executing a further extension of the exclusivity period by letter dated July 12, 2006. This letter agreement extended the exclusivity period through August 18, 2006. Attached as Exhibit G is a true and accurate copy of the Parties' July 12, 2006 letter agreement.

49.    The July 12th amendment to the LOI permitted URRC to participate in due diligence with Coca-Cola and NTR plc. It did not permit URRC to negotiate with Coca-Cola or NTR over alternate or competing sources of financing.

50.    Carlos Gutierrez represented that URRC would speak with NTR for the sole purpose of discussing a waste management acquisition and ascertaining whether NTR wanted to be a co-investor in the Transaction with Founders.

51.    Upon information and belief, URRC used Founders' equity investment model during its discussions with Coca-Cola and NTR.

52.     Through the July 12th amendment to the LOI, URRC represented that the LOI continued to represent the terms of the proposed transaction between Founders and URRC.

53.     Between July 12, 2006 and August 18, 2006, the Parties resolved the DHEC permit issue as URRC learned that it would be approved for an environmental air permit. Shortly after learning of the approval, URRC actually received the environmental air permit.

54.     Upon learning about the DHEC permit, Founders agreed to provide the financing outlined in the LOI, notwithstanding the fact that the DHEC permit issuance could be appealed.

55.     Between July 12, 2006 and August 18, 2006, after URRC had obtained its DHEC permit and begun discussions with Coca-Cola and NTR, Gutierrez raised the URRC shareholder tax issue related to the international subsidiary as an issue that required resolution prior to closing.

56.     This tax issue, however, was not an issue for Founders or URRC; instead, it was an issue for URRC existing shareholders and Mr. Gutierrez (as URRC's largest shareholder) in particular.

57.     Even though it was under no obligation to do so, Founders offered to eliminate the tax issue by proposing an equity split that was more attractive to the URRC shareholders in return for doing away with the international subsidiary concept.

58.     After the DEHC permit had been issued and URRC had breached the exclusivity provision by negotiating with Coca-Cola and NTR, Carlos Gutierrez began to make demands for material changes to the terms of the Transaction outlined in the LOI.

59.     Among other things, Mr. Gutierrez wanted to completely renegotiate the 62.5% to 37.5% equity split that had already been established and agreed upon.

-10-

60.     Although the exclusivity provision had expired, Founders continued to negotiate in good faith in an attempt to finalize the definite agreements and close the Transaction. After August 18, 2006, Founders continued to review the definitive agreements, to negotiate employment agreements and to analyze the Coca-Cola pricing and supply agreement, to complete due diligence, and began to prepare an incentive stock option plan at URRC's request.

61.     At or about this same time, Founders' Managing Member, JD White, offered to restructure the equity split from 62.5% to 37.5% to 60% to 40% in an effort to close the Transaction and eliminate any tax issues with the international subsidiary.

62.     Mr. Gutierrez, however, continued to delay and seek concessions that were never contemplated under the original deal as reaffirmed by the parties five times. Among these new demands, was his self-serving insistence on a guaranteed five-year employment agreement for himself. This demand for a guaranteed employment agreement was unreasonable because it contemplated a salary above market standards and it bound the company to Mr. Gutierrez for five years.

63.     On October 23, 2006, after (a) stringing Founders along for more than eighteen (18) months, (b) using the LOI to stabilize its relationship with Coca-Cola, and (c) using Founders' investment model to shop for other alternative sources of financing, URRC refused to move forward with the Transaction.

64.     On this same date, at a meeting in New York City, Carlos Gutierrez represented to representatives of Founders and certain co-investors that the equity split agreed to under the original LOI and reaffirmed by five subsequent letter agreements, had "always been"

-11-

an issue to him from day one and he was never interested in going forward with the Transaction under that equity split.

65.     On this same date, Founders reaffirmed its position that it was prepared to close the transaction under the existing terms of the LOI or slightly adjust the equity ownership to 60% to 40% and eliminate the international subsidiary.

## FIRST CAUSE OF ACTION – BREACH OF DUTY TO NEGOTIATE IN GOOD FAITH

### (URRC)

66.     Founders and FEF re-allege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

67.     The LOI signed by both Parties on July 15, 2005, the subsequent amendments thereto and the June 9, 2006 Signing/Closing/Funding Proposal memorandum, established both expressly and impliedly a preliminary commitment to close the Transaction pursuant to the terms in the LOI, which obligated the Parties to negotiate in good faith toward execution of definitive agreements.

68.     Defendant URRC breached that preliminary commitment by failing to negotiate in good faith. In particular, URRC breached that agreement by, among other things:

  a.     Insisting on an equity split that was far different than that outlined and agreed to in the LOI and amendments thereto;

  b.     Having discussions with others (including Coca-Cola, Southeastern Container and NTR) about alternate forms of equity investments and using Founders' financial model for the Transaction during those negotiations;

-12-

c.   Inducing Founders to perform certain obligations without any
     intent to close.

69.   Unlike defendant URRC, at all times Founders fulfilled its obligation to
negotiate in good faith from the initial execution of the LOI through October 23, 2006, as
evidenced by its continued willingness to proceed to closing and by engaging professionals and
consultants to undertake business, legal, financial and technical due diligence.

70.   At all times, Founders remained ready, willing, and able to execute
definitive agreements consistent with the terms of the LOI, the amendments thereto and the June
9, 2006 Signing/Closing/Funding Proposal memorandum.

71.   In addition, even though some of the conditions outlined in the LOI could
not be satisfied by URRC, Founders was nevertheless willing waive this conditions and proceed
with the Transaction and honor the economics of the Transaction.

72.   As a result of URRC's failure to negotiate in good faith, Founders and/or
FEF have suffered damages in excess of $750,000 which include expenses it incurred for legal
fees, consultant fees, travel expenses, business due diligence and lost management fees.

WHEREFORE, Founders and FEF respectfully request that the Court grant it the
following relief:

a.   entry of judgment against URRC awarding Founders and FEF
     compensatory damages in an amount to be determined at trial;

b.   entry of judgment against URRC awarding Founders and FEF
     reasonable attorney's fees, costs and interest associated with
     pursuing the claims in the Complaint; and

-13-

      c.      entry of judgment against URRC awarding Founders and FEF such

other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION – BREACH OF LOI EXCLUSIVITY PROVISION

### (URRC)

73.     Founders and FEF re-allege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

74.     Founders and URRC agreed upon and executed an LOI and amendments thereto that expressly recognized that the exclusivity provision in the LOI was "binding."

75.     The exclusivity provision contained in the LOI stated in relevant part:

> The Company shall provide Founders a ninety-day period of exclusivity to complete due diligence, to negotiate and execute definitive documentation and to close the transaction. During this exclusivity period, neither the Company nor its affiliates and advisors shall initiate discussions or engage in due diligence correspondence with respect to an equity investment with any party other than Founders.

76.     Although the May 23rd amendment to the LOI permitted URRC to speak with Coca-Cola and the July 12th amendment to the LOI permitted URRC to speak with both Coca-Cola and NTR, these provisions did not permit URRC to negotiate with Coca-Cola and NTR about alternate or competing sources of financing.

77.     The May 23rd amendment only permitted URRC to have discussions with Coca-Cola Company and its affiliates to "advise them of the status of the Company's obligations of exclusivity to Founders and the plan of action of Company and Founders to address material outstanding issues during such period."

78.     The July 12th amendment noted that the exclusivity restriction did not apply to "due diligence the Company participate[d] in with Coca-Cola or NTR or their affiliates."

79.     As set forth in detail above, URRC breached this express exclusivity provision by, among other things, engaging in negotiations with NTR, Coca-Cola and Southeastern Container over a capital investment in URRC.

80.     URRC's discussions with NTR, Southeastern Container and Coca-Cola resulted in URRC refusing to honor the terms of the Transaction set forth in the LOI.

81.     As a result of URRC's breach of the exclusivity provision, Founders and FEF suffered damages.

WHEREFORE, Founders and FEF respectfully request that the Court grant it the following relief:

    a.     entry of judgment against URRC awarding Founders and FEF compensatory damages in an amount to be determined at trial;

    b.     entry of judgment against URRC awarding Founders and FEF reasonable attorney's fees, costs and interest associated with pursuing the claims in the Complaint; and

    c.     entry of judgment against URRC awarding Founders and FEF such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### (Gutierrez)

82.     Founders re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

-15-

83.    At all relevant times, defendant Gutierrez was the President, Chairman of the Board, and the largest shareholder of URRC.

84.    Defendant Gutierrez owns approximately 309,600 shares of URRC stock which represents a 34.4% ownership interest.

85.    At all relevant times, defendant Gutierrez was aware of the LOI and URRC's and Founders' obligations thereunder.

86.    Despite this knowledge, Gutierrez, without justification, and for his own personal gain and benefit, wrongfully and improperly interfered with Founders' contractual relationship with URRC by preventing URRC from negotiating in good faith and proceeding to closing on the Transaction.

87.    As a result of these wrongful and improper actions, defendant Gutierrez destroyed the contractual relationship between Founders and URRC and caused Founders and FEF to suffer damages.

WHEREFORE, Founders respectfully requests that the Court grant it the following relief:

        a.    entry of judgment against Gutierrez awarding Founders compensatory damages in an amount to be determined at trial;

        b.    entry of judgment against Gutierrez awarding Founders reasonable attorney's fees, costs and interest associated with pursuing the claims in the Complaint; and

        c.    entry of judgment against Gutierrez awarding Founders such other and further relief as this Court deems just and proper.

-16-

## FOURTH CAUSE OF ACTION - TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC RELATIONSHIP

### (Gutierrez)

88.     Founders and FEF re-allege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

89.     At all relevant times, defendant Gutierrez was aware that Founders and FEF had a prospective economic relationship with URRC as evidenced by the LOI.

90.     Despite this knowledge, defendant Gutierrez, without justification, and for his own personal gain and benefit, wrongfully and improperly acted outside the scope of his employment and interfered with Founders' and FEF's prospective contractual relationship with URRC by refusing to allow URRC to move forward with closing the Transaction.

91.     Gutierrez also interfered with Founders' and FEF's prospective contractual relationship by, among other things, misrepresenting to Founders on or about July 15, 2005, that the equity split contemplated under the LOI was acceptable, when in reality he never intended to close the Transaction in accordance with the equity split establish in the LOI and reaffirmed in the amendments thereto.

92.     Gutierrez's sole purpose in interfering with Founders' and FEF's prospective contractual relationship was to harm Founders and FEF and exact personal concessions from Founders for himself.

93.     As a result of these tortious actions, Gutierrez destroyed Founders' and FEF's prospective contractual relationship with URRC and caused Founders and FEF to suffer damages.

WHEREFORE, Founders and FEF respectfully request that the Court grant it the following relief:

-17-

a.  entry of judgment against Gutierrez awarding Founders and FEF compensatory damages in an amount to be determined at trial;

b.  entry of judgment against Gutierrez awarding Founders and FEF reasonable attorney's fees, costs and interest associated with pursuing the claims in the Complaint; and

c.  entry of judgment against Gutierrez awarding Founders and FEF such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION – FRAUD

### (Gutierrez)

94.  Founders re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

95.  At various times between July 15, 2005 and July 12, 2006, including but not limited to on July 15, 2005, November 1, 2005, December 31, 2005, February 17, 2006, and July 12, 2006, defendant Gutierrez represented to JD White, Roger Vincent and other representatives of Founders, in writing and orally, that the 62.5% to 37.5% equity split related to the Transaction was acceptable to him as URRC's largest shareholder and President of URRC.

96.  At these same times and also in June 2006 at a meeting in New York City, Gutierrez made representations to JD White, Roger Vincent and others representatives of Founders that URRC intended to proceed with the Transaction with a 62.5% to 37.5% equity split and sign definitive agreements that would, inter alia, reflect the terms of the LOI.

97.  At the time he made these representations about his and URRC's intent to proceed with the Transaction, Gutierrez knew that the representations were false and that he had no present intention of proceeding with a Transaction involving a 62.5% to 37.5% equity split.

-18-

98.     Gutierrez confirmed the falsity of his representations and his intent never to proceed with the Transaction at an October 23, 2006 meeting at Founder's offices in New York City, when he represented to JD White, Roger Vincent, Warren Harden and others that the equity split was always an issue for him and URRC from day one.

99.     Founders reasonably relied to its detriment upon Gutierrez's representations about proceeding with the Transaction and retained consultants, attorneys, and accountants to engage in due diligence and to draft definitive agreements related to the Transactions.  To this end, Founders incurred in excess of $430,000 in fees and expenses in pursuing a Transaction that Gutierrez had no intention of ever allowing to proceed.

100.     As a result of Gutierrez's misrepresentations, Founders suffered damages:

WHEREFORE, Founders respectfully requests that the Court grant it the following relief:

a.     entry of judgment against Gutierrez awarding Founders compensatory damages in an amount to be determined at trial;

b.     entry of judgment against Gutierrez awarding Founders reasonable attorney's fees, costs and interest associated with pursuing the claims in the Complaint; and

PR: #548487 v1 (BR7R011.DOC)

c.   entry of judgment against Gutierrez awarding Founders such other

and further relief as this Court deems just and proper.

Dated:  November 10, 2006

_____

Angelo A. Stio III [AS 7880]
PEPPER HAMILTON LLP
300 Alexander Park
Princeton, NJ 08543-5276
(609) 452-0808
(fax) (609) 452-1147


Attorneys for Founders Equity SBIC I, LP
and FEF Management Services, LLC


To:   Carlos Gutierrez
      170 Knighton Road
      Spartanburg, SC  29302

      United Resources Recovery Corporation
      5396 N. Blackstock Road
      Spartanburg, SC  29302

# EXHIBIT A

# Founders

Founders Equity is pleased to present this proposal for an investment in United Resource Recovery Corporation ("URRC" or the "Company"). We are interested in the prospects for the Company and forward to working with you and your team to maximize the Company's potential.

This letter ("Letter of Intent"), upon your execution and return hereof, will confirm our understanding relating to the proposed investment by Founders Equity SBIC I, L.P. and its affiliates ("Founders") in the Company. Subject to the terms and conditions set forth in this Letter of Intent and to be set forth in any definitive agreements to be prepared, our understanding is as follows:

| | |
|---|---|
| **Transaction:** | The Company is seeking a financial partner to invest $15.0 million in capital to fund the acquisition, expansion and/or conversion of the Polkton plant ("Polkton") and to finance an ongoing UnPet Recycling expansion program. |
| **Issuer:** | United Resource Recovery Corporation and its affiliates |
| **Investor(s):** | Founders and other institutional investors to be determined (collectively referred to as "Investors" or "Investor Group"). |
| **Amount:** | $15.0 million |
| **Instrument:** | Series A Participating Convertible Preferred Stock (the "Preferred Stock"). Each Share of Preferred Stock shall convert into one share of common Stock. |
| **Conversion Price:** | $10.00 per share |
| **Capitalization:** | At Closing and prior to funding, the Company will have 900,000 shares of fully diluted common stock issued and outstanding. The pre and post financing structure are as follows: |

| Pro-forma Ownership | Pre-Financing | | Post-Closing | |
|---|---|---|---|---|
| Investor Group Preferred | - | | $15,000,000 | |
| **% of Fully Diluted Common** | **%** | **Shares** | **%** | **Share** |
| Investor Group Common Stock Equivalent | 0.0% | - | 62.5% | 1,500,000 |
| URRC Shareholders, Common | 100.0% | 900,000 | 37.5% | 900,000 |
| Total | 100.0% | 900,000 | 100.0% | 2,400,000 |

# Founders

**International
Subsidiary:** Prior to closing it is understood URRC will incorporate a subsidiary for the purpose of pursuing international licensing opportunities. The subsidiary will have the exclusive right to use the Company's intellectual property, including, know how, for its patented UnPET and Hybrid UnPET technology, as such process shall be modified and updated from time to time, solely for the purpose of pursuing international licensing opportunities. Ownership of the intellectual property will remain with URRC. The ownership of this subsidiary company shall, at the time of closing be 80% by URRC and 20% by an investor group identical to the pre-closing ownership of URRC.

**Closing Conditions:** The investment is subject to customary conditions including, to Founders sole satisfaction:

1) the completion of business, accounting, technical and legal due diligence;
2) the completion of an audit and review of the Company's financial statements for the years ended December 31, 2004 and 2003;
3) an agreement to prepare a strategic plan after the closing;
4) an agreement to acquire Polkton or other acceptable facility;
5) an indication of terms for debt financing;
6) an agreement to supply a minimum of 40 million pounds of UnPET to either PEPSICO of KO;
7) the negotiation and execution of definitive documentation;
8) no material adverse changes in the business or its prospects before closing;
9) the Company being operated in the ordinary course, which means no material asset sales, dividends, distribution to shareholders, etc, other than permitted exceptions to be disclosed by the Company and mutually agreed upon;
10) the mutually satisfactory negotiation and execution of employment, compensation, confidentiality, proprietary rights, non-compete and no-hire agreements being signed by key management;
11) an understanding for the creation post-closing of a management incentive and retention program;
12) Founders' ability to attract an institutional co-investor(s) for up to $7.5 million of the committed capital; and
13) the establishment of sufficient business and key person insurance.

**Dividend Rate:** The Preferred Stock shall have an 8.0% cumulative dividend payable in cash or in-kind at the Company's option.

**Stock Option Plan:** Post-closing, the Board of Directors will implement an employee stock incentive plan for issuance to management and key employees.

**Voting Rights:** The Preferred Stock will have one vote per share on an as converted basis.

**Liquidation
Preference:** In the event of a liquidation, the Preferred holders shall be entitled to receive, in preference to the holders of Common Stock, an amount

# Founders

payable equal to the original issue price plus any undeclared, accrued and unpaid dividends. This amount payable can be in the form of cash and/or securities at the option of the Preferred holder. A consolidation or merger of the Company, an IPO, or the sale of all or substantially all of the Company's assets, shall be treated as a liquidation.

**Participation with Stock:**

Upon payment of the Liquidation Preference, Preferred Holders shall participate with the Common Shareholders on an as converted basis. If within five (5) years the Preferred Shareholders can convert their shares and the net proceeds exceeded a 36% internal rate of return, the Preferred Shareholders will be required to convert one fifteenth (1/15) of their shares rather than liquidate and participate on a converted basis. For each additional percentage of internal rate of return the Preferred Shareholders will be required to convert an additional one fifteenth (1/15) of their shares rather than liquidate and participate on a converted basis. Once the internal rate of return exceeds 50%, all of the shares will be required to be converted.

**Conversion:**

The holders of the Preferred may convert shares into common stock on a one to one basis at any time.

**Redemption:**

Subject to tax counsel review, the Company shall redeem 100.0% of the Preferred Stock on the sixth anniversary of the Closing at the original purchase price plus any undeclared and accrued dividends.

**Shareholders Agreement:**

The Investor Group, URRC's current shareholders, and the Company shall enter into a Shareholders Agreement, which will include Preemptive Rights, co-sale and piggyback rights, and agreement to sell provisions.

**Protective Provisions:**

The Preferred Stock will have customary super majority protective provisions.

**Registration Rights:**

Holders of the Preferred Stock purchased through this financing shall be entitled to two demand registrations exercisable at any time after the fifth anniversary of Closing or six months after the Company's initial public offering. Holders of the Preferred Stock as converted shall be entitled to unlimited piggyback and S-3 registration rights. All registrations will be at the Company's expense and will be subject to customary cutbacks at the underwriter's discretion.

**Compliance with SBIC Regulations:**

The Structure of the investment must comply with the laws and regulations governing Small Business Investment Companies.

# Founders

**Board of Directors:** The Board of Directors shall be comprised of seven (7) members. The Investor Group shall have the right to appoint the majority of the Board of Directors. Current Management shall have the right to appoint three Board members. Upon the first Closing, the Board shall form an Audit Committee and Compensation Committee. It is our mutual understanding that some Directors will be independent outsiders with relevant expertise.

The Board shall meet quarterly, or more often if required, with adequate notice provided to all Directors. Certain key strategic decisions, including approval of the budget, issuances of debt or equity, mergers/acquisitions, and transactions with affiliates shall require the approval of a majority of the Company's Board of Directors (the "Requisite Vote"). The Compensation Committee shall approve all compensation decisions for key management. The Investor Group Directors shall comprise a majority of both the Audit and Compensation Committees.

**Board Expenses:** The Company shall reimburse Board members for all reasonable expenses associated with attendance at Board and Committee meetings.

**Information Rights:** The Company shall provide holders of the Preferred with monthly financials not later than 25 days after the close of the month, audited financials not later than 90 days after the close of the fiscal year, and an annual plan (with budget and narrative) no later than 30 days prior to the close of the previous year. In addition, the Company shall provide additional information that may be required under SBIC regulations.

**Key Person Insurance:** The Company shall maintain key person insurance on certain members of management until otherwise determined by the Board of Directors.

**Non-Compete:** Prior to closing, certain employees of the Company will sign non-compete and no-hire agreements, the terms of which must be acceptable to the Investor Group.

**Estimated Legal, Accounting and Consulting Expenses:** Each Party shall pay their legal fees and out of pocket expenses with respect to this transaction prior to the Closing. Founders shall select the firms completing the legal, accounting and strategic reviews. Upon the closing of the Transaction, the Company shall pay the reasonable fees and out of pocket expenses of the Investor Group with respect to this Transaction.

# Founders

| | |
|---|---|
| **Management Fees:** | As compensation for its active participation in the strategic direction and oversight of the Company's activities, the Company shall enter into a financial advisory agreement with an affiliate of Founders for a term of the lesser of, the period the Preferred Stock remains outstanding, five years or as long as a representative of Founders remains on the Company's Board of Directors. The terms of this agreement shall include a fee of $375,000 as it relates to securing other institutional investors and monthly advisory fee not to exceed $15,000 per month (based on hours worked), the reimbursement of reasonable out-of-pocket expenses, plus customary transaction fees associated with future financing or acquisitions. |
| **Exclusivity Period:** | The Company shall provide Founders a ninety-day period of exclusivity to complete due diligence, to negotiate and execute definitive documentation and to close the transaction. During this exclusivity period, neither the Company nor its affiliates and advisors shall initiate discussions or engage in due diligence correspondence with respect to an equity investment in the Company with any party other than Founders. Forty-five days after the signing of this agreement, at the Company's request, Founders will provide an assurance that it is still reasonably confident it intends to close the transaction or Founders will release the Company from the exclusivity provision. |
| **Confidentiality:** | The term sheet is confidential and may not be disclosed to anyone other than representatives of Founders and the Company and their financial and legal advisors. |
| **Termination:** | This Proposal shall expire at 5:00 PM, Friday July 29, 2005 |
| **Approximate Closing:** | On or before three months from the execution of this letter. |
| **Note:** | *This Term sheet, and the proposed terms set forth herein, does not constitute a binding agreement or commitment of Founders or any of its affiliates, except for the expense, confidentiality, and exclusivity provisions. Any agreement or commitment shall only be contained in definitive agreements (containing the usual representation, warranties, conditions and covenants for this type of transaction) to be negotiated, executed and delivered, if at all, after completion of appropriate due diligence and fulfillment of the other conditions referred to above.* |

# Founders

**Founders Equity SBIC I, L.P.  and Founders Equity NY, L.P.**

By

Warren H. Haber
Managing Member of General Partner FEFGP, LLC and
Managing Member of General Partner Founders NYGP, LLC

Date: 7/15/05

**United Resource Recovery Corporation**

By:

Carlos D. Gutierrez
Chief Executive Officer

# EXHIBIT B

# Founders

November 1, 2005

Mr. Carlos D. Gutierrez, President
United Resource Recovery Corporation
5396 N. Blackstock Road
Spartanburg, SC  29303

Re:   Letter of Intent dated July 15, 2005 as amended on September 14,
2005, among Founders Equity SBIC I, L.P., and United Resource
Recovery Corporation  (the "LOI")

Dear Carlos:

By our signatures below, we hereby agree to the following amendments to the LOI.

1. That the end of the Exclusivity Period in the Letter of Intent is hereby extended until the
close of business on December 31, 2005.

Except as herein amended, the Letter of Intent remains in full force and effect.

Very truly yours,

By: _____

Founders Equity SBIC I, L.P.

Agreed To and Accepted By:

_____
Carlos D. Gutierrez, President
United Resource Recovery Corporation

1292257.1

# EXHIBIT C

# Founders

December 31, 2005

Mr. Carlos D. Gutierrez, President
United Resource Recovery Corporation
5396 N. Blackstock Road
Spartanburg, SC  29303

Re: Letter of Intent dated July 15, 2005 as amended on September 14, 2005 and November 1, 2005, among Founders Equity SBIC I, L.P., and United Resource Recovery Corporation  (the "LOI")

Dear Carlos:

By our signatures below, we hereby agree to the following amendments to the LOI.

1. That the end of the Exclusivity Period in the Letter of Intent is hereby extended until the close of business on February 17, 2006.

Except as herein amended, the Letter of Intent remains in full force and effect.

Very truly yours,

By: _____

Founders Equity SBIC I, L.P.

Agreed To and Accepted By:

_____
Carlos D. Gutierrez, President
United Resource Recovery Corporation

1292257.1

# EXHIBIT D

01/2006  14:04     8645740710              URRC                           PAGE  02

# Founders

February 17, 2005

Mr. Carlos D. Gutierrez, President
United Resource Recovery Corporation
5396 N. Blackstock Road
Spartanburg, SC 29303

        Re:    Letter of Intent dated July 15, 2005 as amended on September 14,
                2005, November 1, 2005 and December 31, 2005, among Founders
                Equity SBIC I, L.P., and United Resource Recovery Corporation  (the
                "LOI")

Dear Carlos:

        By our signatures below, we hereby agree to the following amendments to the LOI.

1.  That the end of the Exclusivity Period in the Letter of Intent is hereby extended until the
    close of business on March 31, 2006.

        Except as herein amended, the Letter of Intent remains in full force and effect.

        Very truly yours,

By:

Founders Equity SBIC I, L.P.

Agreed To and Accepted By:

Carlos D. Gutierrez, President
United Resource Recovery Corporation

1292257.1

# EXHIBIT E

May 23, 2006

Mr. Carlos D. Gutierrez, President
United Resource Recovery Corporation
5396 N. Blackstock Road
Spartanburg, SC  29303

Re:    Letter of Intent dated July 15, 2005 as amended on September 14,
       2005, November 1, 2005, December 31, 2005 and February 15, 2006,
       among Founders Equity SBIC I, L.P., and United Resource Recovery
       Corporation (the "LOI")

Dear Carlos:

By our signatures below, we hereby agree to the following amendments to the LOI:

1.    The provision of the Letter of Intent entitled "Exclusivity Period" is amended to read
in full as follows:

> The Company shall provide Founders a period of exclusivity to complete
> due diligence, to negotiate and execute definitive documentation to close
> the transaction. The period of exclusivity shall be reinstated on the date
> hereof and shall continue through June 2, 2006. During this exclusivity
> period, neither the Company nor its affiliates and advisors shall initiate or
> participate in discussions or engage in due diligence correspondence with
> respect to an equity investment in or loan to the Company with any person
> other than Founders. Notwithstanding the generality of the foregoing, the
> Company may have discussions with Coca-Cola Company or its affiliates
> to advise them of the status of the Company's obligations of exclusivity to
> Founders and the plan of action of Company and Founders to address
> material outstanding issues during such period.

2.    Except as herein amended, the Letter of Intent continues to represent the terms of a
proposed transaction between Founders and the Company.

Very truly yours,

By: _____
       Founders Equity SBIC I, L.P.

Agreed To and Accepted By:

_____
A. Gerald Fishbeck, Vice President

United Resource Recovery Corporation

# EXHIBIT F

# Founders

| | |
|---|---|
| **TO:** | **URRC** |
| **FROM:** | **FOUNDERS** |
| **DATE:** | **June 9, 2006** |
| **SUBJECT:** | **Signing/Closing/Funding Proposal** |

## Pre-Signing

- An Exclusivity Extension will be provided by URRC extending exclusivity through July 15, 2006
- Legal diligence (tax and permitting) and definitive documentation to be finalized (the Company and Founders will negotiate in good faith to resolve any outstanding business issues)
- UHY on-site visit: Review of DMS controls and review of 2005 audit work papers
- Due diligence access to management, if requested, by potential co-investors
- Attendance by one investor group representatives at the DHEC June 22nd meeting, and if applicable the July 11th hearing (to be done in coordination with the Company)

## Signing

- Signing means the signing of a Definitive Stock Purchase Agreement
- Parties will work in good faith towards Signing at the earliest practicable, mutually agreed upon date, currently estimated to be between June 30th and July 15th

## Signing to Closing/Funding Period

- Definitive Stock Purchase Agreement to contain customary covenants, including:
- The investor group will have information rights
- There will be no change in the equity structure or corporate governance of the Company
- The Company will be run in the ordinary course

## Conditions to Closing/Funding:

## If Closing + <30 days

- Closing/Funding will happen after confirmed receipt of a Permit (defined below) from DHEC if such confirmation falls with in the period extending 30 days from Signing
- A Permit will be defined as follows:
  - An unconditional permit, issued by DHEC, to allow the building of the contemplated facility
  - Expiration of any additional avenues for review by DHEC or affiliates
  - The written confirmation of the Company's rights to acquire the land required for the contemplated facility on terms substantially similar to those previously disclosed to the investor group

# Founders

- Note: The ability of thirds parties to further contest or appeal the issuance of the Permit and/or the building of the contemplated facility through the legal system shall not interfere with the funding of the transaction

## If Closing + >30 to <90 days

- If confirmed receipt of a Permit falls within the period extending from thirty days post-signing to ninety days post-signing, then closing/funding will happen after:

  - URRC provides the investors with confirmation that the Representations and Warranties (R&W) in the Stock Purchase Agreement are true and accurate on the day of closing/funding in all material respects

  - If there has been a change in the R&W, the Company will provide the investors with an updated disclosure schedule delineating the change

  - If the Company becomes aware of any updates to the R&W during the period between Signing and closing, they will disclose such information with Founders and Founders will begin diligence at such time so as to minimize any delay in funding due to diligence requirements and to provide the Company with assurances as to whether Founders reasonably believes the investors will waive such change to the R&W

  - The investors shall be given reasonable time to diligence any changes to the R&W and may elect to waive them or choose to terminate the agreement

## Closing + 90 days

- Ninety days after signing, the Company will inform Founders if they reasonably expect to receive a Permit and will provide a timeline for such receipt. Investors will have the right to conduct due diligence on the status of the permit

- The Company will provide Founders with an updated R&W with schedules which will be true as of that date

- If the Investors provide the Company with a waiver for any changes to the R&W then the Investors shall have the option to extend the agreements further (the Optional Extension)

- The Investors may elect to exercise the Optional Extension to provide the Company with an additional period extending through the date 180 days after signing to receive a Permit

## If Closing + >90 to <180 days

- If, the Optional Extension is exercised and the Company gets confirmed receipt of a Permit prior to the date 180 days post-signing, then closing/funding will happen after:

  - URRC provides the investors with confirmation that the Representations and Warranties (R&W) are true on the day of funding

  - If there has been a change in the R&W, the Company will provide the investors with an updated disclosure schedule delineating the change

  - If the Company becomes aware of any updates to the R&W during the period between Signing and closing, they will disclose such information with Founders and Founders will begin diligence at such time so as to minimize any delay in funding due to diligence requirements and to provide the Company with assurances as to whether Founders reasonably believes the investors will waive such change to the R&W

# Founders

- ■ The investors shall be given reasonable time to diligence any changes to the R&W and may elect to waive them or choose to terminate the agreement

## Other

- ■ If a closing/funding does not occur under a scenario covered here then the definitive documents shall terminate and the Company and Investors shall have no obligations to each other, unless otherwise agreed to in writing

- ■ If the business terms proposed herein are acceptable to the Company they shall indicate such by promptly providing the Exclusivity Extension

- ■ Upon receipt of the Exclusivity Extension, a copy of these terms shall be provided to the Investors' and the Company's respective counsel who shall be instructed to draft definitive documents and to negotiate amongst themselves in good faith to document, as required, the intent of these business terms

# EXHIBIT G

# **Founders**

July 12, 2006

Mr. Carlos D. Gutierrez, President
United Resource Recovery Corporation
5396 N. Blackstock Road
Spartanburg, SC 29303

        Re:    Letter of Intent dated July 15, 2005 as amended on September 14,
                2005, November 1, 2005, December 31, 2005, February 15, 2006 and
                May 23, 2006, among Founders Equity SBIC I, L.P., and United
                Resource Recovery Corporation (the "LOI")

Dear Carlos:

        By our signatures below, we hereby agree to the following amendments to the LOI.

        1.    The provision of the Letter of Intent entitled "Exclusivity Period" is amended to read
in full as follows:

                The Company shall provide Founders a period of exclusivity to complete
                due diligence, to negotiate and execute definitive documentation to close
                the transaction. The period of exclusivity shall be reinstated on the date
                hereof and shall continue until August 18, 2006. During this exclusivity
                period, neither the Company nor its affiliates and advisors shall initiate
                discussions, consummate a transaction or engage in due diligence
                correspondence with respect to an investment in or exclusivity agreement
                with the Company with any party other than Founders. The foregoing
                restrictions shall not apply to any due diligence the Company participates
                in with Coca-Cola Company or NTR or their affiliates.

        2.    Except as herein amended, the Letter of Intent continues to represent the
terms of a proposed transaction between Founders and the Company.

              Very truly yours,

              By:

              Founders Equity SBIC I, L.P.

Agreed To and Accepted By:

Carlos D. Gutierrez, President
United Resource Recovery Corporation

1031876