# JOHN KOHUT'S AFFIDAVIT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

-----------------------------------------------------------------x

UNITED RESOURCE RECOVERY           :
CORPORATION,
                                   :
           Plaintiff,
                                   :
     -against-                              Civil Action No.
                                   :        7:07-502-HFF
RAMKO VENTURE MANAGEMENT, INC. and
JOHN KOHUT,                        :

           Defendants.             :

-----------------------------------------------------------------:

RAMKO VENTURE MANAGEMENT, INC.,    :

    Counterclaim and Third-Party Plaintiff,  :

           -against-               :

UNITED RESOURCE RECOVERY           :
CORPORATION and
CARLOS GUTIERREZ,                  :

    Counterclaim and Third-Party Defendants.  :

-----------------------------------------------------------------x


**AFFIDAVIT OF JOHN KOHUT**

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

JOHN KOHUT, being duly sworn, deposes and says:

1       I am submitting this affidavit in support of the motion of RamKo Venture Management, Inc. ("RamKo") and myself to transfer this lawsuit from South Carolina to New York City.

2.      I have read the Answer, Counterclaim and Third-Party Claim of RamKo and myself with care and, rather than repeat the background allegations contained therein that are included in the accompanying Memorandum of Law in Support of Defendants' Transfer Motion at pp. 1-8, I hereby affirm that those allegations are true to the best of my knowledge, information, and belief. I wish to emphasize that nearly all of the extensive work I did, as RamKo's principal, for plaintiff United Resource Recovery Corp. ("URRC") over the years from the inception of our dealings in 2001 until this lawsuit was filed in 2007 was performed in New York, from RamKo's offices located in Manhattan.

3.      In fact, when URRC entered into a written agreement with RamKo in mid-2005 pursuant to which URRC finally started to pay RamKo for some (but by no means all) of the work it was doing for URRC, that agreement expressly confirmed the parties' understanding that the services RamKo would provide to URRC in the nature of CFO-type services, would be performed in New York. This location was entirely consistent with the practice that was in place long prior to the time that written agreement was executed, and that remained in place thereafter. A copy of that mid-2005 "Consulting Agreement" is attached hereto as Exhibit A; but I wish to note that this agreement is not in dispute in this case. What is in dispute are the essentially identical services RamKo provided for years before June 2005, for which it has not been paid (and which similarly were provided overwhelmingly from New York); as well as

2

other investment banking services that are expressly excluded from this Consulting Agreement, including the services provided for the Founders deal, as to which nearly all the work and negotiation took place in New York.

4. The fee that RamKo is due in connection with the Founders transaction is a central issue in this case, and the witnesses from Founders are essential to RamKo's ability to prove the predicate of its entitlement to a fee, *i.e.*, that Founders was ready, willing and able to close a deal with URRC on the terms set forth in the parties' Letter of Intent ("LOI"). The Founders witnesses are all located in New York, which is where nearly all of the negotiations of the Founders-URRC transaction took place. Because of the crucial nature of the testimony from Founders witnesses, on March 22, 2007, I spoke to Warren Haber, the senior partner of Founders, and asked him whether he and his colleagues would be willing to testify if a trial were to be held in South Carolina. Mr. Haber responded, in substance, that he could not even speak to me about the issue because he was prohibited from discussing any aspect of the Founders-URRC situation by the terms of an agreement entered into between Founders and URRC pursuant to the settlement of Founders' lawsuit against URRC.

5. The unavailability of Founders' personnel, except by compulsory court process, is a potentially case-determinative issue. Any impediment to the ability of the finder of fact to hear live testimony from the Founders witnesses creates a massive problem in terms of RamKo's ability to prove its case. It is essential that the finder of fact have the benefit of everything that the Founders witnesses have to say, as I anticipate that there will be direct conflicts in the testimony of the Founders witnesses, and the testimony of URRC's CEO, Mr. Gutierrez, concerning the reasons why the Founders deal did not close. In order

for this issue to be fairly evaluated, the finder of fact must have the ability to hear both sides (Founders and URRC) on equal terms.

6. Specifically, there are three Founders witnesses (all of whom work in New York City and live in the New York area) whose testimony would be critical to RamKo's ability to show that Founders was ready, willing and able to close on a deal with URRC on the terms set forth in the parties' LOI (or on terms even more favorable to URRC). Those three people are (a) Warren Haber, senior partner, (b) J.D. White, managing partner, and (c) Roger Vincent, Jr., principal. Each of these witnesses was deeply involved in the negotiations of the Founders-URRC deal and each has a unique perspective on it. Mr. Haber was the overall visionary for the transaction; Mr. White was the person responsible for reducing the deal to legal form; and Mr. Vincent was the point man for due diligence. Each witness interfaced directly with URRC's CEO and COO, and each has knowledge bearing directly on the readiness, willingness, and ability of Founders to close a deal on terms equal to or better for URRC than the terms set forth in the LOI. Based on interactions that I personally witnessed as well as the allegations set forth in Founders' Complaint, filed in Federal Court in New York, in November 2006, against URRC (a copy of which is attached as Exhibit B hereto), I believe that each of these three Founders witnesses would give vital testimony supporting the proposition that URRC reneged on the deal set forth in the LOI because Mr. Gutierrez simply did not want to go through with it on the terms which URRC had agreed upon in the LOI.

7. Another New York area witness, Doug Stern of Plum Tree Capital who was to have been a co-investor with Founders, was present at the final October 2006 meeting between URRC and Founders at which Mr. Gutierrez informed the Founders representatives that his problem with the Founders deal

was the equity split set forth in the LOI, thereby making it explicitly clear that he and URRC were simply reneging on the deal terms to which they had previously agreed. Mr. Stern lives and works in New Jersey, well within 100 miles of the Southern District of New York. Because Mr. Stern and Plum Tree were affiliated with Founders for purposes of the URRC transaction, I presume that the same confidentiality constraints that apply to Founders apply to him as well.

8. I also want to describe the relationship of Adirondack Capital Partners, Inc. ("Adirondack") to RamKo and to this case. When URRC and RamKo entered into a written agreement (later modified by agreement between URRC and RamKo) respecting RamKo's compensation in connection with a potential Founders deal, an agreement respecting a break-up fee was included. That agreement (the "Break-Up Fee Agreement") is attached hereto as Exhibit C. The Break-Up Fee Agreement recites that it is entered into between URRC, on the one hand, and RamKo and its affiliate Adirondack on the other. Adirondack is a separate company that has no common ownership with RamKo. Adirondack was included in this potential transaction because it was a registered broker-dealer. Adirondack, to the best of my knowledge, information, and belief, was and is located in New York City, and worked on a potential URRC transaction only in New York City. No one from Adirondack ever traveled to South Carolina in connection with any URRC-related business.

9. Finally, I want to address the manner in which this case was launched, pre-emptively, by URRC. During the weeks and months (and in a sense even years) prior to the filing of URRC's declaratory judgment action, I had been having a series of conversations, emails, and other writings with URRC's CEO and COO regarding RamKo's compensation. Until this lawsuit was filed, no one from URRC had ever suggested that URRC's position was

5

what it now alleges in its complaint, *i.e.*, that RamKo was entitled to nothing except the fee that it was paid pursuant to the June 2005 Consulting Agreement. To the contrary, URRC always acknowledged that it owed RamKo substantial compensation and that payment thereof would be made once doing so would be less of strain on URRC's resources. The Consulting Agreement, which was expressly limited both in terms of the scope of the work that was covered, and the time period covered, did not cover the great bulk of RamKo's entitlements. Given my close involvement, through RamKo's consulting work, both with the people at URRC as well as with every detail of URRC's financial needs, I had always been flexible about the timing of RamKo's compensation and trusted URRC to pay RamKo fairly as and when its financial circumstances enabled it to do so, which basically meant that most of RamKo's compensation would be paid as and when URRC raised significant new capital. So I was patient.

10. Most recently, I had been engaged in discussions with URRC, specifically with both the CEO, Mr. Gutierrez, and with the COO, regarding a resolution of all of RamKo's entitlements for all the work it had performed for URRC. Mr. Gutierrez made a proposal that was not satisfactory and then suggested that I have discussions with the COO. After I had done so, I was told by Mr. Gutierrez that the COO felt that we were "very close" to an agreement. The CEO also told me not to "do anything" while we worked this out. Then, without any warning, URRC filed this declaratory judgment action, which greatly surprised, and disheartened me.

11. I understood Mr. Gutierrez's instruction that I should not "do anything" while we talked to mean that I should not file a lawsuit as that would be expensive and unnecessary. My interpretation of his instruction was not just based on common sense, but also based on comments made to me by Mr.

6

Gutierrez about the Founders lawsuit. Mr. Gutierrez had told me directly that he recognized that URRC owed Founders money in connection with URRC's decision to walk away from the Founders deal, but he emphasized that if Founders had only approached him before filing a lawsuit, URRC and Founders could have worked things out amicably, without involving lawyers and incurring needless expense. I referred to those comments by Mr. Gutierrez in later discussing my own situation with him, and I was given every reason by Mr. Gutierrez and the COO to understand that our discussions were progressing in a positive direction towards an amicable resolution of RamKo's compensation issues. In fact, one of the scenarios URRC was discussing with me would have involved an ongoing relationship between RamKo and URRC, so I certainly was made to believe that it would be highly counterproductive for me to do anything like file a lawsuit.

12. Based on the circumstances which are outlined above, and as to which there are a number of supporting emails that describe the ongoing negotiations in further detail, I have concluded (a) that I was deliberately lulled into believing that URRC was making a sincere effort to work out my compensation in a fair way, and (b) that URRC took advantage of this to file a pre-emptive lawsuit in a forum that will prejudice RamKo's ability to present its case, for the reasons already discussed. I think it is self-evident that Mr. Gutierrez, who had emphasized to me his purported distaste for litigation and alleged preference for amicable resolution of business disputes, and who told me that we were "very close" to a resolution and urged me not to "do anything" while we worked things out, would not have suddenly filed a declaratory judgment action while those discussions were ongoing for any reason other than to attempt to force this litigation into a venue where the crucial, and very adverse (to URRC) non-party Founders witnesses cannot be compelled to come.

7

_____
JOHN KOHUT

Sworn to before me this
23 day of March, 2007.

_____
Notary Public

NANCY J. COHEN
Notary Public, State of New York
No. 01CO6134863
Qualified in New York County
Commission Expires Oct. 11, 2009

8

CONSULTING AGREEMENT

This AGREEMENT, dated as of May 27th, 2005, by and between United Resource Recovery Corporation, Inc., a South Carolina corporation, having an office located at 5396 N. Blackstock Road, Spartanburg, SC 29303 (the "Company") and RamKo Venture Management, Inc., a New York corporation, having an address of 111 East 80th Street, New York, New York 10021 ("Consultant").

1. Services. Consultant agrees to provide the services of a skilled professional reasonably requested by the executive officers of the Company. These services shall be for an average of six and one-quarter (6.25) business days per month, but in any event for not more than seventy five (75) business days in any yearly period, commencing June 1, 2005, as a consultant and advisor, such services to be substantially similar to those performed by a principal financial officer. Such services are hereinafter referred to as the "Services." Unless otherwise agreed between Consultant and the Company, Consultant shall perform the Services at an office of the Consultant to be located in the City of New York (the "Office"). The Company agrees that Consultant shall have ready access to the Company staff and resources as necessary to perform the Services provided for in this Agreement.

3. Compensation. As compensation for the Services, the Company agrees to pay Consultant on or prior to June 1, 2005 a fee of $8,500 and to pay on the first day of each month thereafter, commencing July 1, 2005, a fee of $8,500.00.

3. Expenses. In addition to the compensation received pursuant to Section 2 hereof, during the term of this Agreement, Consultant shall be entitled to receive prompt reimbursement from the Company for all reasonable and necessary out-of-pocket expenses incurred by it in performing Services hereunder. Any item of such expenses in excess of $1,000, however, shall be reimbursable hereunder only if such item of expense has been approved by an executive officer of the Company before it is incurred by Consultant, except for travel and lodging expenses for Consultant traveling from the Office to any office or facility of the Company. Reimbursement of any expense under this Section 3 in excess of $50 shall be made by the Company only upon submission by Consultant of itemized proof (to the extent reasonably available) that such expense was actually incurred in performing services hereunder and the amount thereof. Any skilled professional shall be entitled to first class air accommodation for any air travel that is scheduled to exceed 1 1/2 hours in connection with the rendering of the Services hereunder.

4. <u>Term and Termination</u>. This Agreement shall remain in full force and effect until a party shall terminate this Agreement by written notice of such termination to the other party, which termination shall be effective; (a) upon a material breach of this Agreement, immediately after delivery of such notice by the non-breaching party and (b) upon termination for any other reason, 90 days after delivery of such notice by either party (each, the "Termination Date"). Upon any termination, whether for breach or otherwise, the Company shall be obligated to pay Consultant the fees required under Section 2 hereof through the Termination Date and any un-reimbursed expenses under Section 3 hereof. The Company also shall pay an additional amount equal to the excess, if any, of days worked per month (above six and one quarter days per month) for each month starting in the immediately preceding June and ending with the month of termination divided by 6.25 and multiplied times $8,500. The provisions of this Section and sections 5, 6, 9, 12, 15 and 17 of this Agreement shall survive the termination of this Agreement.

5. <u>Confidentiality</u>. All information regarding the business of the Company or any of its directors, shareholders, subsidiaries or affiliates (including without limitation, records, clients and customer lists, data documents and methods) compiled by, obtained by or furnished to Consultant while it is retained by or associated with any of the foregoing is acknowledged to be confidential information and the exclusive property of such companies. During or after the termination of this Agreement, Consultant agrees that it will not, directly or indirectly, divulge or use such information other than in the ordinary course of business for the Company or any of its shareholders, subsidiaries or affiliates. Upon termination of this Agreement, Consultant shall return to the Company, or destroy, any material involving any such confidential information.

6. <u>Indemnity</u>. (a) The Company shall indemnify the consultant, its directors, shareholders, agents, officers and employees (the "Consultant Indemnified Parties") and hold them harmless from any liability, loss or expense, including without limitation reasonable attorneys' fees (subject to paragraph (c) of this Section 6), incurred by any of the Consultant Indemnified Parties in connection with any claim, action or other proceeding against any Consultant Indemnified Party arising out of performance of services for the Company hereunder; provided, that the Company shall not be liable for any of the foregoing to the extent they arise from Consultant's gross negligence or willful misconduct. The Company shall also use its best efforts to obtain for the Consultant Indemnified Parties coverage under any insurance policy now or hereafter obtained during the term of this Agreement covering the officers and directors of the Company against claims, actions or proceedings similar to those described above. The Company shall pay all expenses including attorneys' fees, actually, reasonably, and necessarily incurred by the Consultant Indemnified Parties in connection with the defense of such action, suit or proceeding, and

2

in connection with any related appeal including the costs of court settlements, subject to paragraph (c) below.

       (b) The Consultant shall indemnify the Company, its directors, shareholders, agents, officers and employees (the "Company Indemnified Parties") and hold them harmless from any liability, loss or expense, including without limitation reasonable attorneys' fees (subject to paragraph (c) of this section 6), incurred by any of the Company Indemnified Parties in connection with any claim, action or other proceeding against any Company Indemnified Party arising out of Consultant's gross negligence or willful misconduct in the performance of its services hereunder. The Consultant shall pay all expenses including attorneys' fees, actually, reasonably, and necessarily incurred by the Company in connection with the defense of such action, suit or proceeding, and in connection with any related appeal including the costs of court settlements, subject to paragraph (c) below.

       (c) The obligations and liabilities of each indemnifying party hereunder with respect to claims resulting from the assertion of liability of indemnified parties shall be subject to the following tens and conditions:

       (i) The indemnified party shall give prompt notice to the indemnifying party of any claim which might give rise to a claim by the indemnified party against the indemnifying party based on their indemnity agreements contained in paragraph (a) or (b) of this Section 6, stating the nature and basis of said claims and the amounts thereof, to the extent known.

       (ii) In the event any such action, suit or proceeding is brought against the indemnified party, with respect to which the indemnifying party may have liability under said indemnity agreements, the action, suit or proceeding shall be defended (including all proceedings on appeal or for review) by the indemnifying party. The indemnified party shall have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the indemnified party's own expense unless (A) the employment of such counsel and the payment of such fees and expenses both shall have been specifically authorized by the indemnifying party in connection with the defense of such action, suit or proceeding, or (B) such indemnified party shall have reasonably concluded and specifically notified the indemnifying party that there may be specific defenses available to it which are different from or additional to those available to the indemnifying party or that such action, suit or proceeding involves or could have an effect upon matters beyond the scope of the indemnity agreements contained in paragraphs (a) and (b) of this Section 6, in any of which events the indemnifying party, to the extent made necessary by such defense, shall not have the right to direct the defense of such action, suit or

proceeding on behalf of the indemnified party. In such case only that portion of such fees and expenses reasonably related to matters covered by said indemnity agreements shall be borne by the indemnifying party. The indemnified party shall be kept fully informed of such action, suit or proceeding at all stages thereof whether or not it is so represented. The indemnifying party shall make available to the indemnified party and its attorneys and accountants all books and records of the indemnifying party relating to such proceedings or litigation and the parties hereto agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such action, suit or proceeding.

(d) Neither the indemnifying party nor the indemnified party shall make any settlement of any claims without the written consent of the other party, which consent shall not be unreasonably withheld or delayed.

(e) Except as herein expressly provided, the remedies provided in this Section 6 shall be cumulative and shall not preclude assertion by any party of any other rights or the seeking of any other rights or remedies against any other party hereto.

7. <u>Restriction</u>. The Consultant shall during the term of this Agreement be deemed to be an independent contractor. It and its directors, shareholders, agents, officers and employees shall be permitted to engage in any business and perform services for its or their own accounts provided that such business and services shall not be in competition with, or be for a company that is in competition with, the Company or its affiliates or subsidiaries.

8. <u>Additional Services</u>. (a) Should the Services rendered be for a period greater than 84 business days in any calendar year (the "Additional Services"), the Company shall pay the Consultant an additional $1,500 for each day of such Services, provided that no Additional Services shall be rendered prior to the Consultant notifying the Company in writing that the initial 60 day period of Services has or is about to expire and the Company shall provide to the Consultant written authorization to render a fixed number of days of Additional Services. Prior to rendering any Additional Services in excess of the number of days authorized in accordance with the provisions of this Section, the notification and authorization procedures set forth above shall be repeated.

(b) Any service, other than the Services, including but not limited to investment banking services performed by Consultant for the Company, are not covered by, nor subject to the terms and provisions of this Agreement, and compensation for and the conditions for the performance of such services are or shall be the subject of separate agreements mutually agreeable to the parties thereto.

(c)   It is understood and agreed between the parties hereto that this Agreement is independent from and not conditional upon nor related to the execution or performance by either party of any other agreement between the parties. Neither party shall have any right to offset any claims arising from any other agreement or action not directly resulting from the Services against payments due hereunder.

9.   <u>Arbitration</u>. Every dispute which may arise with reference to this Agreement or the construction thereof or any matter contained in or arising out of this Agreement shall be referred to an arbitrator to be appointed by the parties hereto. If the parties cannot agree on an arbitrator, the arbitrator shall be selected by the American Arbitration Association.

10.   <u>Effect of Waiver</u>. The waiver by either party of a breach of any provision of this Agreement shall not operate as or be construed as a waiver of any subsequent breach thereof.

11.   <u>Notice</u>. Any and all notices or other documents under this Agreement shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid and return receipt requested, to any other party at the addresses specified above, or to such other address as a party may specify by notice hereunder. No other method of giving notice is hereby precluded which gives actual notice to any party hereto.

12.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the law of the State of New York without giving effect to the conflicts of law principles thereof.

13.   <u>Assignment</u>. The rights, benefits and obligations of the Company and the Consultant under this Agreement shall not be assignable or transferable.

14.   <u>Entire Agreement</u>. This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions, and preliminary agreements made prior to the date hereof. This Agreement may be amended or replaced only in writing executed by all parties hereto.

15.   <u>Disclosure</u>. The company represents, warrants and agrees from and after the date of this Agreement: (a) it will not engage in any activity or course of conduct resulting in any financial statements of the Company, including but not limited to any periodic

income statements, balance sheets or cash flow statements, prepared for use internally or for use by lenders, suppliers or other non-affiliated entities, not fairly presenting the financial condition and the results of operations of the Company as at the end of and for any reporting period covered thereby; and (b) it will undertake to correct in a reasonable period of time (time being of the essence) any activity or course of conduct that may result or have previously resulted in any report, financial statement or other document used internally, or provided to lenders, suppliers or other non-affiliated entity, containing any untrue statement of a material fact or omitting a material fact necessary to make the statements in any such document misleading as of the date of any such document.

17. <u>Payment of Expenses</u>. The Company agrees to pay for and hold Consultant harmless for all out-of-pocket costs and expenses of Consultant (including, without limitation, the fees and out-of-pocket expenses of all counsel retained by RamKo) arising in connection with the entering into, administration (including without limitation, any waiver, amendment or modification) or enforcement of, or preservation of rights under, this Agreement and any of the documents contemplated thereby. Consultant hereby agrees that the legal fees and out-of-pocket expenses of counsel retained by Consultant in connection with the entering into preparation and execution of this Agreement shall not exceed $500.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first above written.

United Resource Recovery Corporation, Inc.

By _____ its _____

Date _____

RamKo Venture Management, Inc.

By_____ its _____

Date _____



**RamKo**
Capital, Inc.
Consulting Group
Venture Management, Inc.

711 Fifth Avenue, New York, New York 10022

Telephone: (212) 223-2451
Facsimile: (212) 223-2490

Mr. Carlos D. Gutierrez
President
United Resource Recovery Corporation
5396 Blackstock Road
Spartanburg, SC 29303

January 2, 2004

Re: Equity Private Placement, United Resource Recovery Corporation, ("URRC").

Dear Carlos,

This is to confirm our conversation wherein RamKo Venture Management ("RamKo") and its affiliate Adirondack Capital Partners Inc. have agreed, on a best efforts basis, to attempt to place an equity funding for URRC. Further, we have agreed that should RamKo be in the position to close such transactions, on substantially the terms outlined, and if, for any reason, the Company chooses to accept alternative funding or a strategic investment, RamKo shall be entitled to, as a break-up fee, compensation equal to its minimum fee ($300,000 plus warrants) less any amount contractually due and payable or paid under the enclosed Summary of Terms.

Additionally, I would like to direct your attention to page 4 of the Summary of Terms. Please note that the paragraph entitled "Conversion" outlines a procedure where the preferred equity could have a claim upon conversion, for a greater percentage of common equity then we have discussed. This type of provision is not meant to increase the position of the investor in the ongoing investment. It is however, meant to protect the investor against committing to the investment, only to have the investment be used as a form of stalking horse for the purpose of promoting a sale of the Company. The impact, if any, can be seen by reviewing a timeline of the relative worth of the Company vs. time since investment. As an example, if after the investment (with money down-streamed to Raleigh) someone offered you $40 million for the total business, even after full dilution the provision would not be operable. Alternatively, if you raise $3 million and subsequently agreed to a buyout of under $15 million (as in a quick flip) the provision would operate to protect the investor. I would be pleased to spend the time with you and Gerry to get you and or your counsel comfortable with the concept.

URRC  
January 2, 2004

Page 2

      Should you have any questions and or comments, please don't hesitate to telephone. If the foregoing and the enclosed Summary of Terms accurately outline our agreements in these contemplated transactions, please execute, fax and return by U.S. mail a copy of each document (3). Thank you for your courtesy. We look forward to working with you and your whole organization.

      Sincerely

      RamKo Venture Management, Inc.

      By John W. Kohut, President

Acknowledged and Agreed:

United Resource Recovery Corporation

Carlos D. Gutierrez, President