IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| United Resource Recovery Corporation, | ) | |
| Plaintiff, | ) ) ) | C.A. No. 7:07-CV-502-HFF |
| -vs- | ) ) | |
| RamKo Venture Management, Inc., and John Kohut, | ) ) ) | |
| Defendants. | ) ) ) | **AFFIDAVIT OF CARLOS GUTIERREZ** |
| | ) | |
| RamKo Venture Management, Inc., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| -vs- | ) ) | |
| Carlos Gutierrez, | ) ) | |
| Third-Party Defendant. | ) ) ) | |

The undersigned hereby states and deposes as follows:

1. I am over the age of eighteen (18) and competent to make this affidavit.

2. I am the CEO and a principal shareholder in United Resource Recovery Corporation ("URRC"), a South Carolina corporation that has its principal place of business in Spartanburg, South Carolina. URRC's headquarters and plant facilities are located in Spartanburg, South Carolina, and URRC keeps all its corporate and financial records related to its polyethylene terephthalate ("PET") recycling business in Spartanburg, South Carolina.

3. URRC has one active subsidiary, United/DMS of Tennessee, LLC, which operates a silver reclamation business in Knoxville, Tennessee.

4. All but two of URRC's fifteen shareholders are citizens and residents of South Carolina. All but one of URRC's directors are citizens and residents of South Carolina. All of URRC's principal officers are citizens and residents of South Carolina.

5. I am a citizen and resident of the State of South Carolina and reside in Spartanburg County.

6. Beginning in August 2001 and continuing until early 2004, URRC signed three investment agreements with John Kohut of RamKo Venture Management, Inc. Kohut drafted each investment agreement and URRC signed each agreement in Spartanburg, South Carolina. Each agreement also provided that the existing URRC shareholders would continue to own a controlling interest in the Company. Kohut and RamKo were never able to meet the terms of the private placement and therefore no contingent fee was ever earned.

7. Also, during the period between August 2001 and early 2005, Kohut traveled to Spartanburg, South Carolina, multiple times to meet with me and the other officers, shareholders and directors of URRC, to familiarize himself with URRC's financial position and work on generating interest in the private equity community for the private placement. In the course of performing his due diligence review of URRC's financial records, Kohut spoke with URRC's auditors and accountants at both Price Waterhouse Coopers ("PWC") in Spartanburg and Cherry Bekaert and Holland ("CBH") in Greenville. Auditor Larry Fritz and tax accountants Bill Kastler and

Owen West of PWC and auditor Allen Robinson of CBH will testify that Kohut hindered their audits numerous times by asking them to explain their work and decisions, causing unnecessary costs and delays.

8. I and URRC's officers, Gerry Fishbeck and Lawson Hayes, introduced Kohut to potential debt and equity investors, including Matthew Myers (formerly of BB&T), Vice President of First Citizens Bank in Spartanburg, Andy Westbrook (formerly of BB&T), President of The Peoples National Bank in Easley, and Bill Browning, Vice President of BB&T in Greensboro, North Carolina, Chris Jones and Martin Gilmore of BB&T Capital Partners, and Bert Newsome of BB&T Capital Markets, all located in Winston Salem, North Carolina. In each case, Kohut alienated the potential investors.

9. Kohut works in the same building as Founders and actually maintains his primary office within Founders' office space in New York City. In fact, there is no way to get to Kohut's office without going through Founders' office. Kohut can walk out of his office, take several steps in either direction, and ask any of the three Founders employees to assist him by testifying in this case. I understand that Kohut is close friends with Warren Haber, a senior partner with Founders. Haber has given Kohut work over the years and the two have invested together in several businesses. Haber has testified on Kohut's behalf in another lawsuit Kohut brought in 1991 against the Burpee Seed Company for firing him.

10. In the Spring of 2005, Kohut informed URRC that he was no longer willing to continue on the terms of the earlier agreements but insisted instead that he be retained as a part-time consultant for a fee of $8,500 per month plus certain expenses. The

parties signed a Consulting Agreement, drafted by Kohut, to that effect. Under the agreement, Kohut is not required to work more than 6.25 days per month for URRC. This Consulting Agreement superseded the three previous investment agreements with Kohut and did not contain any type of breakup fee provision. URRC has paid Kohut more than $200,000 under this agreement and continues to pay him $8,500 per month, although URRC has given notice that it will terminate this agreement in May, 2007.

11. Since 2001, Kohut has traveled to Spartanburg on many, many occasions.

12. In 2005, URRC purchased DMS, a company that recycles silver byproducts from industrial processes, to augment its silver recycling business. URRC structured the acquisition with the seller and arranged the financing of the purchase from its existing bank without Kohut's help. Kohut performed due diligence on DMS and produced a subpar product. Mike Reeves, Bob Getsinger, Bill Adams, Chuck Robinson and Ronnie Holcomb, the managers and former owners of DMS, can testify that Kohut performed a flawed due diligence review for URRC's purchase of DMS and did not participate in structuring or raising funding for the deal.

13. At no time did I promise Kohut that URRC would pay him any extra fee for work performed in connection with the acquisition of DMS. Kohut insisted in performing the work on due diligence . . . to quote him: "Use me since you are paying me."

14. In mid-2005, URRC began negotiating with Founders and signed a Letter of Intent in July 2005. Unlike the previous investment agreements, neither Kohut nor RamKo was a party to this agreement, though as a financial consultant, he was involved in the negotiations. Under this Letter of Intent, Founders and the other private equity

investors would invest $15,000,000 and take the majority stake and control of the company (and an equal share of international licensing revenue) and the existing URRC shareholders taking the minority stake. This was quite a significant change from the previous deal structures in that URRC gave up control and it was dealing directly with a potential investor.

Between the date of the Letter of Intent and summer of 2006, the parties signed various extensions and reinstatements of the exclusivity provisions of the Letter of Intent and negotiated on the terms of definitive deal documents. The last extension of the exclusivity period expired August 18, 2006. No further extensions were signed and URRC could negotiate with anyone it chose to after that time. We continued to have discussions with Founders until October, 2006 when all negotiations ceased.

15. At no time did I promise Kohut or RamKo that URRC would pay them a fee if the Founders transaction closed or agree that the prior investment agreements continue in place. Rather, I always told Kohut that I would support him in getting a fee from the investors if the deal closed. In fact, in our June, 2006 meeting with Founders, I was able to get Founders to agree to pay Kohut part of the fee Founders was to receive for obtaining investors and grant him warrants from the director/management option pool. This, of course, would only occur if and when the deal closed.

16. In November 2006, Founders sued URRC in the Southern District of New York on various claims related to the failure of the deal to close. URRC decided that rather than fight a protracted, expensive legal battle with Founders, which would interfere with its ongoing expansion efforts, it would settle the case in partial exchange for ownership of the results of due diligence work performed by Founders at some

considerable expense. As part of this decision, URRC also considered the cost of New York counsel, litigation support services, travel, lodging, meeting facilities, and the time its principals would be forced to spend focusing on the case rather than running the business. URRC recognized its need to move past this dispute if it was to obtain the necessary financing for its business, and believed that a quick settlement was the best outcome.

17. URRC and Founders signed a settlement agreement that included a confidentiality provision. URRC requested the confidentiality provision because it did not (and does not) believe the settlement is the business of anyone other than the parties to it. However, URRC never intended for the confidentiality provision to hamper Kohut and RamKo in any future litigation with URRC. URRC is willing to waive the confidentiality provision of the settlement agreement and allow Founders to consult with Kohut and RamKo about issues in the declaratory judgment action between URRC and Kohut and RamKo and has, in fact, obtained Founders' consent to disclose the same.

18. Kohut began demanding compensation for his past investment banking work prior to the filing of the Founders lawsuit. In most of our discussions, Kohut brought up the possibility that he would resort to litigation if he did not get what he wanted. I did not try to persuade him to delay any legal action. Early in our negotiations, I did mention that I wished we had been able to work out a deal with Founders without resorting to litigation, but I did not tell Kohut not to consult with counsel about his compensation claims. In fact, in at least one conversation, I recall telling Kohut, "you need to do what you need to do" in reference to his suggestion that he might be talking to his

lawyer. So far as I knew, Kohut was speaking with an attorney about our negotiations because he continued to threaten litigation if we could not resolve our disagreement on his terms.

19. During January and early February of 2007, we negotiated about this issue in earnest. I offered to extend his consulting agreement for another year at $8,500 per month. I also offered to pay him a $100,000 if a potential deal with NTR closed while he was engaged with us. Kohut countered on February 7, 2007 by demanding a settlement payment of $375,000 on the spot to walk away from their business relationship. I rejected this demand by saying, "John, you're crazy" and reiterating my prior offer. Kohut rejected this and told me that he would have his attorney call my attorney, Frank Williams. I understood that we had reached an impasse. Frank waited for more than a week and did not hear from Kohut's attorney. During the same period, I did not have any conversations with Kohut, which was unusual because he normally called or emailed every day. Frank had not heard from him by February 20, 2007.

20. I decided to act to resolve Kohut's compensation claims by filing a declaratory judgment action. It is important for URRC to have its rights and responsibilities judicially determined so that it can move forward with other financing opportunities.

Carlos Gutierrez
CEO, United Resource Recovery Corp.

Sworn to before me this
17th day of May, 2007

Kimberly R. Raines
Notary Public for the State of South Carolina
My commission expires: 4/20/07

7