IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED RESOURCE RECOVERY CORPORATION, | ) ) ) | Case Number: 7:07-502-HFF |
| Plaintiff, | ) ) | |
| vs. | ) ) | DEFENDANTS' REPLY TO |
| RAMKO VENTURE MANAGEMENT, INC. and JOHN KOHUT, | ) ) ) | PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE |
| Defendants. | ) ) | |
| RAMKO VENTURE MANAGEMENT, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| CARLOS GUTIERREZ, | ) | |
| Third-Party Defendant. | ) ) | |

Defendants RamKo Venture Management, Inc., ("RamKo") , and John Kohut, ("Kohut"), respectfully submit this Reply Memorandum in response to Plaintiff's Memorandum in Opposition to Defendants' Motion to Transfer Venue, and in support of their motion, pursuant to 28 U.S.C. §1404(a), to transfer this case to the Southern District of New York.

**ARGUMENT**

Unable to challenge the logic of the Seventh Circuit's holding in *Hyatt Int'l Corp. v. Coco* that the so-called "plaintiff's" choice of forum is entitled to no meaningful weight in a declaratory judgment action, United Resource Recovery Corp., ("URRC"), merely argues that

1

neither the Fourth Circuit nor any Court in this District has adopted its reasoning. But of course a District Court within the Fourth Circuit did exactly that, in *Piedmont Hawthorne Aviation, Inc. v. Tritech Environmental Health and Safety, Inc.,* 402 F.Supp.2d 609, 616 (M.D.N.C. 2005); and in any event, the point that is left unrebutted by URRC is that the reasoning of *Hyatt* and *Piedmont* makes sense. An important reason why this is so is that the natural plaintiff, as the party with the burden of proof, ought not to be handicapped by the tactical selection of a forum that will make it difficult for the party with that burden to put on its case. This is not a question of convenience or expense, but of fundamental access to proof.

In the instant lawsuit, the great bulk of the amount in dispute is the break-up fee that is only payable if RamKo proves that the Founders deal could have been closed on terms consistent with the Letter of Intent between Founders and URRC. URRC argues that "it is difficult to comprehend how any witness from Founders might offer crucial testimony" (URRC Memo., pp. 7-8); but the only way that could be true would be if URRC were willing to stipulate that it reneged on the terms of the deal expressed in the Letter of Intent. Clearly URRC has no such plans; to the contrary, it argues that "URRC never refused to close with a group of investors, particularly a group that was ready, willing or able to perform, and therefore, Kohut and RamKo never became entitled to a breakup fee." (URRC Memo. at p. 3) Thus has the issue been joined, and Founders' testimony could hardly be more material.

What this case is mostly about is the core proposition, obviously disputed by URRC, that Founders was ready, willing, and able to close on terms equal to or better than those outlined in the parties' Letter of Intent. Only the Founders witnesses from New York can establish that as fact.

In a further attempt to sidestep the central nature of the Founders testimony and its direct bearing on RamKo's entitlement to a break-up fee, URRC argues that RamKo's agreements providing for a break-up fee were "superseded" by the 2005 Consulting Agreement. (URRC Memo. at 4; Gutierrez Aff. at Par. 10; the Consulting Agreement is attached as Exhibit A to the Kohut Affidavit filed with the Motion to Transfer.[1]). This argument is demonstrably false. The Consulting Agreement states at Paragraph 1 that it applies only to services of the sort performed by a principal financial officer and, for the avoidance of doubt, specifically recites at Paragraph 8(b), that it does not cover investment banking services, which are the subject of separate agreements. And there is contemporaneous documentation showing that Mr. Gutierrez, during the negotiation of the Founders deal, treated the various extant investment agreements providing for a break-up fee as "operative agreements" together with the Consulting Agreement. The contention that the Consulting Agreement "supersedes" the investment agreements with the break-up fee can only be advanced if one completely disregards the express terms of the Consulting Agreement, and the contemporaneous record. And it would only be advanced by a party desperate to find a way to maintain that the crucial testimony from Founders is irrelevant because there is no issue over a break-up fee. But the argument doesn't work.

In a further effort to conjure up a counterweight to RamKo's compelling reason for moving the case to the only forum where Founders' witnesses can be compelled to appear, URRC has resorted to the discredited tactic of compiling a 15-man roster of purported non-parties located in or near South Carolina whom it contends would be witnesses -- but who are

---

[1] For reference purposes, the Kohut Affidavit submitted with the original moving papers will be called "Kohut Aff. I," and the Kohut Affidavit submitted with this Reply Brief will be called "Kohut Aff. II."

either collateral, cumulative, and/or not really non-parties.  This is best illustrated by the fact that ten of these 15 non-party witnesses supposedly would testify that RamKo did a poor job for URRC at some point *prior* to June 2005.  But as already noted, URRC finally entered into a new Consulting Agreement with RamKo whereby it started paying RamKo for the work typically performed by a CFO (excluding investment banking services) *commencing* in June 2005, *i.e., after* these witnesses would say RamKo did this or that poorly.  URRC did so because Mr. Gutierrez said, in a contemporaneous email, that "my conscious [sic; conscience] is hurting me," obviously for failing to keep his promises to compensate RamKo for these valuable services.  URRC cannot materially negate the value of RamKo's pre-June 2005 CFO-type services with 10 or even 100 witnesses taking pot shots at his performance prior to the time that URRC itself deemed it good enough to start paying for it.

As for the remaining five of these 15 purported non-party witnesses, three are actually parties, in that they work for a URRC subsidiary (called United/DMS) that URRC acquired with RamKo's help. The last two non-party witnesses cited by URRC were the sellers of DMS, two cumulative witnesses with little, if anything material to say.

In sum, URRC's arguments that the Founders witnesses don't matter, that the Consulting Agreement supersedes the break-up fee agreements, and that there are a greater number of non-party witnesses who are material to this case located in South Carolina, are wholly illusory.

URRC also claims that the interests of justice do not weigh against it because it "strongly denies Kohut's allegations that it somehow lulled him into not filing suit and then raced to the courthouse to gain tactical advantage."  (URRC's Memo., p. 15)  URRC's CEO, Mr. Gutierrez, swears in an affidavit that "I did not try to persuade [Kohut] to delay any legal action." (Gutierrez Aff., Par 18).  And URRC's Memo, at p. 11, contends that Kohut made demands on

4

February 7, 2007 which caused Mr. Gutierrez to say "John, you're crazy." Yet, in a contemporaneous email dated February 8, 2007 to URRC's Chief Operating Officer, Gerry Fishbeck, Kohut described a perfectly amicable conversation with Mr. Guiterrez and related, in real time and obviously not because he ever imagined that it would matter in a litigation, that Gutierrez had "asked that I do nothing" while he considered the situation. (*See* Kohut Aff. II, Exhibit A.)

Moreover, far from things having reached an impasse, Mr. Kohut and Messrs. Gutierrez and Fishbeck discussed the situation by telephone as the URRC executives drove to the airport on February 12, 2007, during which they advised Kohut that they both would be out of the office at a Texas trade show for the balance of the week, returning to their offices on February 20, 2007 (the 19th was a holiday). (Kohut Aff. II, Par. 2)  The conversation concluded that settlement might be assisted by having Kohut's counsel speak to URRC's corporate attorney, and that discussions could resume the following week when they returned.  Accordingly, Mr. Gutierrez's current alleged recollections that he told Kohut that "you need to do what you need to do" (Gutierrez Aff., Par. 18), and that as of February 7, 2007, he told Mr. Kohut that he was "crazy" and that things "had reached an impasse" (*id.* at Par. 19) seem awfully convenient, and very much at odds with what actually occurred.

Any sensible person in RamKo or Kohut's situation would have tried his utmost, as Kohut did, to resolve a compensation issue amicably, especially with a client who had always promised to do right by him.  Litigation is expensive and time-consuming, and is the last resort of the reasonable businessman.  URRC took unfair advantage by telling Kohut to "do nothing," pretending to be giving the situation further consideration while it prepared and then launched a pre-emptive declaratory judgment action.  URRC thus cannot claim entitlement to a "plaintiff's

5

choice of forum" when it not only isn't really the plaintiff, but where it maneuvered itself into its current role through duplicity.

### I. THE FOUNDERS WITNESSES ARE CRITICAL, AND CAN ONLY BE COUNTED ON FOR TRIAL IN NEW YORK

**A. The Central Nature of the Founders Witnesses**

The break-up fee resulting from the Founders deal that URRC reneged on is the single largest element of RamKo's damages in this case. The fee is $300,000 plus the value of warrants to purchase post-funding equity in URRC. RamKo's entitlement to this fee hinges upon the proposition that Founders was ready, willing and able to close on terms equal to or better than those set forth in the Founders-URRC Letter of Intent. It is known that Founders' witnesses would support that proposition because they contended as much in the lawsuit they filed against URRC, which URRC settled.

In its response memorandum, URRC tries to minimize the importance of having the Founders witnesses available to testify live, at trial, with regard to this crucial proposition. URRC does so by advancing a variety of specious arguments. First, URRC tries to contend that the Founders testimony isn't really crucial. (URRC Memo., pp. 7-8) That is absurd. URRC acknowledges that it plans to take the position that Founders and URRC simply failed to reach a meeting of the minds, and that there was no agreed-upon transaction from which URRC walked away. *See* URRC Memo., at p. 3 ("URRC never refused to close") and p. 8 ("Founders offered what it offered; URRC countered as it did; the parties did not reach a meeting of the minds.") These are *exactly* the contentions that Founders would forcefully rebut. Founders will testify that it did have a meeting of the minds with URRC; that the meeting of the minds was expressed in a written Letter of Intent; and that URRC did refuse to close on the deal, with its CEO, Mr.

Gutierrez, even admitting in front of several Founders witnesses that his problem with the deal, all along, was the equity split, which was the split that he had previously *agreed to* and had set forth in the Letter of Intent. That, in most people's estimation, would constitute refusing to close.

URRC now, evidently, maintains that there were a host of legitimate reasons why the apparent deal between Founders and URRC was never a deal at all. While URRC is entitled to try to make that case and evidently plans to do so, surely it appreciates that its position is fundamentally disputed by Founders, which sued URRC and Mr. Gutierrez over precisely this issue. URRC should not be heard to argue that Founders' testimony regarding this direct and central conflict is not crucial, nor should it be permitted to handicap the outcome of that conflict by saddling RamKo with the unfair and potentially insurmountable burden of trying to cajole Founders witnesses into coming to South Carolina voluntarily to testify at a time that has yet to be determined, regardless of whatever else those witnesses might be doing in furtherance of Founders' own business. That handicap would not exist if RamKo could simply invoke the subpoena power of a trial court located in the Southern District of New York. The exercise of that subpoena power would ensure a fair fight between whatever URRC plans to contend the unresolved deal issues were, versus the conviction that Founders expressed, in its own lawsuit, that URRC simply reneged.

It is utterly illogical for URRC, in its memorandum, to state affirmatively that it "never refused to close with a group of investors," (p. 3), and then state that "it is difficult to comprehend how any witness from Founders might offer crucial testimony" (pp. 7-8), when Founders, in its own federal court complaint, alleges that:

7

63. On October 23, 2006, after (a) stringing Founders along for more than eighteen (18) months, (b) using the LOI to stabilize its relationship with Coca-Cola, and (c) using Founders' investment model to shop for alternative sources of financing, URRC refused to move forward with the Transaction.

64. On this same date, at a meeting in New York City, Carlos Gutierrez represented to representatives of Founders and certain co-investors that the equity split agreed to under the original LOI and reaffirmed by five separate letter agreements had "always been" an issue to him from day one and he was never interested in going forward with the Transaction under that equity split. (Founders Complaint attached as Exhibit C to Defendants' Answer.)

So, it would appear that hearing from the Founders witnesses who attended that meeting in New York City will be not only crucial, but dispositive. As for the speculation advanced by URRC in its papers that Mr. Kohut is such good friends with the people from Founders that they will drop everything and go wherever he asks them to go, simply because he rents space in the same office suite, Founders is a large enterprise entrusted with investments and investable assets of over $100 million; its obligations are to its investors and partners. Neither RamKo nor Mr. Kohut individually has done a deal with Founders in many years, and they have no current business involvement. (Kohut Aff. II, Par. 4) While it is possible that a Founders executive would agree to come to South Carolina on short notice at his own expense, there is no possible way of predicting the schedules of people with those kinds of responsibilities. Board meetings, investor meetings, road shows, new investment opportunities, and many other things are constantly competing for their attention. Under these circumstances, there is no substitute for a subpoena.

Depositions or other forms of remote testimony of the sort proposed by URRC are not an acceptable substitute. *See Gulf Oil Corporation v. Gilbert,* 330 U.S. 501, 511 (1947) ("to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most

litigants.")  It is doubtful that URRC would be pleased with the prospect of having Mr. Gutierrez testify by deposition or videoconference.  As the excerpt from the Founders complaint makes clear, the Founders witnesses are similarly crucial to RamKo's case.  Since RamKo will have the burden of proof on its claim to a break-up fee, it would be highly unfair for the real defendant URRC, which does not bear that burden, to arrogate to itself the choice of forum that normally belongs to the real plaintiff.

### B. The Consulting Agreement Did Not Supersede Anything

In an effort to mask the importance of the Founders' witnesses' testimony, URRC even tries to claim in its memorandum, and in the Gutierrez Affidavit, that there is no break-up fee at issue in this case, because the "Consulting Agreement [which contains no break-up fee provision] superseded the three previous investment agreements with Kohut."  (Gutierrez Affidavit, Par. 10).  *See also* URRC Memo. at p. 4, asserting that "the consulting agreement had superceded [sic] all previous agreements between Kohut and URRC, and the contingent fee and breakup fee terms of those earlier agreements no longer applied.")

This contention, that the Consulting Agreement superseded the investment banking agreements between RamKo and URRC, is so obviously and demonstrably false that it calls into question whether URRC is familiar with the terms of its own agreements, because if it is, it is difficult to see how such an argument can seriously be advanced.

Far from "superseding" the prior agreements regarding investment banking and money-raising services, the Consulting Agreement was narrowly drawn.  It explicitly defined the "Services" to which the Consulting Agreement applied as those that are "substantially similar to those performed by a principal financial officer," (Par. 1) and, for the avoidance of any possible

doubt, it explicitly excepted from that definition any investment banking services, in the following unequivocal terms:

> 8 (b)   Any service, other than the [principal financial officer] Services, including but not limited to investment banking services performed by Consultant for the Company, are not covered by, nor subject to the terms and provisions of this Agreement, and compensation for and the conditions for the performance of such services are or shall be the subject of separate agreements mutually agreeable to the parties thereto.

In the face of this provision, URRC nonetheless argues that there is no more issue of the break-up fee, because the prior investment banking agreements containing a break-up fee have been superseded by an agreement containing a provision that provides, expressly, that no such superseding is intended.  This is a frivolous argument.

As if that weren't enough to show that the Consulting Agreement did not supersede the investment agreements, there is a late 2005 email from Mr. Kohut to Mr. Gutierrez supplying, at Mr. Gutierrez's request, electronic copies of the *five* "operative agreements" between RamKo and URRC for inclusion on the due diligence disk being prepared for Founders. The investment agreements were included. (Kohut Aff. II, Ex. B)  Obviously, the parties treated the investment agreements that included the break-up fee as having survived the execution of the Consulting Agreement.  To contend otherwise is to deny reality as reflected in the contemporaneous written record, as well as in the agreements themselves.

Ironically, the Consulting Agreement came into existence because, as Mr. Gutierrez wrote to Mr. Kohut in May 2005, "my conscious [sic; should be conscience] is hurting me." (Kohut Aff. II, Ex. C)  What Mr. Kohut understood this to mean was that Mr. Gutierrez was feeling pangs of conscience based on the fact that he had been promising to pay for RamKo's work when URRC closed a funding, and he had just rejected a very credible investor. (Kohut

Aff. II, Par. 2) Accordingly, a decision was made to start paying RamKo, on a going-forward basis, for a subset of its services, namely the CFO-type services.

For Mr. Gutierrez to now argue that this Consulting Agreement was meant to supersede all prior agreements on all subjects between URRC and RamKo, and that Mr. Kohut should now be fully satisfied with the limited payments he received under that narrowly defined agreement, shows the extent to which Mr. Gutierrez's conscience has evolved in just two years.

## II. URRC'S CLAIM THAT THERE ARE MATERIAL NON-PARTY WITNESSES IN SOUTH CAROLINA IS ILLUSORY

In any case involving two parties with home bases in two different jurisdictions, either side can create a lengthy list of people in either location who had contact with one or both of the parties. Courts therefore focus their inquiry on where the *material* non-party witnesses reside.

In this case, RamKo resisted the temptation to name every one of the many parties in New York with whom URRC had contact during its many trips to New York, because the fact is that the Founders witnesses are the critical, material witnesses whose testimony is absolutely essential and cannot be replicated via deposition.

On the other hand, URRC's list of non-parties consists exclusively of people who either have nothing meaningful to contribute, or aren't even non-parties. Specifically, URRC's list of 15 non-parties consists primarily of people located in South Carolina who purportedly will testify that RamKo did a poor job prior to June 2005. (Kohut Aff. II, Par. 3) This testimony allegedly would be relevant to RamKo's claim for *quantum meruit* compensation for the CFO-type services it provided before June of 2005, when RamKo and URRC entered into their Consulting Agreement, pursuant to which URRC finally started paying RamKo for these CFO services going forward. The fact that URRC was sufficiently satisfied with RamKo's CFO-type

services that it started paying for them in June 2005 renders close to meaningless any contention by non-parties that the pre-June 2005 services really weren't so good after all. Obviously, URRC itself didn't share that opinion, and it is therefore apparent that the testimony of these people is being posited solely for purposes of creating a list of witnesses. *See Gulf Oil, supra* at 511 ("The learned and experienced trial judge was not unaware that litigants generally manage to try their cases with fewer witnesses than they predict in such motions as this.")

There are 10 (of the total of 15) purported non-party witnesses who fall into the category of people who will question the quality of the pre-June 2005 work that RamKo did. Not only is the impact of any such testimony rendered nil by URRC's decision to start paying RamKo for ongoing services in 2005; the testimony that is being proffered is, in some instances, facially absurd. *See*, for example, the proposed testimony from URRC's auditors, who allegedly will testify that Mr. Kohut "hindered their audits numerous times by asking them to explain their work and decisions, causing unnecessary costs and delays." (Lawson Hayes Aff., Par. 5) Does it seem out of line, and testimony-worthy, for a consultant performing the role of a principal financial officer to ask auditors to explain their work and decisions? Isn't that what a principal financial officer ought to be doing? URRC evidently thought so when it started paying RamKo for ongoing services in 2005. It is obvious that this proposed testimony is nothing but make-weight that no one would ever put forward except to try to prop up one's position on a transfer motion.

As mentioned earlier, 10 of the 15 witnesses fall into this pre-June 2005 category. As for the other five, they relate to DMS, the silver business that URRC acquired with RamKo's investment banking help.

12

There is no question but that the DMS deal closed, and there is no question but that RamKo assisted, in the expectation of being paid, and is thus entitled to a fee. To the extent that URRC proposes to call these witnesses to challenge the quality or quantity of RamKo's work, three of the witnesses are still with the entity that URRC acquired, and hence those witnesses are not even non-parties since they are controlled by URRC.

As for the other two witnesses, the sellers of DMS, they allegedly will testify regarding Mr. Kohut's "limited involvement with the transaction and presence in Tennessee." It seems entirely unlikely that the cumulative testimony of both individuals would be offered on such a small point; nor does such testimony seem dispositive of anything. At most, and if true, it makes the case that Mr. Kohut didn't show up frequently in Tennessee. That is hardly inconsistent with his performance of substantial investment banking analysis back in New York, where virtually all of his work was performed, exactly as he and URRC contemplated.

In short, it is unavailing to summon even an army of non-party witnesses if the testimony they have to provide is of little moment. Nothing that URRC has proffered comes remotely close to the materiality of the evidence that will be furnished via the testimony of the Founders witnesses. The Founders evidence, moreover, will be sharply contested by URRC, making it crucial that the jury have a full opportunity to evaluate the demeanor of the various witnesses with respect to the central issue of whether or not URRC walked away from a deal on terms to which it had previously expressed agreement, and one which Founders was ready, willing and able to close. This can only happen where Founders can be subpoenaed, in the Southern District of New York.

### III.  URRC'S DENIAL THAT IT LULLED RAMKO INTO INACTION IS INCONSISTENT WITH THE CONTEMPORANEOUS WRITTEN RECORD

Mr. Gutierrez would have this Court believe that, far from using this declaratory judgment action to usurp the real plaintiff's choice of forum, he only filed this action because URRC needed judicial resolution of RamKo's claims, his implication being that he grew tired of waiting for RamKo to file a lawsuit. (Gutierrez Aff., Par. 20)  This is disingenuous, and the story told by Mr. Gutierrez is at odds with the candid and contemporaneous written record.

Mr. Gutierrez claims, in his affidavit, that "In most of our discussions, Kohut brought up the possibility that he would resort to litigation if he did not get what he wanted.  I did not try to persuade him to delay any legal action."  If that were the case, then what would explain Mr. Kohut's February 8, 2007 email to URRC's Chief Operating Officer, Gerry Fishbeck, before any lawsuit had been filed, the day after Mr. Gutierrez now claims he told Mr. Kohut he was "crazy" and that things "had reached an impasse" (Gutierrez Aff., Par. 19), wherein Mr. Kohut described his actual interactions with Mr. Gutierrez, which had been seemingly amicable, as follows:

> **I told him that I had stayed away from getting lawyers involved** because it increases both of our costs but if he would like I would have my guy talk to your counsel. That way your counsel could give you guys input which you could share with John [a URRC director]. **He asked that I do nothing** and said he would talk with Frank [ URRC's corporate counsel ] - and repeated he knew he owed me a quick answer on this whole thing.  (emphasis added)

That sure doesn't sound like the conversations that Mr. Gutierrez is now describing in his affidavit. As late as February 12, 2007, Messrs. Gutierrez, Fishbeck, and Kohut were still discussing finding a means to both compensate RamKo for its past work and to continue a business relationship going forward.  During that conversation, the parties discussed having this dialogue resume the following week, after the holiday weekend, when Messrs. Gutierrez and Fishbeck would be back, and that it would also make sense to have counsel speak, which Kohut

understood could take place on the same timetable. (Kohut Aff. II,, Par. 2) But before that process had run its course, URRC, the defendant, made a grab for venue by bringing a declaratory judgment action, and now affects the role of the aggrieved party that needed a judicial determination of its rights and responsibilities.

This case was and is RamKo's to bring, if it had to be brought. RamKo is the party alleging that its contracts were breached and that it was defrauded. It is the real plaintiff and URRC and Gutierrez are the real defendants. Venue is critical because of the Founders witnesses. It was wrong for URRC to lull RamKo into inaction by pretending to be engaged in settlement discussions while it was hatching a plan to file a declaratory judgment action, and it is wrong for URRC to try to stack the evidentiary deck against RamKo by locating this case in a forum that lacks subpoena power over the Founders witnesses.

## CONCLUSION

For the foregoing reasons, and those set forth in Ramko's initial memorandum, Defendants' motion to transfer this case to the Southern District of New York should be granted in all respects.

Respectfully submitted,

By: s/Julianne Farnsworth
Julianne Farnsworth
Federal Bar #4438
FARNSWORTH LAW FIRM LLC
Post Office Box 338
Charleston, South Carolina 29402
Phone: (843) 723-0425
Fax:    (843) 723-0426
Email: Julianne@Farnsworthlaw.com
ATTORNEY FOR THE DEFENDANTS

May 14, 2007,
Charleston, South Carolina