EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED RESOURCE RECOVERY CORPORATION, | ) ) ) | Case Number: 7:07-502-HFF |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| RAMKO VENTURE MANAGEMENT, INC.and JOHN KOHUT, | ) ) ) | **ANSWER AND COUNTERCLAIM AND THIRD-PARTY COMPLAINT** **(JURY TRIAL DEMANDED)** |
| Defendants. | ) ) ) | |
| RAMKO VENTURE MANAGEMENT, INC., | ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| CARLOS GUTIERREZ, | ) ) ) | |
| Third-Party Defendant. | ) | |

The Defendants, RamKo Venture Management, Inc. ("RamKo") and John Kohut, ("Kohut"), answering the complaint and by way of Counterclaim and Third-Party Complaint, would respectfully allege that:

## FOR A FIRST DEFENSE

1)      Defendants deny each and every allegation of the Complaint not hereinafter specifically admitted, modified or explained, and demand strict proof thereof.

2)      Defendants admit, upon information and belief, the allegations of Paragraph 1 of the Complaint.

1

3)    Defendants admit the the allegations of Paragraph 2 of the Complaint.

4)    Defendants deny the allegations contained in Paragraph 3 of the Complaint, except to admit that RamKo has worked as a consultant for and otherwise represented the interests of the Plaintiff. The remaining allegations are denied and strict proof is demanded thereof. Further answering the allegations of Paragraph 3 of the Complaint, Defendants submit that all of the very substantial work performed by Kohut was performed in his capacity as an officer of RamKo, that Defendants have traveled to South Carolina on a limited, as-needed basis in connection with this work, and that Defendants have performed no work in South Carolina other than for Plaintiff. Defendants further deny that they "regularly" transact business in South Carolina and submit that the agreements out of which this controversy arises were prepared, negotiated and performed, insofar as Defendants' performance was or is concerned, almost entirely in New York.

5)    Paragraph 4 of the Complaint sets forth a legal conclusion to which no response is required by these Defendants. To the extent a response is deemed required, Defendants deny the allegations of Paragraph 4 and demand strict proof thereof.

6)    Defendants deny the allegations contained in Paragraph 5 of the Complaint, and strict proof is demanded thereof. Further answering the allegations of Paragraph 5 of the Complaint, Defendants submit that among the various services performed by the Defendants for the Plaintiff in 2001, RamKo was engaged by the Plaintiff and/or its wholly-owned subsidiaries to raise $7.2 million on certain terms, that no private placement occurred at this time, and that the 2001 agreement respecting such fund-raising was superseded by a later agreement.

7)    Defendants deny the allegations contained in Paragraph 6 of the Complaint, and strict proof is demanded thereof. Further answering the allegations of Paragraph 6 of the Complaint, Defendants submit that among the various services performed by Defendants for the Plaintiff in 2002, RamKo was engaged by the Plaintiff to raise $6 million on certain terms, that no private placement occurred at this time, and that the 2002 agreement respecting such fund-raising was superseded by a later agreement.

8)    Defendants deny the allegations contained in Paragraph 7 of the Complaint, and strict proof is demanded thereof. Further answering the allegations of Paragraph 7 of the

Complaint, Defendants submit that among the various services performed by Defendants for the Plaintiff in 2004, RamKo was engaged by Plaintiff to raise funds on certain terms, that no private placement occurred on the original terms, that the 2004 agreement was modified by the parties' oral agreement, that Defendants introduced to Plaintiff an investor group that was ready, willing and able to enter into a private placement on the modified terms agreed upon and as to which Plaintiff signed a Letter of Intent, that Plaintiff reneged on the Letter of Intent, and that the 2004 agreement, as originally entered into and as modified by oral agreement, contained a "break-up" fee to which RamKo is or will be entitled upon the occurrence of Plaintiff's acceptance of alternative funding or a strategic investment by any other source of funds.

9)    Defendants deny all of the allegations contained in Paragraph 8 of the Complaint except to admit the allegation that Defendants continued to work with the Plaintiff in attempting to raise capital.

10)    Defendants deny the allegations of Paragraph 9 of the Complaint and strict proof is demanded thereof. Further answering the allegations of Paragraph 9 of the Complaint, Defendants submit that the Consulting Agreement, pursuant to which RamKo was paid $8,500 per month commencing June 2005, was expressly for services other than investment banking services.

11)    Defendants do not have sufficient information or knowledge to admit or deny the allegations of Paragraph 10 of the Complaint and, therefore deny the same and demand strict proof thereof. Further responding to the allegations of Paragraph 10 of the Complaint, Defendants submit that the Plaintiff had the opportunity to close on a private placement on terms that they had deemed acceptable in an executed Letter of Intent, and that they reneged on that opportunity.

12)    Defendants admit as much of the allegations of Paragraph 11 of the Complaint, that allege that for a period of time a consulting fee of $8500.00 per month was paid. The remaining allegations are denied and strict proof is demanded thereof. Further responding to the allegations of Paragraph 11 of the Complaint, Defendants submit that Plaintiff has recently given notice of termination of the Consulting Agreement, and that the Consulting Agreement was expressly designed to encompass a limited subset of RamKo's services.

13)     Defendants deny the allegations of Paragraph 12 of the Complaint and strict proof is demanded thereof.

14)     Defendants do not have sufficient information or knowledge to admit or deny the allegations of Paragraph 13 of the Complaint and, therefore deny the same and demand strict proof thereof. Further responding to the allegations of Paragraph 13 of the Complaint, Defendants state that they have limited knowledge or information to the effect that Plaintiff is or may be continuing to negotiate some form of funding or investment by NTR and/or Coca-Cola.

15)     Defendants deny the allegations of Paragraph 14 of the Complaint and strict proof is demanded thereof. Further answering the allegations of Paragraph 14 of the Complaint, Defendants submit that upon Plaintiff's acceptance of alternative funding or a strategic investment by any other party, RamKo will be entitled to its break-up fee pursuant to its agreement with Plaintiff and that RamKo is entitled to additional compensation, and expense reimbursement, independent of the break-up fee, all as detailed in RamKo's counterclaims below.

16)     Defendants deny the allegations of Paragraph 15 of the Complaint and strict proof is demanded thereof. Further answering the allegations of Paragraph 15 of the Complaint, Defendants state that Plaintiff has informed Defendants that Plaintiff does not intend to make good on its obligations to RamKo.

17)     Defendants deny the allegations of Paragraph 16 of the Complaint and strict proof is demanded thereof. Further answering the allegations of Paragraph 16 of the Complaint, Defendants submit that the only valid reason why court intervention is necessary is to adjudicate Plaintiff's breaches of contract and/or quasi-contractual obligations to RamKo.

18)     Defendants deny each and every allegation contained in Paragraph 17 of the Complaint and strict proof is demanded thereof.

### FOR A SECOND DEFENSE BY WAY OF FIRST AFFIRMATIVE DEFENSE

19)     Further answering the complaint herein and as a second defense thereto, Defendants reiterate all of the admissions, allegations and denials in Paragraphs 1-18 above as fully as if repeated herein.

4

20)    Defendants allege that Plaintiff's complaint, in its entirety, fails to state a cause of action and should be dismissed with prejudice.

### FOR A THIRD DEFENSE BY WAY OF SECOND AFFIRMATIVE DEFENSE

21)    Further answering the complaint herein and as a third defense thereto, Defendants reiterate all of the admissions, allegations and denials in Paragraphs 1-20 above as fully as if repeated herein.

22)    Defendants allege that with the possible exception of Plaintiff's prospective liability for RamKo's break-up fee, which liability would be prospective only to the extent that no alternative funding or strategic investment may yet have occurred, the liabilities at issue herein are for damages already incurred and hence are not the appropriate subjects of declaratory relief.

### FOR A FOURTH DEFENSE BY WAY OF THIRD AFFIRMATIVE DEFENSE

23)    Further answering the complaint herein and as a fourth defense thereto, Defendants reiterate all of the admissions, allegations and denials in Paragraphs 1-22 above as fully as if repeated herein.

24)    Defendants allege that the relief sought by Plaintiff is barred by the doctrines of waiver, estoppel and ratification.

### FOR A FIFTH DEFENSE BY WAY OF COUNTERCLAIM
### AND THIRD PARTY COMPLAINT

25)    Further answering the complaint herein and as a fifth defense thereto, Defendants reiterate all of the admissions, allegations and denials in Paragraphs 1-24 above as fully as if repeated herein.

26)    This Counterclaim and Third-Party Complaint is brought on behalf of the Defendant and Third-Party Plaintiff, RamKo Venture Management, Inc. ("RamKo"), against the Plaintiff and Third-Party Defendant, Carlos Gutierrez.

27)    This Court has jurisdiction over the subject matter of the Counterclaim by RamKo against the Plaintiff pursuant to the doctrines of diversity and ancillary jurisdiction.

28)    Third-Party Defendant Carlos Gutierrez is an individual who resides at 170 Knighton Road, Spartanburg, South Carolina.

29)    This Court has personal jurisdiction over the Third-Party Defendant Carlos Gutierrez because he is a resident of South Carolina.

5

30)    This Court has jurisdiction over the subject matter of the Third-Party Complaint by RamKo against Gutierrez pursuant to the doctrines of diversity and ancillary jurisdiction.

31)    The proper venue for the Counterclaim and Third-Party Complaint is the subject of a Motion for Transfer filed by the Defendants simultaneously with this Answer, Counterclaim and Third-Party Complaint. Defendant and Third-Party Plaintiff, Ramko, files this Counterclaim and Third-Party Complaint in this Court without waiving its arguments for transfer to the Southern District of New York, and asserts that it is specifically reserving those arguments and grounds.

32)    The basis for the counterclaim and Third-Party Complaint is to recover damages for (1) breach of contract in connection with a series of written and oral agreements relating to the raising of funds for URRC's business that were entered into between RamKo and URRC; (2) *quantum meruit* compensation and for unjust enrichment in connection with extensive, additional services of a financial and investment banking nature provided by RamKo and accepted by URRC over the course of five years, for which URRC has paid RamKo nothing; and for promissory estoppel and fraud, in light of URRC's and its CEO's misleading assurances to RamKo, orally and in writing, that URRC would compensate RamKo appropriately for its extensive services. URRC and its CEO, Carlos Gutierrez, having already reneged on a capital-raising deal that would have generated a significant fee for RamKo, are now attempting to renege on every one of the numerous promises they made to RamKo over the course of five years, pursuant to which they obtained extensive and valuable services for which they have paid RamKo nothing.

## BACKGROUND

33)    When RamKo began its relationship with URRC in approximately 2001, URRC was in need of substantial financial expertise both with respect to its day-to-day operations and also with respect to the realization of its overall strategic vision. URRC's key asset on which its future profitability depended was a proprietary "bottle-to-bottle" waste-recycling technology capable of extracting re-usable raw material from used plastic bottles; but the transformation of that technology into a profitable enterprise required the construction of one or more factories and hence very substantial capital expenditures. URRC at that time was relying, for cash, chiefly on revenues from its existing but diminishing silver recycling

business, and hence was also looking for ways to maximize the cash flow from that business while it simultaneously developed the plastic recycling business on which its future depended. RamKo, accordingly, was engaged by URRC (a) to supply both day-to-day assistance with the wide range of financial matters that would typically be the responsibilities of a CFO (everything from reviewing and recommending courses of action on such day-to-day matters as corporate accounting, auditing, loans, etc. to providing more generalized or longer-range financial guidance to the Company on business initiatives), as well as (b) to provide extensive investment banking services of different sorts at different times. Among the many different investment banking assignments undertaken by RamKo was the job of acting as URRC's banker with respect to a major private placement that would involve the raising of up to $16 million in fresh capital.

34)    These financial damages that are the subject of these counterclaims fall into three major categories. First, in connection with the raising of $15 million via private placement, RamKo negotiated a deal, consistent with URRC's stated criteria, with a firm called Founders, which was ready, willing and able to close on that deal. At the eleventh hour, URRC reneged on a deal that was fully consistent with (and even more advantageous than) a Letter of Intent it had signed. Importantly, however, URRC had agreed with RamKo to pay RamKo a break-up fee if it backed out of that deal in order to accept alternative funding or a different strategic investment. RamKo accordingly is entitled to that break-up fee now (or will be upon URRC's consummation of an alternative transaction). Indeed, URRC previously acknowledged its obligation to RamKo under these circumstances, and negotiated a specific fee it would pay RamKo if it closed a transaction with one of its alternative suitors, but now finds it convenient to disavow all such agreements.

35)    Second, URRC acknowledged in early 2004 that RamKo had provided very valuable services to URRC for which RamKo had not been paid, and entered into an agreement to pay RamKo, in the form of valuable warrants to purchase URRC equity, for RamKo's pre-2004 prior work. The obligation explicitly acknowledged and referred to in that agreement has never been satisfied, either through the provision of warrants of equal value or by payment of the equivalent value of those warrants in cash. Here again, URRC now disavows its obligation to RamKo even though having previously acknowledged that very obligation in writing.

7

36)    Third, RamKo continued to perform additional services for URRC *after* the time of the "prior work" agreement, for which compensation is also due. Although the parties entered into an agreement in 2005 whereby URRC finally undertook to start paying RamKo for its CFO-type services rendered from mid-2005 forward, that agreement specifically provided that RamKo's compensation for investment banking services would be separate, and would in no way be offset by the compensation URRC finally started to pay in 2005 for the CFO services. RamKo in fact performed additional investment banking services in 2005, chiefly in connection with a consummated corporate acquisition by URRC, for which no compensation has been paid despite URRC's promises to pay RamKo fairly.

37)    As detailed below, URRC has blatantly defaulted on its contractual obligations, written and oral, to RamKo. Moreover, by abruptly taking the position in this lawsuit that it never meant to incur any obligation to pay RamKo for certain of the services which URRC and Gutierrez expressly and consistently, over the years, promised to pay for, URRC and Gutierrez have now exposed their prior, express promises as fraudulent.

38)    Each of the three categories of URRC's unscrupulous defaults -- the break-up fee on the Founders deal; the pre-2004 services; and the 2004 and later investment banking services – is addressed below.

## RAMKO'S ENTITLEMENT TO A BREAK-UP
## FEE ON THE FOUNDERS DEAL

38)    In January 2004, RamKo and URRC entered into three agreements dated January 2, 2004 (the "January 2, 2004 Agreements"), that were reduced to writing and signed by the parties. (Attached as Exhibit A and their terms are incorporated herein by reference.). One of those agreements, entitled "Summary of Terms" set forth the broad outline of a potential private placement transaction which RamKo was engaged to use its best efforts to achieve. A second agreement entered into at the same time provided that RamKo would be entitled to receive a break-up fee from URRC if an investor were ready to close on a transaction as outlined in the "Summary of Terms" but URRC, for any reason, chose to accept alternative funding or an investment from some other source (the "Break-Up Fee Agreement"). Finally, a third agreement provided, among other things, that in consideration of past work on URRC's behalf, RamKo would receive a 10-year warrant to purchase up to

8

4% of URRC's common stock after the closing of the private placement transaction (the "Past Work Agreement").

39)      RamKo in fact used its best efforts to identify and engage the interest of potential investors to proceed with a private placement transaction along the lines of the "Summary of Terms." In fact, through its diligent work, RamKo introduced over forty (40) private equity funds to the potential URRC transaction. One such potential investor was Founders Equity SBIC, LLP ("Founders"), a private equity group. Founders reviewed URRC's business plan and related underlying projection (a lengthy and detailed document that RamKo prepared from information provided by URRC), which demonstrated a need over time for a total of $16 million in new equity and advertised a willingness on the part of URRC to cede existing shareholder control in exchange for that level of capital. Founders noted that URRC's plan was to raise $8 million initially and then the second $8 million later, but Founders came to the conclusion, towards the end of 2004, that it did not want to rely on the vagaries of URRC's ability to raise the second $8 million. Founders accordingly advised URRC in late 2004 that Founders would be willing to explore a transaction with URRC pursuant to which Founders would invest $15 million in exchange for immediate control of URRC, thereby obviating the need for a second round of financing later on.

40)      URRC instructed RamKo that it would, in fact, proceed with the Founders' discussions on this revised basis, and in March 2005 Founders determined that it was prepared to move forward with due diligence if URRC was willing to accept a $15 million investment in URRC in exchange for 62.5% of URRC's equity.

41)      Shortly after Founders first indicated, and URRC approved, that the size of the potential investment would increase significantly, from $8 million to $15 million, RamKo had prepared revisions of the January 2, 2004 Agreements designed to scale down the size of RamKo's fee as a percentage of the larger deal that was now under discussion. These three revised agreements (the "December 10, 2004 Revisions"), are attached hereto as Exhibit B and their terms are incorporated here by reference. URRC's CEO, Carlos Gutierrez, told RamKo's President, John Kohut, that the December 10, 2004 Revisions in fact represented URRC's agreement with RamKo, and that he was willing to sign them; however, Kohut and Gutierrez agreed there was no need to actually sign the documentation at that time. The December 10, 2004 Revisions do, nonetheless, represent the parties' oral agreement regarding

the revised terms of RamKo's compensation within the context of the larger, $15 million deal that was now, as of late 2004, being discussed; and these remained the agreed-upon terms of RamKo's compensation going forward.

42)    The negotiations with Founders proceeded for several months thereafter. In the spring of 2005, URRC broke off negotiations with Founders because it thought, for a brief period, that it had more attractive alternatives. But URRC soon thereafter came to the realization that Founders represented its only shot at getting much-needed financing, and instructed RamKo to revive negotiations with Founders. RamKo did so, and on July 15, 2005, Founders and URRC finally entered into a Letter of Intent (the "July 15, 2005 Letter of Intent") pursuant to which Founders would invest $15 million in exchange for 62.5% of URRC's equity.

43)    There ensued lengthy due diligence and negotiations aimed at finalizing a definitive agreement between Founders and URRC. Despite the fact that all substantial issues eventually were resolved, and despite the fact that Founders was ready, willing and able to close on the transaction contemplated by the July 15, 2005 Letter of Intent on the same or better terms as specified therein, URRC ultimately reneged on the proposed transaction in October of 2006. Because of URRC's and Gutierrez's bad faith conduct in reneging on this deal, Founders sued URRC in federal court for breach of contract and of the duty to negotiate in good faith, and sued Gutierrez for tortious interference with contract, tortious interference with prospective economic relationship, and fraud. A detailed recitation of the course of events leading up to the filing of Founders' lawsuit can be found in the Complaint filed by Founders against URRC and Gutierrez, (a copy of which is attached hereto as Exhibit C). URRC and Gutierrez settled Founders' lawsuit, on unknown terms, thereby avoiding a potentially unfavorable adjudication of Founders' claims.

44)    As an examination of Founders' allegations reveals, and as is in fact the case, URRC refused to proceed with the Founders transaction because URRC came to feel that it had superior alternatives, namely potential deals with a company called NTR, and/or a potential deal with The Coca-Cola Company ("Coke"). On information and belief, URRC in fact breached at least the spirit of the exclusivity provisions of the July 15, 2005 Letter of Intent and the amendments extending that agreement, in order to pursue possible deals with NTR and/or Coke. On information and belief, compounding the impropriety of URRC's

conduct in this regard was the fact that it used the fact of its potential deal with Founders, as well as analyses developed during the course of the negotiations with Founders, in a manner that heightened the interest of NTR and Coke -- just the sort of thing that the exclusivity agreement between URRC and Founders was supposed to preclude.

45)     However, URRC ignored its commercial obligations to Founders and, notwithstanding extensive efforts on the part of Founders to prevent URRC from doing so, URRC irrevocably walked on the Founders deal in October 2006. URRC, on information and belief, is currently negotiating with two other parties, NTR and Coke, with respect to alternative funding and/or a strategic investment.

46)     As alleged hereinabove, the January 2, 2004 Agreements between RamKo and URRC included a Break-Up Fee Agreement. The relevant portions of the Break-Up Fee Agreement remained in effect pursuant to the December 10, 2004 Revisions of these agreements. The most relevant portion, which is identical in both the original January 2, 2004 and revised December 10, 2004 iterations, provides that:

> This is to confirm our conversation wherein RamKo Venture Management ("RamKo") and its affiliate Adirondack Capital Partners Inc. have agreed, on a best efforts basis, to attempt to place an equity funding for URRC. **Further, we have agreed that should RamKo be in a position to close such transactions, on substantially the terms outlined, and if, for any reason, the Company chooses to accept alternative funding or a strategic investment, RamKo shall be entitled to, as a break-up fee, compensation equal to its minimum fee ($300,000 plus warrants) less any amount contractually due and payable or paid under the enclosed Summary of Terms.**

47)     RamKo satisfied the performance conditions underlying its entitlement to the break-up fee by reason of the fact that Founders was ready, willing, and able to proceed with a transaction on terms that URRC had deemed acceptable pursuant to the orally agreed-upon December 10, 2004 Revisions; indeed, URRC's acknowledgment that the modifications to the size of the deal, from $8 million to $15 million, with a resulting 62.5% to 37.5% equity split, were acceptable to URRC, is evidenced by URRC's signature on the July 15, 2005 Letter of Intent that specifies those terms.

48)     URRC reneged on its understandings with Founders in order to pursue "alternative funding or a strategic investment" with other parties who were then, and on information and belief remain, NTR and Coke. There is no time limit upon URRC's

obligation to pay the break-up fee; if URRC walked out on a transaction that RamKo could have closed with Founders, which URRC unquestionably did, then the only remaining condition precedent to URRC's liability for the break-up fee is the requirement that URRC accept alternative funding or a strategic investment from some other party.  Upon the acceptance by URRC of any such alternative funding or a strategic investment from NTR, Coke, or from any other party, URRC will owe RamKo the consideration specified in the Break-Up Fee Agreement, namely $300,000 in cash, plus ten-year warrants to purchase equity in URRC as set forth in the parties' agreement (or, as to the warrants, the reasonable value thereof as computed using appropriate methodologies for valuing warrants).

### RAMKO'S ENTITLEMENT TO COMPENSATION
### FOR PRE-2005 SERVICES

49)    The break-up fee is not the only money that URRC owes RamKo.  Between 2001 and the end of 2003, RamKo performed extensive services of various types for URRC with the expectation of being paid, for which it has received no compensation.  These services included a broad array of financial consulting services, including services of the type that would normally be performed by an in-house CFO as well as those that would typically be within the expertise of an outside investment banker.  Because URRC, like many early-stage companies, was cash-constrained, Gutierrez promised Kohut repeatedly that RamKo would be "taken care of" when URRC raised financing.  Kohut, on behalf of RamKo, was willing to provide services based upon Gutierrez's promises because he believed in URRC's technology and was willing to take the risk that URRC would be successful.  He was not, however, ever prepared to take the risk that Gutierrez was misleading him by creating false expectations, in order to obtain RamKo's services for nothing.

50)    Consistent with the foregoing, shortly before the parties entered into the January 2, 2004 Agreements, Gutierrez and Kohut agreed that it would be appropriate to make provision in these agreements for a reasonable amount of compensation to be payable to RamKo strictly for past work that RamKo had performed.  The parties accordingly agreed to a provision in the Past Work Agreement stating that

> RamKo and the Company [URRC] have agreed that **in consideration of past work on the Company's behalf,** the Company shall issue to RamKo or its designee a 10 year warrant to purchase up to 4,000 shares (post private placement closing) [*i.e.*, 4%] of the Company's common stock exercisable,

12

inclusive of a cashless exercise option, at $200.00 per share (based on the capital structure outlined in the Summary of Terms).

Accordingly, the value of options to purchase 4% of the Company's common stock on the (post-funding) basis outlined above represents a fair representation of the value the parties placed on the "past work" that RamKo had provided to URRC as of January 2004, for which RamKo had received no compensation.

51)    RamKo continued to provide additional services to URRC, similar in scope to its prior services, for the remainder of 2004 and the first five months of 2005, for which RamKo has received no compensation. RamKo is entitled to compensation for its services in the years 2001 through 2004 and for January through May 2005, on the basis of *quantum meruit,* unjust enrichment, and/or promissory estoppel. The value of those services will be determined at trial, but are alleged to be substantially in excess of $400,000.

## RAMKO'S ENTITLEMENT TO 2005
## INVESTMENT BANKING COMPENSATION

52)    As a final significant category of entitlement, RamKo is owed compensation from URRC for investment banking services it provided to URRC in 2005 and thereafter. Although RamKo also continued to provide "CFO"-type services to URRC in 2005 and thereafter, as of June 2005 the parties finally entered into a separate "Consulting Agreement" providing that RamKo would be paid, beginning in June 2005, a monthly fee in respect of CFO-type services to be provided from June 2005 forward. Those payments are not in dispute and any disputes that may arise in respect of that agreement are subject to arbitration. Importantly, that Consulting Agreement specifically *excepted* investment banking services from coverage under the Consulting Agreement, and provided that there would be no offsets of other compensation owed to RamKo by reason of any payments made pursuant to the Consulting Agreement. Accordingly, any investment banking services rendered by RamKo in 2005 or later are not covered either by the above-described "Past Work Agreement" or by the "Consulting Agreement," and RamKo is entitled to the reasonable value thereof on the basis of *quantum meruit,* unjust enrichment, and promissory estoppel.

53)    In 2005, in reliance on Gutierrez's promises that this assignment would generate a fee for RamKo consistent with normal investment banking fees if it were consummated, and in reasonable expectation of receiving ordinary and customary

compensation for the value of its services, RamKo provided investment banking services to URRC (and was introduced to DMS's sellers by URRC as URRC's investment banker for the transaction) in connection with URRC's acquisition of a silver recycling business called DMS. That acquisition was consummated with RamKo's substantial assistance. The reasonable value of RamKo's services, measured by reference to the size of the transaction in accordance with prevailing industry standards, is approximately $150,000.

## FOR A SIXTH DEFENSE BY WAY OF FIRST CAUSE OF ACTION AGAINST URRC FOR BREACH OF CONTRACT

54)    Defendant RamKo realleges the allegations contained in Paragraphs 1 through 53 above as fully as if repeated herein.

55)    URRC has informed RamKo in the Complaint filed in this captioned action (for the first time and in contravention of its numerous previous expressions, written and oral) that it believes it owes RamKo no break-up fee and that it intends to pay RamKo nothing if and when it accepts alternative funding or a strategic investment from NTR, Coke, or any other party. Accordingly, URRC is in anticipatory breach of its agreements, written and oral, to pay RamKo the agreed-upon break-up fee.

56)    All performance conditions on the part of RamKo were met when Founders was ready to proceed with a transaction substantially on the terms outlined in the July 15, 2005 Letter of Intent between Founders and URRC. The final conditions to RamKo's entitlement to its break-up fee will be met if and when URRC accepts alternative funding or a strategic investment from a party other than Founders. As alleged hereinabove, the amount of that fee is $300,000, plus warrants to purchase post-funding URRC equity or the reasonable cash equivalent value of those warrants, the precise amount of which will be determined at trial.

57)    In addition to the break-up fee, RamKo was promised, orally and as reflected in the Past Work Agreement, compensation for the extensive pre-June 2005 services to URRC for which no compensation has been paid, together with reimbursement of its out-of-pocket expenses incurred in connection therewith. It was always understood that those services were not being provided *gratis* and that RamKo would be paid the reasonable value of those services, in stock or warrants if not in cash, when URRC's financial condition enabled it to make such payment. Although URRC's Gutierrez at times appeared to suffer from a form of

convenient amnesia with regard to his promises to RamKo of compensation, causing Kohut, in turn, to have to virtually beg to be paid and even offer to compromise what he was due in an effort to get something paid to him, it was not until this lawsuit was filed by URRC that URRC for the first time repudiated its prior agreements to provide RamKo with fair compensation for its past, pre-2005 work.

58)    The "past work" that RamKo had performed prior to 2005 had a fair value, pursuant to prevailing standards for similar work, in excess of $400,000; and RamKo further incurred out-of-pocket expenses in connection with this work, all for the benefit of Plaintiff. In addition, the investment banking work (outside the purview of the Consulting Agreement for CFO services) that RamKo thereafter did for URRC in 2005, in connection with the DMS acquisition, had a fair value, pursuant to prevailing standards for similar work, of approximately $150,000.

59)    By reason of the foregoing, RamKo has sustained or will soon sustain damages in an amount in excess of $1 million dollars, comprised of the break-up fee inclusive of warrants, plus the fair value of its uncompensated work and expenses from 2001 through 2005.

## BY WAY OF A SEVENTH DEFENSE AND SECOND CAUSE OF ACTION AGAINST URRC FOR UNJUST ENRICHMENT

60)    Defendant realleges the allegations contained in paragraphs 1 through 59 of the above as fully as if repeated herein.

61)    In the alternative, Ramko is entitled to the compensation (and expenses) set forth above on the grounds of unjust enrichment. URRC received services provided by RamKo as described hereinabove; URRC benefited from those services; and under principles of equity and good conscience, URRC should be required to pay for those services.

62)    With respect to the break-up fee, URRC used the proposed Founders transaction as a stalking horse in order to negotiate terms that URRC deemed preferable with other potential investors. This constitutes an appropriation by URRC of the value of RamKo's work on the Founders transaction, as well as an appropriation of the value of the work that RamKo did on the alternative transactions. The break-up fee described above is a reasonable measure of damages for that appropriation.

63)    With respect to the other services provided by RamKo as described above for which no compensation has been received, it would be manifestly unjust for URRC to have accepted the benefit of those services and the out-of-pocket expenses incurred by RamKo in connection therewith without paying for them. URRC accordingly is liable for the reasonable value of those services and expenses on the basis of unjust enrichment.

64)    By reason of the foregoing, RamKo has sustained damages in an amount in excess of $1 million dollars, comprised of the break-up fee inclusive of warrants, plus the fair value of the work described above that was performed from 2001 through 2005, for which it has received no compensation.

## BY WAY OF EIGHTH DEFENSE AND THIRD CAUSE OF ACTION AGAINST URRC FOR QUANTUM MERUIT

65)    Defendant realleges the allegations set forth above in Paragraphs 1-64 as fully as if repeated herein.

66)    In the alternative, RamKo is entitled to the compensation (and expenses) set forth above on the basis of *quantum meruit.* Ramko provided the services described hereinabove and incurred expenses in connection therewith in good faith; those services (and expenses) were accepted by URRC; and there was an expectation that RamKo would be compensated for their fair value.

67)    By reason of the foregoing, RamKo has sustained damages in an amount in excess of $1 million dollars, comprised of the break-up fee inclusive of warrants, plus the fair value of the work described above that was performed from 2001 through 2005, for which it has received no compensation.

## FOR A NINTH DEFENSE BY WAY OF FOURTH CAUSE OF ACTION AGAINST URRC AND GUTIERREZ FOR PROMISSORY ESTOPPEL

68)    Defendant realleges the allegations set forth above in Paragraphs 1-67 as fully as if repeated s herein.

69)    In the alternative, RamKo is entitled to the compensation (and expenses) set forth above on the basis of promissory estoppel.

70)    URRC, through its CEO Gutierrez, repeatedly promised RamKo's President Kohut, that RamKo would be paid in accordance with prevailing standards for similar work for the services it was providing, including (1) the services it was providing in connection

with the Founders' transaction, (2) its services in respect of "past work" performed pre-2005, and (3) its investment banking services performed during 2005 that were not the subject of the separate Consulting Agreement. In reliance on those promises, RamKo devoted and continued to devote considerable time, energy, and expertise to working on behalf of URRC.

71)     By reason of the foregoing, RamKo has sustained damages in an amount in excess of $1 million dollars, comprised of the break-up fee inclusive of warrants, plus the fair value of its uncompensated work from 2001 through 2005.

### FOR A TENTH DEFENSE BY WAY OF FIFTH CAUSE OF ACTION AGAINST URRC AND GUTIERREZ FOR FRAUD

72)     Defendant realleges the allegations set forth above in Paragraphs 1-71 as fully as if repeated s herein.

73)     According to the complaint in the Founders lawsuit against URRC and Gutierrez, Gutierrez committed a fraud against Founders by representing that the 62.5% to 37.5% equity split that was set forth in July 15, 2005 Letter of Intent was acceptable to him, when in fact the intent of URRC and Gutierrez was never to proceed with a transaction on that basis. The fraud allegations against Gutierrez are set forth in Paragraphs 95 through 99 of the Founders Complaint and are incorporated and alleged herein, upon information and belief, by reference.

74)     The fraud described in the Founders complaint was also a fraud upon RamKo. RamKo expended substantial time and effort pursuing the transaction with Founders, and stood to be compensated with a substantial fee upon consummation of the transaction. Notwithstanding the compensation provided by the break-up fee as alleged hereinabove, RamKo invested time and energy in the Founders transaction in reliance upon URRC's and Gutierrez' representation that they were serious about proceeding on the terms that ultimately were expressed in the July 15, 2005 Letter of Intent; and like Founders, RamKo was shocked and distressed to learn that Gutierrez viewed the 62.5% to 37.5% equity split as a problem of deal-breaking magnitude even after he signed a Letter of Intent in which he agreed to that split. In addition to the value of its time and energy expended in the belief that URRC was serious about pursuing the Founders deal to consummation, RamKo has sustained reputational damage caused by the unfortunately accurate perception in the private equity community that

RamKo's client, URRC, reneged on a significant transaction in the pursuit of which Founders had spent hundreds of thousands of dollars in due diligence and related expenses.

75)     By reason of the foregoing, RamKo has sustained damages separate from its contractual or quasi-contractual damages, the amount thereof to be established at trial.

76)     URRC and Gutierrez also committed a separate fraud against RamKo by inducing RamKo to provide services to URRC in connection with URRC's and Gutierrez's pursuit of an alternative deal with NTR and/or Coke. In or about early April 2006, Gutierrez sought to develop an alternative to the Founders deal by engaging in discussions with NTR. Gutierrez told Kohut that he wanted Kohut to update URRC's business plan into a form suitable for presentation to NTR. Subsequently, Gutierrez telephoned Kohut and told him to hold up on doing further work regarding the update; Gutierrez said that the reason for the hold was that URRC's COO was concerned that a dispute might ensue if RamKo performed work on an NTR transaction in the absence of a specific agreement on RamKo's fee in connection therewith. Gutierrez directed Kohut to speak to the COO and decide upon an appropriate fee if the NTR transaction, rather than the Founders deal, went forward. Gutierrez stated that it was essential that there be agreement on RamKo's fee before RamKo did any further work on the potential NTR transaction.

77)     Kohut communicated with URRC's COO and pointed out, among other things, that he would be entitled to a break-up fee on the Founders deal if a deal with NTR went forward in place of Founders. URRC's COO stated that he wanted everyone to agree upon exactly what RamKo's fee would be in the event of a transaction in any form with NTR, and noted that there was no reason why RamKo should receive any less compensation than it would have received for the Founders transaction, if a deal with NTR was consummated. Pursuant to Gutierrez's instruction that Kohut and the COO negotiate an acceptable fee in respect of NTR -- which Gutierrez said he would approve before RamKo engaged in any further work in support of an NTR transaction -- Kohut and the COO arrived at an agreement providing that if URRC accepted a deal with NTR, RamKo would receive a fee of $375,000, plus 1.5% of URRC's equity on a pre-closing basis. This deal was communicated to Gutierrez by the COO, with the understanding that it would be subject to approval by Gutierrez in a conference call the following day. After having been so informed of the terms of the fee agreement, Gutierrez responded to RamKo that a conference call would not be

necessary, and directed RamKo to proceed with the business plan update, specifically an update of the plan's executive summary, without disputing or modifying, or even commenting on the terms of RamKo's fee (other than saying that a conference call for further negotiation or discussion was not needed).  Gutierrez thereby conveyed by his conduct that he approved of the fee agreement negotiated by Kohut and the COO.  RamKo accordingly was given ample reason to understand, and in fact understood, that if a deal was made with NTR, RamKo would be paid on the basis outlined to Gutierrez and to Kohut by the COO.  URRC further utilized RamKo to prepare and/or review other corporate data for distribution to NTR and/or Coca-Cola in connection with a possible transaction with those entities.

78)    On information and belief, at the time that Gutierrez created the foregoing understanding regarding RamKo's compensation, he intended to obtain RamKo's services by fraud in that he harbored an undisclosed intention to reserve to himself the option of not paying RamKo.  That undisclosed intention is made evident by the fact that URRC, in its current Complaint herein, maintains that RamKo is entitled to no fees beyond the fees  URRC started paying as of June 2005 for CFO-type services.

79)    By reason of the foregoing, RamKo is entitled to damages in an amount in excess of $1 million, the precise amount to be proven at trial.

80)    Further by reason of the foregoing, RamKo is entitled to an award of punitive damages, to punish URRC and Gutierrez for conduct that was willful and malicious, in an amount to be determined by the finder of fact.

WHEREFORE, having fully answered the Complaint, Defendants pray that this Court:

(a)    Dismiss the Complaint with prejudice in its entirety;

(b)    Grant judgment in an amount in excess of $1 million in compensatory damages, the precise amount to be proven at trial, against URRC on Defendant RamKo's first, second and third causes of action as set forth in RamKo's counterclaim;

(c)    Grant judgment in an amount in excess of $1 million in compensatory damages, the precise amount to be proven at trial, against URRC and Carlos Gutierrez, jointly and severally, on RamKo's fourth and fifth causes of action as set forth in RamKo's Counterclaim and Third-Party Complaint;

(d)     Grant judgment in an amount in excess of $1 million in punitive damages against URRC and Carlos Gutierrez, jointly and severally, pursuant to RamKo's fifth cause of action;

(e)     Grant a trial by jury of all defenses, counterclaims and Third Party Claims in this action;

(f)     Grant all costs, including reasonable attorney's fees, incurred by Defendants in connection with this action; and

(g)     For such other and further relief as the Court may deem just and reasonable.


                                        Respectfully submitted,


                                        By: s/Julianne Farnsworth

                                        Julianne Farnsworth
                                        Federal Bar # 4438
                                        FARNSWORTH LAW FIRM LLC
                                        Post Office Box 338,
                                        Charleston, South Carolina 29402
                                        Phone:(843) 723-0425
                                        Fax:(843) 723-0426
                                        Email: Julianne@Farnsworthlaw.com

                            ATTORNEY FOR THE DEFENDANTS



April 4, 2007
Charleston, South Carolina

# EXHIBIT A
# January Agreements

# RamKo

711 Fifth Avenue, New York, New York 10022

Capital, Inc.
Consulting Group
Venture Management, Inc.

Telephone: (212) 223-2451
Facsimile: (212) 223-2490

Mr. Carlos D. Gutierrez
President
United Resource Recovery Corporation
5396 Blackstock Road
Spartanburg, SC 29303

January 2, 2004

Re: Equity Private Placement, United Resource Recovery Corporation, ("URRC").

Dear Carlos,

This is to confirm our conversation wherein RamKo Venture Management ("RamKo") and its affiliate Adirondack Capital Partners Inc. have agreed, on a best efforts basis, to attempt to place an equity funding for URRC. Further, we have agreed that should RamKo be in the position to close such transactions, on substantially the terms outlined, and if, for any reason, the Company chooses to accept alternative funding or a strategic investment, RamKo shall be entitled to, as a break-up fee, compensation equal to its minimum fee ($300,000 plus warrants) less any amount contractually due and payable or paid under the enclosed Summary of Terms.

Additionally, I would like to direct your attention to page 4 of the Summary of Terms. Please note that the paragraph entitled "Conversion" outlines a procedure where the preferred equity could have a claim upon conversion, for a greater percentage of common equity then we have discussed. This type of provision is not meant to increase the position of the investor in the ongoing investment. It is however, meant to protect the investor against committing to the investment, only to have the investment be used as a form of stalking horse for the purpose of promoting a sale of the Company. The impact, if any, can be seen by reviewing a timeline of the relative worth of the Company vs. time since investment. As an example, if after the investment (with money down-streamed to Raleigh) someone offered you $40 million for the total business, even after full dilution the provision would not be operable. Alternatively, if you raise $3 million and subsequently agreed to a buyout of under $15 million (as in a quick flip) the provision would operate to protect the investor. I would be pleased to spend the time with you and Gerry to get you and or your counsel comfortable with the concept.

URRC                                             Page 2
January 2, 2004

        Should you have any questions and or comments, please don't hesitate to telephone. If the foregoing and the enclosed Summary of Terms accurately outline our agreements in these contemplated transactions, please execute, fax and return by U.S. mail a copy of each document (3). Thank you for your courtesy. We look forward to working with you and your whole organization.

                                         Sincerely

                                         RamKo Venture Management, Inc.

                                         By John W. Kohut, President

Acknowledged and Agreed:

United Resource Recovery Corporation

Carlos D. Gutierrez, President

# EXHIBIT B
# December Agreements

Mr. Carlos D. Gutierrez
President                                                                December 10, 2004
United Resource Recovery Corporation
5396 Blackstock Road
Spartanburg. SC 29303

Re: Equity Private Placement, United Resource Recovery Corporation, ("URRC").

Dear Carlos,

        This is to confirm our conversation wherein RamKo Venture Management ("RamKo") and its
affiliate Adirondack Capital Partners Inc. have agreed, on a best efforts basis, to attempt to place an equity
funding for URRC. Further, we have agreed that should RamKo be in the position to close such
transactions, on substantially the terms outlined, and if, for any reason, the Company chooses to accept
alternative funding or a strategic investment, RamKo shall be entitled to. as a break-up fee. compensation
equal to its minimum fee ($300.000 plus warrants) less any amount contractually due and payable or paid
under the enclosed Summary of Terms.

        Additionally. I would like to direct your attention to page 4 of the Summary of Terms. Please note
that the paragraph entitled "Conversion" outlines a procedure where the preferred equity could have a claim
upon conversion, for a greater percentage of common equity then we have discussed. This type of
provision is not meant to increase the position of the investor in the ongoing investment. It is however,
meant to protect the investor against committing to the investment, only to have the investment be used as a
form of stalking horse for the purpose of promoting a sale of the Company. The impact, if any, can be seen
by reviewing a timeline of the relative worth of the Company vs. time since investment. As an example, if
after the investment (with money down-streamed to Raleigh) someone offered you $100 million for the
total business, even after full dilution the provision would not be operable. Alternatively, if you raise $15
million and subsequently agreed to a buyout of under $50 million (as in a quick flip) the provision would
operate to protect the investor. I would be pleased to spend the time with you and Gerry to get you and or
your counsel comfortable with the concept.

URRC                                                                      Page 2
December 10, 2004


        Should you have any questions and or comments, please don't hesitate to telephone. If the foregoing and the enclosed Summary of Terms accurately outline our agreements in these contemplated transactions, please execute, fax and return by U.S. mail a copy of each document (3). Thank you for your courtesy. We look forward to working with you and your whole organization.


                                              Sincerely

                                              RamKo Venture Management, Inc.


                                              _____
                                              By John W. Kohut, President



Acknowledged and Agreed:

United Resource Recovery Corporation




_____
Carlos D. Gutierrez, President

# RamKo Venture Management, Inc.
### 711 Fifth Avenue
### New York, New York 10022

Mr. Carlos D. Gutierrez                                              December10, 2004
President
United Resource Recovery Corporation
5396 Blackstock Road
Spartanburg, SC 29303

Re: Equity Private Placement, United Resource Recovery Corporation ("URRC")
– SIDE LETTER #1

Dear Carlos,

This is to confirm our conversation wherein RamKo Venture Management, Inc. ("RamKo") and its affiliate Adirondack Capital Partners Inc. ("B/D") have agreed, on a best efforts basis, to attempt to raise expansion funding for URRC. The major points for the Private Placement are summarized on our executed copy of the "Summary of Terms". One of the provisions enclosed therewith, calls for the Company to enter into a financial advisory agreement with RamKo or one of its affiliates. We agree herewith, that in the event the Company, deems it necessary, as a requirement of the contemplated funding, to not retain RamKo's services, then the Company, on the one hand and RamKo, on the other hand, agree that, in such event the Company herewith grants to RamKo or one of its affiliates, the right of first refusal to arrange any additional funding necessary (exclusive of any bank related Senior Debt), for a period not to exceed 5 years, or such shorter time that cash commissions paid for such placements, equal the fees that would have been payable over the term of the contemplated financial advisory agreement. For purposes of this calculation, future fees paid, shall not include any fees paid or payable, as a result of transactions contemplated by the "Summary of Terms" and shall at all times be calculated, on the basis of fees considered normal and customary in the investment banking industry, for similar transactions.

Additionally, this is to acknowledge our discussions wherein RamKo has reduced its fee as previously agreed with the Company. Beyond that RamKo has further agreed to consider the reduction of it's new stated fees, subject to the source of the potential investor, and based upon then market pricing for similar transactions.

Further, RamKo and the Company have agreed that to the extent that Warrants have not been issued pursuant to the Private Placement, in consideration of past work on the Company's behalf, the Company shall issue to RamKo or its designee a 10 year warrant to purchase up to 5,000 shares of the Company's common stock exercisable, inclusive of a cashless exercise option, at the same per share (share amount based on the capital structure outlined in the Summary of Terms) as the per share price of the placement. In no event shall the Company issue Warrants to RamKo or its designee's in an amount convertible to in excess of 5,000 shares.

**RamKo Venture Management, Inc.**
711 Fifth Avenue
New York, New York 10022

URRC                                                                    Page 2
December 10. 2004

    I have previously forwarded a copy of RamKo's standard financial advisory agreement, as executed by another of its clients.  It remains our intent to use this form as the basis of our Agreement.

    Should you have any questions and or comments, please don't hesitate to telephone.  If the foregoing, the Summary of Terms and the draft Agreement accurately outline our agreements in these matters, please execute, fax and return by U.S. mail a copy of this document.  Thank you for your courtesy.  We look forward to working with you and your whole organization.

                          Sincerely

Acknowledged and Agreed:

United Resource Recovery Corporation                RamKo Venture Management. Inc.

                                      By John W. Kohut, President

Carlos D. Gutierrez, President

# Private Placement – URRC

## Summary of Terms

| | |
|---|---|
| **Issuer:** | United Resource Recovery Corporation ("URRC" or the "Company") |
| **Private Placement:** | On a best efforts basis, RamKo Venture Management, Inc. ("RamKo"), through themselves, their agents and/or Affiliates, ("the Investor Group") will arrange a Private Placement of up to 250 units at 100,000 each – for a total of up to $25,000,000 (for a maximum aggregate issuance of 66.666 <u>Convertible Preferred Shares</u>) |
| | All preferred shares shall be convertible 1:1 into common shares and other than having a liquidation preference over the common shares shall in all other manners function equal to the common shares, unless otherwise agreed to by the Company. |
| **Capitalization Structure:** | Assume 1,000,000 Authorized Shares of Capital Stock with an initial issued and outstanding of 100,000 shares or share equivalents. At the initial closing, without regard to the effect of any Warrants, the shares would be held or reserved as follows (assumes a post money valuation of $40,000.000): |

| | | |
|---|---|---|
| Existing stockholders | 62,500 | shares |
| Initial Private Placement | 37,500 | shares |

**Percent of fully diluted Common:** (post conversion, exercise of all then issued warrants)

| | Pre-Financing | Post-Financing |
|---|---|---|
| Investor Group (Initial Private Placement)* | 0% | 62.5% |
| Original Shareholders | 100.0% | 37.5% |
| Total | 100.0% | 100.0% |

\* Prior to conversion or exercise of any Warrants the Company would have raised up to $25 million for up to 62.5% dilution to the current ownership of the parent company.

# Private Placement – URRC

## Summary of Terms

| | |
|---|---|
| **Series closings :** | An initial closing may be held upon the receipt of valid subscription documents totaling $10 million. Thereafter, upon the occurrence of certain required events, one or more secondary closings may be held, at the discretion of the Company, in increments of $5 million. The Company will be obligated to close on all subscriptions validly held in anticipation of the initial closing and at it's discretion may, if the issue was not fully subscribed, agree to keep accepting subscriptions for a subsequent closing, or to terminate such offering.  The Company is under no obligation to accept subscriptions in excess of $10 million. |
| **Dividend Rate:** | The Preferred Stock shall have an annual dividend rate of 8% compounded semi-annually. |

**Fees and Expenses:**

| | |
|---|---|
| $750,000 | Commission (assuming a $15 million placement) – the greater of 10% of the actual equity placed – not to exceed $600,000 or 5% of the actual equity placed. |
| $250,000 | estimated closing expense (actual expense will be reimbursed) |
| To be determined | Blue Sky Fees |
| Other comp. | 500 "A"Warrants, for each  $1 million raised. Warrants will be issued for a maximum of 5,000 common shares, each with a cash-less exercise provision and a ten year expiry; each having an exercise price equal to the share price of the placement. |

| | |
|---|---|
| **Closing Conditions:** | The investment is subject to customary conditions, each to the satisfaction of RamKo, including:  1) the satisfactory completion of business, accounting and legal due diligence; 2) a satisfactory review of the Company's audited financial statements for the year ended December 31, 2004, as well as a review of the most recent interim financial statements of the Company,  with results satisfactory to RamKo  3)the negotiation and execution of definitive documentation:  4) no material adverse changes in the business or its prospects before closing;  5) the Company being operated in the ordinary course of business with no material asset sales, dividends declared or paid or any other shareholder distribution; 6) employment, compensation, confidentiality, proprietary rights, non compete agreements (inclusive of a no-hire agreement) satisfactory to RamKo, being signed by key management;  7) sufficient business and key person , insurance. |

# Private Placement – URRC

## Summary of Terms

| | | |
|---|---|---|
| **Warrants :** | Term: | the lesser of 10 years from closing or 5 years from the IPO date. |
| | Exercise Prices: | "A" Warrants – at a price per share equal to the placement. |
| | Features: | -The "A" Warrants shall be non-callable and shall allow for cashless exercise. |

**Liquidation Preference:**

In the event of a liquidation, the Preferred holders shall be entitled to receive, in preference to the holders of Common Stock, an amount equal to the original issue price plus accrued but unpaid dividends.   A consolidation or merger of the Company, the sale of all or substantially all of the Company's assets, a material change in senior management, or an initial public offering of at least $15 million, shall be treated as a liquidation.

**Redemption:**

The Company shall redeem one-third of any outstanding Preferred on the fifth anniversary of the Closing, one-third on the sixth anniversary and one-third on the seventh anniversary of Closing.  The redemption amount is the original issue price plus accrued but unpaid dividends, if any.

**Forced Redemption:**

At anytime after the fifth anniversary of the Closing, the Company shall have the right to redeem 100% of any then unconverted Preferred Shares at the redemption amount (detailed above).

**Conversion:**

Holders of the Preferred Shares may convert their shares immediately preceding a liquidation or redemption event, into a number of common shares which would equal the greater of either one share of Preferred Shares for one share of Common Stock (1:1) or that number of common shares, based on the valuation established for the liquidation or redemption event, that would result in the holder of the Preferred Shares receiving the greater of (i) 200% of the original issue amount, or (ii) a compounded annual return of 30% on the original issue price from the date of purchase, pursuant to the Securities Purchase Agreement, through the date of conversion.  In the event a proposed liquidation event would have paid the holders the requisite return in cash, but such proposal was rejected by the Preferred Shareholders, conversion thereafter shall be on the basis of one share of Preferred for one share of Common.

# Private Placement – URRC

## Summary of Terms

**Preemptive Rights:** The Investor Group shall have the right, but not the obligation, to purchase that portion of any subsequent offerings equal to their pro-rata share of the Common ownership of the Company.

**Co-Sale Rights:** In the event of a proposed sale of Common Stock by any Current Shareholder to a non-Current Shareholder, such shares must be offered first to (i) the Preferred Holders and then (ii) the other shareholders, subject to a shareholders agreement and last (iii) the Company shall have the right to purchase any or all of the offered shares and/or the right to participate pro-rata in the sale of any shares to such non-Current Shareholder either, on the same terms as proposed by the selling shareholder. Existing shareholders will execute an agreement to this effect.

**Protective Provisions:** So long as any of the preferred shares have not been converted, the Company shall not, without the affirmative vote of seventy five percent (75%) of the holders of the Preferred Shares, among other provisions: 1) alter, change or amend the terms of the Certificate of Incorporation or By-Laws of the Company; 2) authorize, create or issue any additional debt beyond that contemplated by the approved business plan; 3) increase or decrease the number of Directors; 4) redeem, repurchase, declare a dividend or make any distributions of capital stock; 5) enter into any material transaction with any officer, Directors, employee, or affiliate; 6) enter into any dissimilar business; 7) acquire companies (or their assets) whose purchase price exceeds 15% of the total assets of the Company as of the most recent quarterly balance sheet; 8) to approve a merger, consolidation or sale of substantially all the assets of the Company

**Registration Rights:** Holders of the Common shall be entitled to unlimited piggyback registration rights. All registrations will be at the Company's expense and will be subject to customary cutbacks at the underwriter's discretion.

**Board of Directors:** At such point as the Private Placement is closed, the Board of Directors of URRC will be comprised of 5 persons. There shall be two directors appointed by current ownership. The Investor Group shall be granted two seats on the Board of Directors and one seat on all Committees of the Board. A fifth member shall be appointed reasonably satisfactory to both the current ownership and the Investor Group.

At such time, the Board shall meet at least quarterly with adequate notice provided to all Directors. Certain key strategic decisions, including approval of the budget, issuance's of debt or equity, mergers/acquisitions, and transactions with affiliates shall require the approval of a 66.7% of the Company's Board of Directors. All compensation decisions for key management shall be approved by the Compensation Committee. An Investor Group Director and an outside Board Member shall comprise the majority.

# Private Placement – URRC

## Summary of Terms

| | |
|---|---|
| **Board Expenses:** | The Company shall reimburse Board members for all reasonable expenses associated with the duties and requirements of their membership on the Board and/or its Committees. |
| **Information Rights:** | The Company shall provide the investors with monthly financials not later than 30 days after the close of the month, audited financials not later than 120 days after the close of the fiscal year, and an annual plan (with budget and narrative) no later than 30 days prior to the close of the previous year. |
| **Key Person Insurance:** | The Company shall maintain key person insurance on certain members of management until otherwise determined by the Board of Directors. |
| **Non-Compete:** | Prior to closing, certain employees of the Company will sign non-compete agreement, the terms of which must be acceptable to the Investor Group. |
| **Estimated Expenses:** | The Company shall pay actual out-of pocket expenses (whether or not such Private placement shall ultimately close) for the preparation, execution and enforcement of the underlying documentation. |
| **Management Fees:** | To the extent the Company accepts Private Placement Funds arranged by RamKo, as compensation for its active participation in the on-going strategic direction and oversight of the Company's activities, the Company shall enter into a financial advisory agreement, (a copy of which has been furnished to the Company) with an affiliate of RamKo for a term of five years, or as long as a representative of RamKo remains on the Company's Board of Directors. The terms of this agreement shall include a monthly advisory fee of $8.500 plus reasonable out of pocket expense. Additionally, RamKo and or its affiliates shall be entitled to customary transaction fees associated with future financing(s) or acquisition(s) arranged by such other RamKo entity. |
| **Incentive Compensation:** | Notwithstanding any other provision contained within this Summary of Terms, it is understood that an Incentive Compensation Program will be developed for the reward of those assisting in the creation of shareholder worth. An amount of fully diluted Common Stock, to be approved by the Board of Directors, equal to between 5% and 10% of the share ownership of the Company, shall be reserved for such program. |

# Private Placement – URRC

## Summary of Terms

**Exclusivity Period:** The Company shall provide RamKo a 180 day period of exclusivity to complete due diligence, to negotiate and execute definitive documentation and to close the transaction. During this exclusive period, neither the Company nor its affiliates and/or advisors shall initiate discussions or engage in due diligence correspondence with respect to an equity investment in the Company with any party other than RamKo. During such period, should the Company introduce "persons" who ultimately invest in such Private Placement – the Company and RamKo agree to reasonably resolve the allocation of such fees if any, based upon the amount of support RamKo personnel have expended on such placement.

To the extent a potential investor is a recipient of the Company's Business Plan or such other documentation, as prepared by RamKo or otherwise has been introduced to the Company by Ramko, or any of its affiliates, and such potential investor makes an investment in the equity of the Company within a two year period, then RamKo shall be due it's fee as outlined hereunder.

**Confidentiality:** The term sheet is confidential and may not be disclosed to anyone other than representatives of the Company and its financial and legal advisors without the express written consent of RamKo.

**Approximate Closing:** June 30, 2005

# Private Placement – URRC

## Summary of Terms

This Term sheet, and the proposed terms set forth herein, does not constitute a binding agreement or commitment of RamKo or any of its affiliates. Any agreement or commitment shall only be contained in definitive agreements (containing the usual representations, warranties, conditions and covenants for these types of transactions) to be negotiated, executed and delivered, if at all, after the completion of appropriate due diligence and fulfillment of the other conditions referred to above. In that regard, RamKo has previously disclosed that it currently intends to put together an Investment Group to subscribe to an amount of the proposed Private Placement. Notwithstanding, nothing contained herein should be deemed to constitute a proposal for an "underwritten" financing. While RamKo is highly confident, based on the terms and conditions outlined herein, that it has knowledge of investors who would fully subscribe to such Private Placement, no such guarantee is made nor should be implied.

It is our understanding that the Company intends to make a decision on the Agency of the Private Placements on December 10, 2004. If the foregoing outline for the Private Placement is satisfactory to the Company, please evidence your willingness to proceed by executing one copy of this outline, on or before December 20, 2004 returning it to the attention of the undersigned (fax confirmed through U.S. mail).


For RamKo Venture Management, Inc.          For United Resource Recovery Corporation




By:                                          By:
John W. Kohut                                Carlos D. Gutierrez
President                                    President
Date:     December 10, 2004                  Date:

Page 7