UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED RESOURCE RECOVERY CORP,          :

                             Plaintiff.          :

              -against-          :

RAMKO VENTURE MANAGEMENT. INC. and  :
JOHN KOHUT,
                                   :
                     Defendants.
--------------------------------------------------------------x          Civil Action No.
                                                07-9452 (RWS)
RAMKO VENTURE MANAGEMENT, INC.,          :

               Third-Party Plaintiff.          :

              -against-          :

CARLOS GUTIERREZ,          :

             Third-Party Defendant.          :

--------------------------------------------------------------x


# DEFENDANT RAMKO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE URRC PARTIES' MOTION TO DISMISS THE COUNTERCLAIMS AND THIRD-PARTY CLAIMS

LLOYD S. CLAREMAN
121 East 61st Street
New York, New York 10065
Tel. No. 212-751-1585
Fax No. 212-838-0814
lloyd.clareman@clareman.com

Attorney for Defendants

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

COUNTER-STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

The Writings in the Counterclaims are Sufficient to State a Claim . . . . . . . . . . . . . . . 2

The Quantum Meruit Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Point One: The Counterclaims Satisfy the Applicable Pleading Standard . . . . . . . . . . 12

Point Two:  The Statute of Frauds Does Not Bar RamKo's Break-up Fee . . . . . . . . . .13

      A. The Break-Up Fee is Adequately Documented . . . . . . . . . . . . . . . . . . . . . . . . .13

      B. RamKo's Relationship With URRC Was So Extensive
        That the Statute Does Not Even Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Point Three:  Recovery in Quantum Meruit and Unjust Enrichment for
           RamKo's Pre-June 2005 Services is Clearly Available . . . . . . . . . . . . . . 19

Point Four:  The URRC Parties' Contention That "The May 2005 Consulting
          Agreement Superseded All Past Agreements" Is Obviously Wrong . . . . . . 21

Point Five:  RamKo is Entitled to Compensation for the DMS Deal . . . . . . . . . . . . . . .22

Point Six:  The Fraud Claims are Adequately and Properly Pleaded . . . . . . . . . . . . . . .24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

## TABLE OF AUTHORITIES

**Cases**

*Bell Atlantic Corp. v. Twombly,* 550 U.S. __ , 127 S.Ct. 1955 (2007) . . . . . . . . . . . . 12

*Conley v. Gibson,* 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Dzek v. Desco Vitroglaze of Schenectady,* 285 A.D.2d 926,
    727 N.Y.S.2d 814 (3d Dep't, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Giordano v. Thomas,* 438 F.Supp.2d 35 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . .20

*Gottesman Company v. Keystone Enterprises, Inc.,* 43 A.D.3d 696,
    841 N.Y.S.2d 540 (1st Dep't 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ladenberg Thalmann & Co., Inc. v. Tim's Amusements, Inc.,*
    275 A.D.2d 243, 712 N.Y.S.2d 526 (1st Dep't, 2000) . . . . . . . . . . . . . . . . . . . . 16

*Morris Cohon & Company v. Russell,* 23 N.Y.2d 569, 245 N.E.2d 712,
    297 N.Y.S.2d 947 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13-14, 22-3

*Riley v. N.F.S. Services, Inc.,* 891 F.Supp. 972, 977 (S.D.N.Y. 1995) . . . . . . . . . . . . . 19

*Royal Air Maroc v. Servair, Inc.,* 603 F.Supp. 836 (S.D.N.Y. 1985)
    (Sweet, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 17, 24-5

*Seneca Ins. Co. v. Morelli,* 1996 WL 312230,
    95 Civ. 10701 (S.D.N.Y., June 10, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Shann v. Dunk,* 84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Streit v. Bushnell,* 424 F.Supp.2d 633 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . .12, 13, 19

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes and Rules**

Fed.R.Civ.Proc. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Fed.R.Civ.Proc. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

Fed.R.Civ.Proc. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed.R.Civ.Proc. 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

General Obligations Law §5-701(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Treatises**

5 C. Wright & A. Miller, *Federal Practice and Procedure*
§1202, at 89-90 (3d Ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Preliminary Statement**

This Memorandum of Points and Authorities is respectfully submitted on behalf of defendant and counterclaimant RamKo Venture Management, Inc. ("RamKo") in opposition to the motion of plaintiff United Resource Recovery Corporation ("URRC") and third-party defendant Carlos Gutierrez (collectively the "URRC Parties") seeking dismissal of RamKo's counterclaims and third-party claim (the "Counterclaims") on the central purported ground that RamKo's claims are barred by New York's General Obligations Law §5-701(a)(10) (the "Statute of Frauds" or "Statute"). In the alternative, to the extent that the Court finds the current Counterclaims to be deficient in any respect, defendants request leave to amend their Counterclaims to include the supporting material that is provided herewith in the Affidavit of John Kohut ("Kohut Aff.")

The Counterclaims as pleaded allege the existence of a five-years-plus business relationship between RamKo and URRC in the course of which URRC, by its words and deeds, and by various writings which it either signed or otherwise signified fundamental agreement with, caused RamKo to perform extensive and sophisticated work on URRC's behalf, from which URRC has benefited enormously. The specific transactions and benefits are detailed in the Counterclaims so that URRC has clear notice of the nature of RamKo's claims. Now, after first replying to the Counterclaims, URRC has interposed a Statute of Frauds motion, contending that almost all the work that RamKo did was done for free because URRC didn't sign all of the agreements that it negotiated with RamKo (though as shown below, it did sign enough of them to overcome the Statute). Defendants maintain that the pleadings are more than sufficient to create fact issues that render dismissal inappropriate; but if the Court should disagree on the current state of the

pleadings, then RamKo respectfully requests leave to amend the Counterclaims to put forward significant additional documentation to further overcome the Statute of Frauds, and further demonstrate that URRC has defrauded RamKo by misappropriating its services through the artifice of having signified -- through a combination of signed writings, unobjected-to writings, and oral statements -- its agreement to compensate RamKo for its services, without having had any actual intention of doing so.

Accordingly, the Kohut Affidavit, submitted herewith, which sets forth substantial additional written admissions by the URRC Parties and written evidence supporting the Counterclaims, is presented not in opposition to the Motion to Dismiss, but in support of defendants' alternative cross-motion for leave to amend their Counterclaims, should amendment be necessary in any respect.

**COUNTER-STATEMENT OF FACTS**

**The Writings in the Counterclaims Are Sufficient to State a Claim**

The URRC Parties contend that there was no writing signed by URRC establishing RamKo's entitlement to a break-up fee in connection with the deal between URRC and Founders -- a deal reflected in a written Letter of Intent dated July 15, 2005 signed by URRC and Founders, attached as part of Exhibit B to the Counterclaims. This is the "Founders Deal" which is the transaction that RamKo alleges URRC walked away from in favor of an alternative transaction that it entered into several months ago with Coca-Cola, thereby triggering RamKo's entitlement to a break-up fee.

The URRC Parties base their claim that there is no writing to support the break-up fee on the unsigned, December 2004 iteration of the break-up fee agreement . But they conveniently ignore the fact that the January 2004 agreement between the parties (the

2

"January Agreement"), Exhibit A to the Counterclaims, contains exactly the same break-up fee agreement, and *is* signed. Thus, the short answer to the URRC Parties' central argument based on the Statute of Frauds is that if the unsigned December 2004 agreement (the "December Amendment"), which is merely a slightly amended version of the January Agreement, is unenforceable under the Statute of Frauds, notwithstanding that the URRC Parties, by their conduct, signified to RamKo and to Founders that the December Amendment was acceptable, then the parties would still be bound by the existing, *signed* January Agreement, which contains precisely the same break-up fee provision. The URRC Parties' contention that the January Agreement has no vitality is a disputed issue of fact.

The URRC Parties contend that the January Agreement has no application to the Founders Deal because the "Summary of Terms" that accompanied the January Agreement stated that it contemplated the raising of only $8 million in equity; whereas the Founders Deal and the proposed December Amendment contemplate a $15 million transaction. Accordingly, say the URRC Parties, "the financing and stock sale under consideration in mid-2005 was completely different from the capital structure and minority stock sale contemplated in January 2004." (URRC Brief. at p. 10) This is the linchpin of their argument, but it is an assertion of disputed fact, wholly unsuitable for resolution at the pleading stage. In point of fact, the URRC Parties' contention that the Founders Deal "was completely different" is flat wrong.

The Counterclaims already allege that URRC intended to raise not just $8 million, but $16 million in two tranches. (Counterclaims, ¶39: ". . . URRC's plan was to raise $8 million initially and then the second $8 million later.") If necessary at this stage, RamKo

3

can allege and conclusively support that the shift from an $8 million to a $15 million transaction represented merely a timing change, and not a fundamental change in the anticipated capital structure of URRC. As explained and documented in the Kohut Aff. submitted herewith, the parties at all times, including when the January Agreement was signed, contemplated that $15 million or more in capital would be raised. At the time the January Agreement was executed, URRC's business plan called for a two-step raising of equity capital, in two, $8 million tranches. (Kohut Aff., ¶¶ 3-4, Exs. A-B).

The January Agreement set forth the parties' agreement in the event that RamKo was in a position to raise the first $8 million. RamKo not only succeeded in accomplishing its mandate, but it found an investor (Founders) with not just the first $8 million but the second $8 million as well (scaled down slightly to a total of $15 million). This accelerated structure was fine with URRC, as evidenced by the fact that URRC signed the July 15, 2005 Letter of Intent that provided for a $15 million investment. URRC in fact had its own reasons for preferring this structure, as can be established in an amended pleading, if necessary. (*See* Kohut Aff., ¶ 5.) Thus, even though the January Agreement anticipated that a first-tranche, $8 million transaction would be effected based on RamKo's marketing efforts, that agreement certainly remained binding on URRC when RamKo succeeded in raising not just the $8 million, but all of the equity capital that URRC's contemporaneous business plan contemplated raising -- even sooner than URRC had hoped to raise it. (*See* Exhibit B to Kohut Aff.).

Much of the above has already been alleged in the current counterclaims, at Paragraphs 38 through 48. However, if more is needed, RamKo can amend the Counterclaims to refer to the URRC business plans that conclusively show that URRC

always contemplated doing the larger equity raise; that the only thing that changed in the Founders Deal was the timing; and that URRC had its own reasons for finding this accelerated timing desirable. Accordingly, the transaction reflected in the December Amendment was not materially different from the transaction contemplated by the January Agreement notwithstanding the superficial change in the nominal size of the deal; and URRC's failure to sign the December Amendment does not vitiate the January Agreement with respect to the binding nature of the break-up fee. Furthermore, additional evidence can, if need be, be supplied in an Amended Counterclaim that would show that URRC clearly acknowledged to third parties (namely Founders), in writing, the existence of its fee agreement with RamKo. (Kohut Aff., ¶¶ 8-9, Exs. C-D).

As alleged in the Counterclaims and as could scarcely be disputed even by URRC, RamKo and its principal, John Kohut, were not a couple of "finders" who stumbled into the scene in 2005. Mr. Kohut, a Bankers Trust veteran with extensive background advising early-stage companies, was URRC's trusted financial adviser who, through his company RamKo, had been working with URRC with dedication since 2001 as an integral part of its financial management team. While most of these facts are currently alleged in Paragraph 33 of the Counterclaims, RamKo could amend its Counterclaims to show that Mr. Kohut was routinely introduced to outsiders as URRC's "banker," "financial man," or even as a "Board member" (though he was not a director). (Kohut Aff., ¶¶ 10-11 and Exs. E-F.) RamKo and URRC worked shoulder to shoulder, for years, towards URRC's success, and Mr. Kohut never doubted URRC's commitments to compensate RamKo fairly for its work, until URRC stunningly reneged last year.

In light of this background, it can be understood that the only reason the December Amendment was prepared by RamKo was because RamKo, motivated by URRC's best interests, proposed to scale back its fee from the 10% contained in the January Agreement, to 5% as set forth in the December Amendment, in light of the fact that all of URRC's equity needs would now be raised in one large, single transaction. There was no change to the break-up fee provision. The only changes in the December Amendment from the January Agreement were for the benefit of URRC.

Thus, the core contention being advanced by the URRC Parties, that there is no enforceable, signed agreement respecting a break-up fee between URRC and RamKo, is false. Moreover, the sorry truth of this situation is that URRC, far from using the Statute of Frauds to protect itself from a fraudulent claim, is seeking to use that statute to perpetrate a fraud on RamKo. URRC has admitted, repeatedly and in writing, that its fee agreement with RamKo exists. As can be alleged in an amended pleading, in April 2005, URRC's CEO, Mr. Gutierrez, wrote as follows to Warren Haber, the CEO of Founders, acknowledging the RamKo fee agreement in connection with the Founders negotiations:

> The composition of the board [of directors] needs to be modified. I feel that **John Kohut [RamKo's principal] has followed the progress of URRC with interest and dedication. He knows the company, he knows Founders, he is aware of the market forces, and therefore I think that we should use his experience.** Since I have three present shareholders that need to be on the board, I would like for Founders to have three and John would be the 7[th]. After all, you have known him much longer than I.
>
> Talking about John . . . is the $375K part of **John's fee**?

See Kohut Aff., ¶ 8, Exhibit C. See also GOL § 5-701(3)(d), stating that "a note, memorandum or other writing sufficient to indicate that a contract has been made, signed by the party against whom enforcement is sought" satisfies the Statute.

For the URRC Parties to come before this Court, claiming that they don't recognize any enforceable fee agreement between John Kohut's company, RamKo, and URRC in connection with the proposed Founders' deal, is a sham. They seek to evade the responsibilities to which they contemporaneously and rightly admitted, back before there was any litigation, back before it became financially expedient for URRC and Mr. Gutierrez to reward Mr. Kohut's years of skillful work and dedication -- an extraordinary contribution that in URRC's stated opinion had earned him not only a fee but a seat on URRC's Board of Directors -- by suddenly treating him as some kind of schemer presenting a fraudulent claim based on a non-existent oral agreement. But the real fraud in this case is being perpetrated by URRC when it pretends that it had no enforceable break-up fee agreement with RamKo in connection with the Founders Deal. It signed the January Agreement; it treated the December Amendment as valid; it signed the Letter of Intent accelerating URRC's equity-raising timetable from $8 million plus $8 million to a single raise of $15 million; and it told Founders that it had a fee agreement in place with RamKo, per the above email and also in draft acquisition agreements exchanged with Founders. (Kohut Aff., ¶ 9, Ex. D). However, RamKo and Mr. Kohut respectfully submit that these additional documents, while they will be important at trial, are unnecessary at the pleading stage where the only requirement is for fair notice of the claim's nature. The existing Counterclaims expressly reference the January Agreement and attach it as Exhibit A.

**The Quantum Meruit Claims**

There are additional claims in this case, for compensation pursuant to *quantum meruit*, unjust enrichment, and fraud, not merely as alternative theories for recovery of

the break-up fee, but as grounds to recover its compensation for the abundant *additional* work that RamKo performed over the course of more than five years. This work was performed with the expectation of compensation significantly beyond the amount that URRC began paying in mid-2005 pursuant to a narrowly drawn Consulting Agreement that by its express terms paid RamKo for only a subset of its services, and only from June 1, 2005 forward. Compensation for (1) all pre-June 1, 2005 services, and (2) all post-June 1, 2005 services beyond those that are typically performed by a Chief Financial Officer (investment banking services, for example, are beyond that scope), remains owed. The URRC Parties' contention that the narrow Consulting Agreement "superseded all past agreements" (URRC Brief, p. 20) is demonstrably false based on the expressly limiting terms of that contract.

Mr. Kohut and RamKo started working with URRC in 2001 when URRC needed knowledgeable financial help but lacked the money to pay for it. URRC lacked a Chief Financial Officer who was capable of doing what was needed, and the URRC Parties asked RamKo to perform the services normally provided by a CFO, as well as assist the Company with its strategic planning and access to much-needed capital for expansion. RamKo and Mr. Kohut did all this work with the understanding that URRC did not have the money to pay RamKo on a current basis but would compensate RamKo for its work when sufficient funds became available. These facts are substantially alleged in the Counterclaims at Paragraph 49 and must be taken as true for purposes of this motion.

For approximately four years, from 2001 until June 1, 2005, RamKo provided these CFO-type services without current compensation but with the expectation of being compensated when URRC eventually had the capital to pay. The URRC Parties argue,

inaccurately, that the conditions upon which these pre-June 1, 2005 services would be paid for were embodied in a side letter to the January Agreement, referred to in the Counterclaims as the "Past Work Agreement." But the correct interpretation of the Past Work Agreement is this: the obligation to pay RamKo for its work from 2001 through early 2005 arose by operation of *quantum meruit*, and by reason of the URRC Parties' oral assurances (not subject to the Statute of Frauds) that RamKo would be paid for its work. After much of this work had been done, and in order to *protect, not create* RamKo's entitlement to be paid, the parties provided, in the Past Work Agreement, that following the closing of a private placement, RamKo would be issued certain warrants to purchase URRC stock, separate and apart from the warrants that would be part of its fee for effecting the equity infusion. The idea of the Past Work Agreement was to try to insulate RamKo's compensation for its past work from any efforts by the equity source to share in RamKo's placement fee (a move that is not uncommon in RamKo's business). It was never intended, and indeed it is illogical to imagine, that this scenario would be the only circumstance under which RamKo would be paid for its past work. The Past Work Agreement, created in 2004, is merely one reflection of RamKo's services; it has no integration clause and nowhere suggests that it is the sole source of RamKo's entitlement.

RamKo's factual allegations concerning its entitlement to *quantum meruit* can be augmented in an Amended Counterclaim if need be. RamKo served URRC in such a close capacity that RamKo's principal, John Kohut, was introduced to outsiders as URRC's financial man and even as a Board member. (*See, e.g.*, Kohut Aff., ¶ 11. Ex. F) Indeed, URRC's Business Plans, distributed to all prospective investors, consistently stated that URRC anticipated that Mr. Kohut would be appointed to URRC's Board, and

identified RamKo from 2002 through 2005 as URRC's "financial advisor" whose "professional services" URRC "regularly employs." (*See* Kohut Aff., ¶ 10, Ex. E).

Nor does the Consulting Agreement limit RamKo's entitlement to compensation. Pursuant to that contract, URRC finally began paying, on June 1, 2005, for RamKo's CFO-type services rendered after that date. But it is critical in the context of this motion to appreciate that this Consulting Agreement does not purport to address RamKo's entitlement to compensation for work performed prior to June 1, 2005; nor does it purport to address RamKo's entitlement to compensation for any investment banking services. The Consulting Agreement, in Paragraph 1, explicitly defines the "Services" that are the subject matter of the Consulting Agreement as

> services . . . commencing June 1, 2005, as a consultant and advisor, such services to be substantially similar to those performed by a principal financial officer. Such services are hereinafter referred to as the "Services."

It could not be any clearer that the "Services" that are the subject of the Consulting Agreement are only those performed "commencing June 1, 2005." The Consulting Agreement further states, in Paragraph 8(b), that "[a]ny service, other than the Services, including but not limited to investment banking services performed by Consultant for the Company, are not covered by, nor subject to the terms and provisions of this Agreement . . . ." Accordingly, any suggestion by the URRC Parties that the Consulting Agreement integration clause, which is limited to "the subject matter hereof," namely post-June 1, 2005 "Services," somehow supersedes any entitlement that RamKo has to compensation for CFO services rendered prior to June 1, 2005, or to compensation for investment banking services, is frivolous.

In addition to RamKo's four years of CFO services prior to June 1, 2005, there were investment banking services performed by RamKo, besides its role in raising equity financing for URRC. that are likewise outside the scope of the Consulting Agreement for which RamKo expected and deserves to be paid.  In 2005, at URRC's request, RamKo provided investment banking services to URRC in connection with the company's analysis and eventual acquisition of a silver recycling business called DMS.  If needed to avoid the Statute of Frauds defense raised by URRC, RamKo can amend its Counterclaims to show that it sent URRC an "Investment Banking Agreement," that URRC told RamKo that the agreement was acceptable, and that URRC accepted RamKo's full performance of the DMS assignment without ever telling RamKo that it had not signed and would not sign the Investment Banking Agreement that the parties agreed would cover the DMS deal.  Here again, URRC invokes the Statute of Frauds with the intention of perpetrating a fraud on RamKo.

* * *

The most charitable view one could take of this Motion to Dismiss is that it is fraught with contested issues of fact that would not be appropriate to resolve even on a post-discovery motion for summary judgment. *See, e.g., Shaftel v. Dadras*, 39 F.Supp.2d 217, 229 (E.D.N.Y. 1999) ("dispositive motions should be denied where issues of material fact exist with respect to whether a particular contract falls within the Statute of Frauds.")  Most certainly these numerous fact issues preclude any possibility of dismissal at the pleading stage.  But looked at more realistically. the URRC Parties' Motion to Dismiss is nothing less than an effort on the part of those parties to enlist this Court in its efforts to renege on promises that it made. orally and in writing, to RamKo and Mr.

11

Kohut over a six year period, during which they extracted valuable services for which they would prefer not to pay. Having used RamKo (1) to secure a total equity commitment from Founders which URRC then used as a springboard to making an even better deal with Coca-Cola; (2) to provide CFO-type services in exchange for promises of payment from 2001 until mid-2005; and (3) to act as its investment banker with respect to DMS; and having finally paid RamKo *only* for the CFO services it provided after June 1, 2005, the URRC Parties come before this Honorable Court seeking to evade their clear written and oral promises to compensate RamKo fairly for *all* its services. There is no basis in law or in equity for the URRC Parties to walk away so easily from six years of obligations to RamKo and Mr. Kohut.

**ARGUMENT**

**POINT ONE: The Counterclaims Satisfy the Applicable Pleading Standard**

The URRC Parties acknowledge that "[a] motion for judgment on the pleadings under Fed.R.Civ.Proc. 12(c) is governed by the same standard applicable to a motion under Federal Rule of Civil Procedure 12(b)(6)." (URRC Brief at 12). But as in *Streit v. Bushnell,* 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006), the URRC Parties' motion, "though acknowledging the proper standard, nonetheless urges an unduly constricted reading of [plaintiff's] pleadings, is premised on a flawed application of Rule 12(b)(6) juris-prudence, and rests fundamentally upon a misconception of relevant state law doctrine."

Rule 12(b)(6) jurisprudence is familiar territory and will be addressed in summary fashion. In *Conley v. Gibson,* 355 U.S. 41, 47 (1957) the Court held that Rule 8(a)(2) of the Federal Rules requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the claim

12

is . . . and the grounds upon which it rests." In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), the Court held that "[g]iven the Federal Rules simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations'" (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)). Most recently. in *Bell Atlantic Corp. v. Twombly,* 550 U.S. __ , 127 S.Ct. 1955 (2007), the Court held (in the context of a price-fixing claim) that only "plausible grounds" for the inference of price fixing need be shown at the pleading stage, "even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* §1202. at 89-90 (3d Ed. 2004):

> [P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings."

*See also Streit v. Bushnell, supra,* at 640 ("the *Swierkiewicz* Court underscored that to satisfy Rule 8(a)(2) a complaint must include only a short and plain statement of the facts designed simply to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'")

The URRC Parties will be unable to sidestep the fact issues embedded in these claims at the summary judgment stage. They certainly cannot do so on the pleadings.

**POINT TWO: The Statute of Frauds Does Not Bar RamKo's Break-Up Fee**

**A. The Break-Up Fee Is Adequately Documented**

> The Statute of Frauds, was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims. But, as

> Professor Williston observed: 'The Statute of Frauds was not enacted to
> afford persons a means of evading just obligations; nor was it intended to
> supply a cloak of immunity to hedging litigants lacking integrity; nor was
> it adopted to enable defendants to interpose the Statute as a bar to a
> contract fairly, and admittedly, made' (4 Williston, Contracts (3d ed.), s
> 567A, pp. 19-20).

*Morris Cohon & Company v. Russell,* 23 N.Y.2d 569, 574, 245 N.E.2d 712, 715, 297

N.Y.S.2d 947, 952 (1969).

In the instant case, the URRC Parties are attempting to use the Statute of Frauds

as a bar to a break-up fee that URRC agreed to, in writing, when it executed the January

Agreement. As discussed above, at the time that this Agreement was entered into, URRC

contemplated raising a total of $16 million in two tranches of $8 million each. (*See*

Counterclaims at ¶39; *see also* Kohut Aff. at ¶¶ 3-5, Exs. A-B regarding additional proof

of the $8 million + $8 million intention.) RamKo performed exactly as it undertook to

do, by producing Founders, a party ready, willing and able to provide not only the first $8

million but all of URRC's equity needs in a single round. Because RamKo felt that its

fee under the January Agreement would be too high if applied to the full $15 million that

Founders was prepared to invest, RamKo prepared an amendment to the January

Agreement that made no changes to the break-up fee, but lowered the fee that would be

paid if the Founders transaction were completed. URRC acknowledged the existence of

the fee agreement with RamKo on multiple occasions, not only to RamKo but to

Founders as well. (*See* Kohut Aff., ¶¶ 8-9, Exs. C-D).

Accordingly, there are two independent grounds for finding an enforceable

agreement respecting the break-up fee. Either the December Amendment to the January

Agreement is enforceable; or if not, then the parties remain bound by the January

Agreement.

It is well established under New York law that in cases involving multiple, related documents, not every document comprising the subject agreement need be signed. This doctrine has been applied so as to permit enforcement of unsigned amendments. *See Royal Air Maroc v. Servair, Inc.,* 603 F.Supp. 836, 841 (S.D.N.Y. 1985) (Sweet. J.):

> [Plaintiff] seeks to invalidate any extension of the Agreement by invocation of the Statute of Frauds, N.Y.Gen.Oblig.Law § 5-701(a) (McKinney) (the "Statute"). The short answer to the contention is that Amendment No. 1 satisfies the elements of the Statute. Under New York law, an integration of several documents satisfies the writing requirement of the statute where they refer to the same subject matter. together contain all the material terms. and at least one of which is signed or prepared by the party to be charged. *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 110 N.E.2d 551 (1953); *Biggle v. Harper & Row Publishers, Inc.,* 675 F.2d 107 (6th Cir.1982) (applying New York law); *Marcraft Recreation Corp. v. Frances Devlin Co.,* 506 F.Supp. 1081, 1085 (S.D.N.Y.1981); *Great Destinations, Inc. v. Transportes Aereos Portugeses S.A.R.L.,* 460 F.Supp. 1160 (S.D.N.Y.1978).

*See also Gottesman Company v. Keystone Enterprises, Inc.,* 43 A.D.3d 696, 841 N.Y.S.2d 540 (1st Dep't 2007) (acknowledgment in acquisition agreement sufficient to avoid Statute of Frauds).

In the instant case, there are more than sufficient documents acknowledged by URRC to bind it to the break-up fee. The January Agreement and the December Amendment refer to the same subject matter, namely the raising of equity for URRC. The fact that the timing of the equity raise was accelerated does not make the December Amendment a new, unrelated agreement. As has already been generally alleged, and as additional contemporaneous documents can specifically prove if the Counterclaims require amendment. URRC and RamKo had prepared a business plan in November 2003 that expressed URRC's intention to raise $16 million in equity capital in two steps. and to sell a majority stake in order to do so. The $8 million equity raise reflected in the

January 2004 Summary of Terms was to be the first step; and RamKo fully performed the January Agreement, which contained the same break-up fee as the December Amendment, by producing an investor, Founders, that was prepared to provide all that financing and then some. Thus, RamKo could have left the documentation exactly as it was and been entitled to the compensation set forth in the January Agreement. Instead, RamKo, acting in URRC's best interests, elected to submit a proposed revision to the January Agreement, the only effect of which was to trim RamKo's fee for a completed transaction (the break-up fee was left unchanged).

Additional documents that could be brought to bear in an amended Counterclaim, if necessary, confirm URRC's obligation. The email of its CEO, Mr. Gutierrez, regarding John Kohut's fee (Kohut Aff., Ex. C), reflects URRC's clear understanding that it was obligated to pay the fees reflected in the December Amendment (or alternatively in the January Agreement, as those were the only two fee agreements that he could have been referring to in that context). Similarly, the reference in the proposed acquisition documents to RamKo (Kohut Aff., Ex. D) reconfirm that URRC recognized the fee agreement. These documents are sufficient to preclude application of the Statute of Frauds. As the Appellate Division ruled in *Ladenberg Thalmann & Co., Inc. v. Tim's Amusements, Inc.*, 275 A.D.2d 243, 246-47, 712 N.Y.S.2d 526, 529 (1st Dep't, 2000):

> The note or memorandum need not be prepared or signed with the intention of evidencing the agreement, and it may come into existence subsequent to the execution of the agreement (*Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 53-54, 110 N.E.2d 551). "[I]t is enough, to meet the statute's demands, that [it was] signed with intent to authenticate the information contained therein and that such information does evidence the terms of the contract" ( id. at 54, 110 N.E.2d 551). Levine's letter to Feinberg confirms that an agreement to pay Ladenburg existed. In the letter, Levine states that he told Brian Gonick, a managing director of Ladenburg, that Ladenburg would be paid a fee.

Thus, if the Court deems the current allegations regarding the signed January Agreement and the December Amendment to be insufficient, RamKo moves to amend its Counterclaims to include, *inter alia,* allegations pertaining to URRC's admissions to Founders regarding the existence of "John [Kohut]'s fee." This is but one illustration of a broader reason why dismissal at the pleading stage would be so unwarranted in this case. Discovery has not even been taken from non-parties, notably Founders and Coca-Cola, whose files may contain further admissions of RamKo's entitlements such as the one made by URRC to Founders regarding "John's fee."

RamKo's full performance of what URRC retained RamKo to do lends further support to RamKo's claim. This is especially so since RamKo will have been defrauded by URRC (which used the Founders Deal to secure a better deal for itself), if the break-up fee is not enforced. As this Court stated in *Royal Air Maroc, supra*:

> New York has carved out a special exception to its statute of frauds which estops a party from asserting the statute as a defense under circumstances similar to the instant case:
>
> Part performance that is clear, certain and definite in object and design as to be unequivocally referable to the agreement, and which will precipitate a fraud if the agreement is not enforced, removes the action from the defense of the statute of frauds.
>
> *Marcraft Recreation Corp., supra,* 506 F.Supp. at 1085; *Rose v. Spa Realty Associates,* 42 N.Y.2d 388, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (Ct.App.1977); *Marine Midland Bank v. Quality Exterior Corp.,* 92 A.D.2d 662, 460 N.Y.S.2d 159 (3d Dep't 1983).

RamKo fully performed by producing Founders. Founders, according to its own lawsuit against URRC (Exhibit C to Counterclaims), was prepared to close on the same terms (or terms more favorable to URRC) as those set forth in the Letter of Intent to which URRC had agreed in July 2005. RamKo thus did everything that URRC asked it

to do under the January Agreement and the December Amendment: and URRC is attempting to precipitate a fraud by denying the existence of a fee agreement that it previously acknowledged. URRC is therefore estopped from asserting that it entered into no enforceable fee agreement with RamKo.

## B. RamKo's Relationship With URRC Was So Extensive That The Statute Does Not Even Apply

The Counterclaims filed by RamKo describe an extensive relationship between RamKo and URRC for over five years, during which time RamKo acted in multiple capacities, including "financial advisor," "principal financial officer," investment banker, and even *de facto* "Board member." *See* existing Counterclaims at ¶¶ 33, 49: and *see* Kohut Aff. at ¶¶ 10-11 regarding the potential augmentation of these allegations. When compensation is sought for services rendered pursuant to this kind of wide-ranging relationship, the Statute of Frauds' underlying policies are not implicated. In *Seneca Ins. Co. v. Morelli*, 1996 WL 312230, 95 Civ. 10701 (S.D.N.Y., June 10, 1996), the Court observed that

> The *Freedman* Court also warned against improper interpretation of § 5-701(10). The Court stated that the purpose of the statute is to prevent intermediaries, whose services can be performed "in the course of a few and even momentary conversations," from making false or exaggerated claims regarding their fees or commissions. *Id.* Because such claims are easily asserted but difficult to disprove, the legislature brought them within the ambit of the Statute of Frauds. *Id.* The Court cautioned that while an overly restrictive interpretation of § 5-701(10) would undermine the purpose of the legislation, it also noted that an overly broad reading of the statute would extend the writing requirement to unintended situations. *Id.* at 266-67, 401 N.Y.S.2d at 181.

> Thus, breach of contract claims by one rendering services as an employee and not merely acting as a finder or negotiator fall outside of New York's Statute of Frauds.

As was the case in *Seneca,* where the individual in question received "non-employee compensation" from the corporation but was nonetheless alleged to have been "employed to render a variety of services" that precluded reliance on the Statute, 1996 WL 312230 at *3, RamKo in this case has alleged that its status and relationship with URRC extended far beyond that of a mere "finder" or "negotiator." RamKo clearly engaged in a breadth and depth of services that went far, far beyond what the *Freedman* Court referred to as "a few and even momentary conversations" that can be typical of "finders." RamKo's work spanned years and encompassed many different roles. *See also Riley v. N.F.S. Services, Inc.,* 891 F.Supp. 972, 977 (S.D.N.Y. 1995) ("where the plaintiff's function transcends the limited role of serving as an intermediary, the Statute of Frauds does not apply"); *see also Streit v. Bushnell, supra* (quoting *Riley*).

**POINT THREE:    Recovery in Quantum Meruit and Unjust Enrichment for RamKo's Pre-June 2005 CFO Services Is Clearly Available**

The URRC Parties completely misconceive RamKo's claim for "past work" compensation when they maintain that the agreement respecting that compensation is spelled out in the Past Work Agreement. That is a distortion of what RamKo has actually alleged. RamKo's allegation is that the oral agreement to pay RamKo for the work it performed in the nature of CFO services, from 2001 through May 2005, is *reflected* in the January 2004 Past Work Agreement (Counterclaims. ¶57); but RamKo does not allege that the Past Work Agreement is the entirety of the agreement. For the same reason, the URRC Parties' allegation that the Past Work Agreement is void because it is based on "past consideration" also distorts what RamKo is alleging. The Past Work Agreement reflects RamKo's entitlement. It did not create that entitlement, nor did it supersede any

prior agreements. It merely identified how RamKo would be paid *if* a stated contingency came to pass. RamKo's fundamental right to compensation is clear:

> A plaintiff makes a successful claim for unjust enrichment in New York when he demonstrates that (1) defendant received services provided by plaintiff, (2) defendant benefited from the receipt of the services, (3) under principles of equity and good conscience, defendant should be required to pay for the services.

*Giordano v. Thomas*, 438 F.Supp.2d 35, 46 (S.D.N.Y. 2005) (citing cases).

RamKo alleges that it provided valuable CFO services to URRC for four years, from 2001 through May 2005, of mostly the same type that URRC began paying $8,500 per month to continue receiving as of June 2005. There was an oral agreement in place from the time these services commenced that RamKo would be paid fairly for these services when URRC was in a financial position to pay. That oral agreement entitles RamKo to compensation; alternatively, RamKo is entitled to recovery pursuant to the doctrines of quantum meruit and unjust enrichment.

The Past Work Agreement did not supersede this pre-existing and ongoing obligation. It was designed to protect RamKo by ensuring that payment was made for past work so that a new investor could not try to deprive RamKo of any portion of what RamKo was due, and remains due. For this reason, the cases cited by the URRC Parties for the proposition that an express contract (which URRC wrongly contends is the Past Work Agreement) precludes recovery in quasi-contract are entirely inapposite to the instant case. As the cases cited by URRC state, the express contract must "govern" the subject matter to preclude quasi-contractual recovery. The Past Work Agreement refers to the work performed prior to its execution, but does not govern it.

**POINT FOUR:  The URRC Parties' Contention that "The May 2005 Consulting Agreement Superseded All Past Agreements" Is Obviously Wrong.**

URRC blatantly misreads the May 2005 Consulting Agreement in order to arrive at its preordained conclusion that this narrow and limited contract -- which did nothing more, or less, than provide RamKo with compensation starting on June 1, 2005 with respect to a subset of RamKo's services -- erases all of the numerous other obligations that URRC incurred to RamKo over the course of more than five years.  Referring to the Consulting Agreement's integration clause, the URRC Parties assert that it superseded "all past agreements."  (URRC Brief, p. 20)  This is a complete overreach.

What the Consulting Agreement's integration clause actually says is that it "constitutes the entire agreement between the parties with respect to *the subject matter hereof* and supersedes all negotiations, prior discussions, and preliminary agreements made prior to the date hereof." (emphasis added)  Accordingly, in order to know the scope of this clause, the first order of business is to identify what the agreement is referring to as "the subject matter hereof."

The answer is simple, and explicit in the Consulting Agreement itself.  Paragraph 1 states that RamKo is to provide services

> commencing June 1, 2005, as a consultant and advisor, such services to be substantially similar to those performed by a principal financial officer. *Such services are hereinafter referred to as the "Services."* (emphasis added)

Having thus defined the Services as post-May 2005 consulting and advisory work of the type performed by a CFO, the Consulting Agreement then states, in Paragraph 8(b):

> Any service, other than the Services, including but not limited to investment banking services performed by Consultant for the Company, are not covered by, nor subject to the terms and provisions of this Agreement, and compensation for and the conditions for the performance

of such services are or shall be the subject of separate agreements
mutually agreeable to the parties thereto.

Moreover, Paragraph 8(c) provides:

It is understood and agreed between the parties hereto that this Agreement
is independent from and not conditional upon nor related to the execution
or performance by either party of any other agreement between the parties.
Neither party shall have the right to offset any claims arising from any
other agreement or action not directly resulting from the Services against
payments due hereunder.

In short, the URRC Parties' contention that the Consulting Agreement covered

everything is utterly specious.

**POINT FIVE: RamKo Is Entitled to Compensation for the DMS Deal.**

RamKo's investment banking services in respect of DMS should be fairly

remunerated, and the writings respecting those services are sufficient. The Consulting

Agreement expressly carves out "investment banking services performed by Consultant

[RamKo]" (Consulting Agreement, Par. 8(b)) and therefore expresses URRC's

recognition that such services were being provided. Importantly, this is not a situation

where a "finder" with an insubstantial relationship to the defendant is making a spurious

claim, and therefore not the kind of situation that the Statute of Frauds was enacted to

prevent. RamKo can prove the substantial work that it did, as the sampling of emails

attached as Exhibits H-L to the Kohut Aff. indicates. RamKo should be given an

opportunity, through discovery, to establish that URRC promised to compensate RamKo

for its work on this acquisition, in accordance with established industry standards for

transactions of this size and type. As stated in *Morris Cohon & Co. v. Russell, supra*:

In an action in Quantum meruit, however, for the reasonable value of
brokerage services, if it does not appear that there has been an agreement
on the rate of compensation, a sufficient memorandum need only evidence
the fact of plaintiff's employment by the defendant to render the alleged

22

services. The obligation of the defendant to pay reasonable compensation for the services is then implied.

RamKo has at least earned the opportunity to obtain admissions at depositions regarding RamKo's work and the understanding that was in place regarding it. Under New York law, "a party's admission to the essential terms and actual existence of the alleged oral contract is sufficient to take the agreement outside the scope of the Statute of Frauds." *Dzek v. Desco Vitroglaze of Schenectady,* 285 A.D.2d 926, 727 N.Y.S.2d 814 (3d Dep't, 2001).

Alternatively, RamKo may recover with respect to the DMS transaction because the Consulting Agreement's carve-out for investment banking services may properly be viewed as what the Second Circuit in *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir. 1996) has called a "Type II agreement" in which the parties agree to negotiate in good faith towards conclusion of an agreement within an agreed-upon framework:

> in Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith towards conclusion within the agreement framework.

In the Consulting Agreement, RamKo and URRC agreed that investment banking services would be the subject of separate agreements. RamKo in fact prepared a proposed agreement that URRC did not reject, and in which it acquiesced, but never quite got around to signing. (*See* Kohut Aff., ¶ 13, Ex. G.) URRC told RamKo, after informing it that the proposed agreement was acceptable, to handle an investment banking deal involving DMS. Having agreed to work with RamKo on investment banking deals; having agreed that those deals would be subject to separate agreements; and having then informed RamKo that the proposed agreement was acceptable, URRC cannot be permitted to assign investment banking responsibilities to RamKo and then

refuse to even negotiate fair compensation, without being deemed to be in violation of a "Type II" agreement, and/or without having been deemed to have defrauded RamKo.

**POINT SIX: The Fraud Claims are Adequately and Properly Pleaded**

The URRC Parties assert that RamKo's claims for fraud fail to satisfy the particularity requirements of Rule 9(b). The URRC Parties complain that RamKo "attaches Founders' complaint to the pleading" to provide the relevant details of URRC's deception of both Founders and RamKo; and they contend that RamKo "omits key details" from its allegations concerning the Coke/NTR fraud. (URRC Brief at p. 22)

The foregoing complaints are groundless. The RamKo counterclaim attaches the Founders complaint as an exhibit, and refers to Paragraphs 95-99 thereof for the who, what, when and where of the fraud committed by Mr. Gutierrez. Since these particular fraud allegations had already been presented in painstaking detail by Founders, RamKo chose to incorporate them by reference in its own pleading, and to attach the Founders complaint as an exhibit. Rule 9(b) is fully satisfied by the incorporated allegations.

There is also more than adequate detail provided in ¶¶76-77 of the Counterclaims regarding the fraud perpetrated on RamKo respecting the potential NTR/Coke deal. Contrary to the URRC Parties' contention, the Counterclaims do contain the date of the alleged misrepresentations ("early April 2006") (Counterclaims, ¶77). Since this fraud was effected by telephone and email, the "where" would not appear to be relevant; but if the Court determines otherwise, RamKo seeks leave to replead to allege where the CEO and COO of URRC were likely located when the referenced calls and emails occurred.

The contention that the fraud claim is a "dressed up" contract claim ignores the words of this Court that it is possible to "precipitate a fraud if [an] agreement is not

enforced . . . ." *Royal Air Maroc, supra,* 603 F.Supp. at 841.  Misconduct can give rise to multiple or alternative causes of action.  As alleged in the Counterclaims, Mr. Gutierrez, on behalf of URRC, made a number of representations to RamKo that were calculated to, and did, cause RamKo to expend great time and energy and to put its professional reputation on the line.  If RamKo's allegations are credited, as they must be on this motion, then the URRC Parties have misappropriated RamKo's valuable services on false pretenses and without compensation.  That is fraud.[1]

### Conclusion

The Motion to Dismiss should be denied in all respects.  In the alternative, defendants should be granted leave to amend the Counterclaims.


Dated:   New York, New York
      March 7, 2008

                                        LLOYD S. CLAREMAN
                                        LC-8385
                                        121 East 61st Street
                                        New York, New York 10065
                                        Tel. No. (212) 751-1585
                                        Fax No. (212) 838-0814
                                        lloyd.clareman@clareman.com

                                        Attorney for Defendants

---

[1] The URRC Parties' contentions regarding the proper measure of damages in a fraud case are plainly inappropriate on a motion to dismiss.  They also ignore the fair market value of RamKo's services.

25