UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED RESOURCE RECOVERY :
CORPORATION,
 :
                Plaintiff,
 :
    -against-                           Civil Action No.
 :   07-9452 (RWS)
RAMKO VENTURE MANAGEMENT, INC. and
JOHN KOHUT, :

                Defendants. :

------------------------------------------------------------:

RAMKO VENTURE MANAGEMENT, INC., :

    Counterclaim and Third-Party Plaintiff, :

    -against- :

UNITED RESOURCE RECOVERY :
CORPORATION and
CARLOS GUTIERREZ, :

    Counterclaim and Third-Party Defendants. :

------------------------------------------------------------x

## AFFIDAVIT OF JOHN KOHUT

STATE OF NEW YORK    )
                                 ) ss.:
COUNTY OF NEW YORK   )

    JOHN KOHUT, being duly sworn, deposes and says:

1. I am submitting this affidavit in connection with defendants' opposition to the motion of United Resource Recovery Corporation ("URRC") and Carlos Gutierrez (together the "URRC Parties") to dismiss the Counterclaims asserted by RamKo Venture Management, Inc. ("RamKo"), the company of which I am the principal. I am providing this affidavit specifically to provide the Court with information and exhibits demonstrating that if additional evidentiary support for any of the Counterclaims is needed, there are substantial additional, detailed factual allegations, supported by abundant evidence, that RamKo can bring to bear.

2. The reason that this additional evidence was not specifically alleged in the first instance was that I never imagined that the URRC Parties would invoke the Statute of Frauds to contend that they had never entered into agreements to compensate me for the work that I did over a period of more than five years, including (a) work on the Founders Deal, which URRC walked away from in order to pursue alternative financing and/or a different strategic investment; (b) work as URRC's financial advisor and *de facto* chief financial officer starting in 2001 and extending into 2007, for which I was only compensated starting in June 2005; and (c) investment banking work in connection with URRC's successful acquisition of DMS. All of these areas are, I believe, clearly referred to in the existing Counterclaims, but if necessary under the applicable rules of pleading, I could support RamKo's entitlements to compensation with additional facts and documents beyond those detailed in the current Counterclaims, by filing an Amended Counterclaim referencing, among other things, the facts and documents discussed below.

**The Founders Deal**

3.   I understand that the URRC Parties are contending that the $15 million size of the Founders' deal represented a completely new deal from the $8 million projected equity raise that is indicated in the Summary of Terms that accompanied the January 2, 2004 signed agreement between RamKo and URRC (the "January Agreement").. But that contention does not fairly describe what actually occurred. In fact, URRC contemplated before, during, and after the execution of the January Agreement, that it would raise approximately $16 million in equity in two tranches of $8 million each. I am attaching as Exhibit A hereto an analysis I prepared with URRC in November 2003, showing that URRC was anticipating the need to raise up to $16 million as of that time.

4.   This expectation of raising a total of $16 million was reiterated in URRC's December 2003 Executive Summary, which I assisted in preparing, the relevant excerpt of which (page 7) is attached as Exhibit B, which states that

> URRC is seeking to raise a total of $8.0 million in private placement equity financing. Subject to future licensing sales, URRC anticipates that another $8 million investment round will be necessary to fund the balance of the Company's development program.

5.   Thus, when Founders proposed a front-end investment of $15 million, this was not a radical departure from URRC's anticipated capital structure. It was merely a timing change. And it was a welcome change to URRC for a number of reasons, including the fact that URRC was contemplating the acquisition of a competitor with a plant in Polkton, North Carolina that would have required accelerated funding had it gone forward.

6. The only reason I proposed that URRC and RamKo amend their January Agreement in December was to take account of the fact that there would be a larger, front-ended transaction, and accordingly to reduce RamKo's fee as a percentage of the deal. I did not propose the December Amendment because I ever imagined that RamKo would not be protected by the January Agreement: after all, the investor that RamKo produced, Founders, was prepared to provide the initial $8 million and, in addition, the balance of URRC's equity requirements. I simply felt the percentage of the fee should be reduced.

7. I believed that URRC accepted and agreed with the December 2004 Amendment; but if URRC is now taking the position, as it appears to be doing in its motion papers, that the December Amendment is unenforceable, then I submit that the January Agreement remains in full force and effect, and that the break-up fee in the January Agreement (which is identical to the provision in the December Amendment) applies to URRC's decision to walk away from the Founders deal in favor of the alternative deal that was recently announced, that surely involved "alternative funding and/or a strategic investment."

8. There is no doubt but that URRC understood that RamKo's fee agreement with URRC was in place when the Founders deal was being negotiated in 2005 and into 2006. I am attaching as Exhibit C a letter dated April 20, 2005 that was sent as an email attachment from URRC's Carlos Gutierrez to Founders' Warren Haber, in which Mr. Gutierrez states:

> I feel that John Kohut has followed the progress of URRC with interest and dedication. He knows the company, he knows Founders, he is aware of the market forces, and therefore I think that we should use his experience. Since I have three present shareholders that need to be on the board, I would like for Founders to have three and John would be the 7th. After all, you have known him much longer than I.

>Talking about John . . . is the $375K part of John's fee?

The reference to "John's fee" is clearly a reference to the fee agreement between my company, RamKo, and URRC; and it is apparent from the above letter that, consistent with my understanding, URRC knew full well in 2005, and acknowledged to Founders at that time, that it had a fee agreement in place with RamKo.

9. There is additional written evidence of URRC's acknowledgment of its fee agreement with RamKo. I am attaching as Exhibit D an email transmitted from URRC's counsel to Founders' counsel, on which Messrs. Gutierrez and Fishbeck of URRC are copied, transmitting various acquisition documents (the relevant excerpt from which is included). The proposed agreement states, in Section 3.21, that "except for [RamKo Venture Management], no person has acted as a broker, finder, or financial advisor for the Company in connection with the negotiations relating to the transactions contemplated hereby."

**Pre-June 2005 Financial Services**

10. My relationship with URRC was long-term and I devoted large amounts of my time to servicing URRC. URRC's business plans going back to at least February 2002 identify RamKo as URRC's financial services firm. Copies of the cover pages and relevant excerpts from URRC business plans dated February 2002, November 2002, December 2003, and January 2005 are attached hereto as Exhibit E. The Consulting Agreement that I entered into with URRC took effect on June 1, 2005, and by its express terms, started to pay

RamKo for this work beginning in June 2005, but did not compensate RamKo for the substantial work that it did for URRC in the years preceding June 2005.

11. Over the years, I was often introduced to third parties as URRC's "banker," "financial man," and at times even as Board member. I am attaching as Exhibit F an email from Gerry Fishbeck, URRC's Chief Operating Officer, in which he describes me to a third party, Mitsubishi, with whom we were meeting about a potential deal, as URRC's "Board Member/Financial."

**Other Investment Banking Work (DMS)**

12. The Consulting Agreement, by its terms, excepted investment banking work, meaning that any investment banking work RamKo did for URRC would not be covered by the monthly consulting fee, which was for "CFO" type services only.

13. In early 2005, I had prepared an Investment Banking Agreement, attached hereto as Exhibit G, which I personally handed to URRC. Mr. Gutierrez read it and told me it was agreeable. However, approximately one year later, I learned that he never signed it.

14. In mid-2005, URRC asked me to perform investment banking services with respect to the potential acquisition of (or alternatively, the sale of URRC's silver business to) DMS. I performed those services, as reflected in a multitude of emails. A sampling of the emails, reflecting a small portion of my work, is attached hereto as Exhibits H through L.

15. There is a good deal more information that bears on my and RamKo's relationship and compensation arrangements with URRC, that would

take me into levels of detail that I understand would be inappropriate in the context of this affidavit. However, I wish to assure the Court that in the event the current Counterclaims are deemed to be insufficient, for any reason, there is a great deal more factual background that could be properly alleged and then proven at trial.

                                                JOHN KOHUT

Sworn to before me this
6th day of March, 2008.

_____
Notary Public

JAMES G. GIBBS
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN BRONX COUNTY
NO. 01GI5054516
MY COMMISSION EXPIRES 1-16-2010

7